DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Timothy Graulich, Esq.
Darren S. Klein, Esq.
Stephen D. Piraino, Esq.
Richard J. Steinberg, Esq.

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Case No. 23-11479 (JPM)** |
| **DIGICEL GROUP HOLDINGS LIMITED,**[1] | |
| **Debtor in a Foreign Proceeding** | **Chapter 15** |

**MOTION FOR (I) RECOGNITION OF FOREIGN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, (III) RECOGNITION OF SANCTION ORDER AND RELATED SCHEME, AND (IV) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

---

[1] The Debtor in this chapter 15 case (the "**Chapter 15 Case**"), and the Debtor's registration number, are: Digicel Group Holdings Limited (55491). The Debtor's registered office and mailing address is Clarendon House, 2 Church Street, Hamilton, HM 11, Bermuda.

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ........................................................................................ iii

RELIEF REQUESTED ................................................................................................. 5

PRELIMINARY STATEMENT .................................................................................. 8

JURISDICTION AND VENUE ................................................................................... 10

BACKGROUND ........................................................................................................... 10

   A.   Debtor's Business Operations and Preexisting Capital Structure ................................ 11

   B.   The 2020 Restructuring ............................................................................................... 16

   C.   Digicel Pacific Sale .................................................................................................... 20

   D.   Events Leading to the Scheme .................................................................................... 21

   E.   The Interim Distribution .............................................................................................. 24

   F.   The Bermuda Proceeding ............................................................................................ 24

   G.   Connections to the United States and This District ..................................................... 28

BASIS FOR RELIEF REQUESTED ........................................................................... 28

   A.   The Debtor Is Eligible for Chapter 15 Relief .............................................................. 30

       1.   The Debtor Meets Eligibility Requirements of Section 109(a) of the Bankruptcy Code .................................................................................................. 30

       2.   The Debtor Meets Eligibility Requirements of Section 1517(a) of the Bankruptcy Code .................................................................................................. 32

           i.   The Bermuda Proceeding Is a "Foreign Proceeding" ................................... 32

           ii.   The Foreign Representative Is a Proper "Foreign Representative" ............. 34

           iii.   The Petition Was Properly Filed Under Sections 1504 and 1509 and Meet the Requirements of Section 1515 and Bankruptcy Rule 1007(a)(4) .................................................................................................... 35

           iv.   The Bermuda Proceeding Is a "Foreign Main Proceeding" ........................ 36

           v.   In the 2020 Chapter 15 Order, This Court Found that the Debtor's Affiliate Has its COMI in Bermuda ............................................................. 44

       3.   In the Alternative, the Court Should Find that the Bermuda Proceeding Is a Foreign Nonmain Proceeding of the Debtor ....................................................... 45

   B.   Enforcement of the Sanction Order and Scheme and Related Relief ........................... 48

       1.   Assistance with Implementing the Scheme ........................................................ 50

       2.   Direction and Authority of Directed Parties ...................................................... 51

3.    Releases Supporting the Scheme in the United States ............................................53

4.    Injunctions Supporting the Scheme in the United States ......................................54

C.    Recognition of the Bermuda Proceeding and Enforcement of the Scheme and the
Sanction Order Is Consistent with the Goals of Chapter 15 ...........................................57

1.    Creditors and Other Parties in Interest Will Be Sufficiently Protected ................58

2.    The Relief Requested Is Not Manifestly Contrary to the Public Policy of
the United States .....................................................................................................60

3.    Enforcement of the Scheme Is Consistent with the Principles of Comity .............63

NOTICE ..............................................................................................................................................68

NO PRIOR REQUEST .......................................................................................................................68

## TABLE OF AUTHORITIES

### CASES

PAGE(S)

*In re ABC Learning Ctrs. Ltd.*,
  728 F.3d 301 (3d Cir. 2013) ............................................ 33, 60

*In re Andrade Gutierrez Engenharia S.A.*,
  No. 22-11425 (MG) (Bankr. S.D.N.Y. Dec. 2, 2022) ........................... 35, 53, 57, 63

*In re AJW Offshore, Ltd.*,
  488 B.R. 551 (Bankr. E.D.N.Y. 2013) .................................... 59

*In re Ascot Fund Ltd.*,
  603 B.R. 271 (Bankr. S.D.N.Y. 2019) ................................... 42

*In re Atlas Shipping A.S.*,
  404 B.R. 726 (Bankr. S.D.N.Y. 2009) ................................. 59, 64

*In re Avanti Commc'ns*,
  582 B.R. 603 (Bankr. S.D.N.Y. 2018) ................................. *passim*

*In re Bd. Of Dirs. of Hopewell Int'l Ins. Ltd*,
  238 B.R. 25 (Bankr. S.D.N.Y. 1999), *aff'd sub nom. In re Petition of Bd. of Dirs. of
  Hopewell Int'l Ins. Ltd.*, 275 B.R. 699 (S.D.N.Y. 2002) ................. 50, 62

*In re Bd. of Dirs. of Multicanal S.A.*,
  307 B.R. 384 (Bankr. S.D.N.Y. 2004) ................................. 65

*In re Bd. of Dirs. of Telecom Arg. S.A.*,
  2006 WL 686867 (Bankr. S.D.N.Y. Feb. 24, 2006) ................. 49, 61, 63

*In re Bd. of Dirs. of Telecom Arg., S.A.*,
  528 F.3d 162 (2d Cir. 2008) ............................................ 57, 65

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
  374 B.R. 122 (Bankr. S.D.N.Y. 2007) ................................. 36

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
  389 B.R. 325 (S.D.N.Y. 2008) ............................................ 45

*In re Berau Cap. Res. Pte Ltd.*,
  540 B.R. 80 (Bankr. S.D.N.Y. 2015) ................................. 30, 31

*Beveridge v. Vidunas (In re O'Reilly)*,
  598 B.R. 784 (Bankr. W.D. Pa. 2019) ................................. 46

*In re British Am. Ins. Co. Ltd.*,
  425 B.R. 884 (Bankr. S.D. Fla. 2010) ................................. 46

iii

*Can. S. Ry. Co. v. Gebhard*,
109 U.S. 527 (1883) ................................................. 57, 65

*In re Cell C Proprietary Ltd.*,
571 B.R. 542 (Bankr. S.D.N.Y. 2017) ................................................. 64

*In re Cenargo Int'l PLC*,
294 B.R. 571 (Bankr. S.D.N.Y. 2003) ................................................. 31

*In re Creative Fin., Ltd. (In Liquidation)*,
543 B.R. 498 (Bankr. S.D.N.Y. 2016) ................................................. 46

*CT Inv. Mgmt. Co., LLC v. Cozumel Caribe, S.A. de C.V.*,
482 B.R. 96 (Bankr. S.D.N.Y. 2012) ................................................. 59

*In re Culligan Ltd.*,
2021 WL 2787926 (Bankr. S.D.N.Y. 2021) ........................................ 34, 39, 50, 61

*In re Culmer*,
25 B.R. 621 (Bankr. S.D.N.Y 1982) ................................................. 49

*Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB*,
773 F.2d 452 (2d Cir. 1985) ................................................. 56

*Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*,
737 F.3d 238 (2d Cir. 2013) ................................................. 30

*In re E-House (China) Enterprise Holdings Limited*,
Case No. 22-11326 (JPM) (Bankr. S.D.N.Y. Nov. 15, 2022) ...........................................39, 63

*In re Fairfield Sentry Ltd.*,
714 F.3d 127 (2d Cir. 2013) ................................................. 29, 37, 46

*In re Garcia Avila*,
296 B.R. 95 (Bankr. S.D.N.Y. 2004) ................................................. 56

*In re George's Bay Limited*,
No. 20-10897 (Bankr. S.D.N.Y. May 28, 2020) ............................................. 34, 50

*In re Gerova Fin. Grp., Ltd.*,
482 B.R. 86 (Bankr. S.D.N.Y. 2012) ................................................. 37

*In re Glob. Ocean Carriers*,
251 B.R. 31 (Bankr. D. Del. 2000) ................................................. 31

*In re Grant Forest Prods., Inc.*,
440 B.R. 616 (Bankr. D. Del. 2010) ................................................. 59

*Hilton v. Guyot*,
159 U.S. 113 (1895) ................................................. 66

*In re Int'l Banking Corp. B.S.C.*,
439 B.R. 614 (Bankr. S.D.N.Y. 2010) .................................................................... 59

*In re Irish Bank Resolution Corp. (In Special Liquidation)*,
2014 Bankr. LEXIS 1990 (Bankr. D. Del. Apr. 30, 2014) ..................................... 33

*Krys v. Official Comm. of Unsecured Creditors of Refco Inc. (In re SPhinX Ltd.)*,
371 B.R. 10 (S.D.N.Y. 2007) .......................................................................... 35, 38

*In re Lloyd*,
2005 Bank. LEXIS 2794 (Bankr. S.D.N.Y. Dec. 7, 2005)..................................... 56

*In re Markel CATCo Reinsurance Fund LTD.*,
No. 21-11722 (LGB) (Bankr. S.D.N.Y. Nov. 4, 2021) ................................. *passim*

*In re Metcalfe & Mansfield Alt. Invs.*,
421 B.R. 685 (Bankr. S.D.N.Y. 2010) .......................................................... *passim*

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
458 B.R. 63 (Bankr. S.D.N.Y. 2011) ....................................................... 44, 46, 47

*In re MMG LLC*,
256 B.R. 544 (Bankr. S.D.N.Y. 2000) ................................................................. 56

*In re Modern Land (China) Co.*,
641 B.R. 768 (Bankr. S.D.N.Y. 2022)........................................................... *passim*

*In re Ocean Rig UDW Inc.*,
570 B.R. 687 (Bankr. S.D.N.Y. 2017)............................................................ 43, 67

*In re Octaviar Admin. Pty Ltd.*,
511 B.R. 361 (Bankr. S.D.N.Y. 2014) .................................................................. 31

*In re Odebrecht Engenharia e Construção S.A.*,
No. 20-12741 (MEW) (Bankr. S.D.N.Y Dec. 30, 2020).........................................35

*In re ODN I Perfurações Ltda.*,
No. 23-10557 (DSJ) (Bankr. S.D.N.Y. May 4, 2023) ................................... *passim*

*In re Oi S.A.*,
587 B.R. 253 (Bankr. S.D.N.Y. 2018) .................................................................. 54

*In re Olinda Star Ltd. (In Provisional Liquidation)*,
614 B.R. 28 (Bankr. S.D.N.Y. 2020) ....................................................... 23, 55, 66

*In re PB Life & Annuity Co.*,
No. 20-12791 (SCC) (Bankr. S.D.N.Y. Jan. 5, 2021) ..........................................34

*In re PDV Ins. Co.*,
No. 18-12216 (MEW) (Bankr. S.D.N.Y. Aug. 30, 2018) .......................................34

*In re Petition of Bd. of Dirs. of Hopewell Int'l Ins.*,
275 B.R. 699 (S.D.N.Y. 2002) .........................................................................50, 62

*In re Poymanov*,
571 B.R. 24 (Bankr. S.D.N.Y. 2017) .................................................................. 31

*In re PT Bakrie Telecom Tbk*,
628 B.R. 859 (Bankr. S.D.N.Y. 2021) ................................................................ 63

*In re Qimonda AG Bankr. Litig.*,
433 B.R. 547 (E.D. Va. 2010) ........................................................................... 59

*In re Ran*,
607 F.3d 1017 (5th Cir. 2010) ........................................................................... 46

*In re Rede Energia S.A.*,
515 B.R. 69 (Bankr. S.D.N.Y. 2014) ........................................................ 57, 62, 64

*In re Samarco Mineração S.A. – Em Recuperação Judicial*,
No. 21-10754 (LGB) (Bankr. S.D.N.Y. May 31, 2021).........................................35

*In re Serviços de Petróleo Constellation S.A.*,
600 B.R. 237 (Bankr. S.D.N.Y. 2019) ........................................................ *passim*

*In re Sino-Forest Corp.*,
501 B.R. 655 (Bankr. S.D.N.Y. 2013) ........................................................ *passim*

*In re Spencer Capital Holdings Ltd.*,
No. 20-12287 (JLG) (Bankr. S.D.N.Y. Nov. 24, 2020) .................................. 34, 50

*In re SPhinX, Ltd.*,
351 B.R. 103 (Bankr. S.D.N.Y. 2006), *aff'd sub nom. Krys v. Official Comm. of Unsecured
Creditors of Refco Inc. (In re SPhinX Ltd.)*, 371 B.R. 10 (S.D.N.Y. 2007) .............. 35, 38, 40

*In re Suntech Power Holdings Co.*,
520 B.R. 399 (Bankr. S.D.N.Y. 2014) ................................................. 37, 39, 40, 43

*In re Toft*,
453 B.R. 186 (Bankr. S.D.N.Y. 2011) ................................................................ 61

*In re Tri—Cont'l Exch.*,
349 B.R. 627 (Bankr. E.D. Cal. 2006) ................................................................ 59

*In re U.S. Steel Canada Inc.*,
571 B.R. 600 (Bankr. S.D.N.Y. 2017) ................................................................ 64

*U.S.J. - Açúcar e Álcool S.A.*,
No. 22-10320 (DSJ) (Bankr. S.D.N.Y. April 14, 2022)................................... 35, 53

*Victrix S.S. Co. v. Salen Dry Cargo A.B.*,
825 F.2d 709 (2d Cir. 1987) .................................................................... 56, 64, 65

*In re VL Assurance (Bermuda) Ltd.*,
No. 21-10682 (MG) (Bankr. S.D.N.Y. May 17, 2021) ........................................................... 34

*In re Yukos Oil Co.*,
321 B.R. 396, 401-03 (Bankr. S.D. Tex. 2005) ....................................................................... 31

PAGES(S)

## STATUTES & RULES

11 U.S.C. § 101(15) ............................................................................................................. 6

11 U.S.C. § 101(23) ................................................................................................. 19, 32, 33

11 U.S.C. § 101(24) ................................................................................................. 6, 34, 35

11 U.S.C. § 103(a) ............................................................................................................ 30

11 U.S.C. § 105(a) ............................................................................................. 5, 49, 50, 52

11 U.S.C. § 109(a) ............................................................................................... 30, 31, 32

11 U.S.C. § 1123(a)(5)(D) ............................................................................................... 49

11 U.S.C. § 1142(b) ......................................................................................................... 48

11 U.S.C. § 1501(a) ..................................................................................................... 25, 61

11 U.S.C. § 1501(a)(5) ..................................................................................................... 51

11 U.S.C. § 1502(2) ......................................................................................................... 46

11 U.S.C. § 1502(3) ......................................................................................................... 33

11 U.S.C. § 1502(4) ................................................................................................... *passim*

11 U.S.C. § 1502(5) ..................................................................................................... 5, 45

11 U.S.C. § 1504 ...................................................................................................... 5, 10, 36

11 U.S.C. § 1506 ....................................................................................................... 60, 63

11 U.S.C. § 1507 ..................................................................................................... *passim*

11 U.S.C. § 1507(a) ......................................................................................................... 52

11 U.S.C. § 1507(b) ......................................................................................................... 49

11 U.S.C. § 1507(b)(5) ..................................................................................................... 49

11 U.S.C § 1508 ......................................................................................................... 43, 44

11 U.S.C. § 1509 ......................................................................................................... 5, 10

11 U.S.C. § 1509(a) ......................................................................................................... 36

11 U.S.C. § 1510 ............................................................................................................... 6

11 U.S.C. § 1515 ..................................................................................................... *passim*

11 U.S.C. § 1515(b) ......................................................................................................... 36

PAGES(S)

11 U.S.C. §§ 1515(b)(1)–(2) ................................................................................. 36

11 U.S.C. § 1515(c) ............................................................................................... 36

11 U.S.C. § 1515(d) .............................................................................................. 36

11 U.S.C. § 1516(a) ............................................................................................... 34

11 U.S.C. § 1516(c) ............................................................................................... 37

11 U.S.C. § 1517 ..................................................................................................... 6

11 U.S.C. § 1517(a) ........................................................................................ *passim*

11 U.S.C. § 1517(a)(2) ........................................................................................... 34

11 U.S.C. § 1517(a)(3) ........................................................................................... 35

11 U.S.C. § 1517(b)(1) ..................................................................................... 19, 37

11 U.S.C. § 1517(b)(2) ........................................................................................... 45

11 U.S.C. § 1519 ..................................................................................................... 7

11 U.S.C. § 1520 .......................................................................................... 5, 29, 45

11 U.S.C. § 1520(a) ............................................................................................... 29

11 U.S.C. § 1521 ............................................................................................. *passim*

11 U.S.C. § 1521(a) ........................................................................... 5, 48, 50, 52

11 U.S.C. § 1521(a)(1) ........................................................................................... 28

11 U.S.C. § 1521(a)(7) ........................................................................................... 48

11 U.S.C. § 1521(e) ............................................................................................... 55

11 U.S.C. § 1522 ............................................................................................... 5, 59

11 U.S.C. § 1522(a) ............................................................................................... 58

11 U.S.C. § 1525(a) ........................................................................................... 5, 58

28 U.S.C. § 157 ..................................................................................................... 10

28 U.S.C. § 157(b)(2)(P) ....................................................................................... 10

28 U.S.C. § 1334 ................................................................................................... 10

28 U.S.C. § 1410 ................................................................................................... 10

Fed. R. Bankr. P. 1007(a)(4) .................................................................. 8, 30, 35, 36

Pages(s)

Fed. R. Bankr. P. 2002(b) ............................................................................................60

Fed. R. Bankr. P. 2002(q) ........................................................................................... 68

Fed. R. Bankr. P. 7007.1 ..........................................................................................8, 36

S.D.N.Y. Local Bankruptcy Rule 3020-1 .....................................................................60

PAGES(S)

OTHER AUTHORITIES

Amended Standing Order of Reference dated January 31, 2012, Reference M-431,
In re Standing Order of Reference Re: Title 11, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012)
(Preska, C.J) ................................................................................................................10

H.R. Rep. No. 109-31(1), at 109 (2005) .................................................................... 60

H.R. Rep. No. 109-31(1), at 116 (2005) .................................................................... 58

iv

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Lawrence Hickey, in his capacity as the authorized foreign representative (the "**Foreign Representative**")[2] of Digicel Group Holdings Limited ("**DGHL**" or the "**Debtor**"), which is subject to a reorganization proceeding entitled "In the Matter of Digicel Group Holdings Limited" concerning a scheme of arrangement under section 99 of the Bermuda Companies Act (the "**Scheme**") between DGHL and the Scheme Creditors (as defined below), pending before the Supreme Court of Bermuda, Civil Jurisdiction (Commercial Court) (the "**Bermuda Court**"), 2023: No. 282 (the "**Bermuda Proceeding**"), by and through the undersigned counsel, respectfully submits this motion (this "**Motion**") and represents as follows:

## RELIEF REQUESTED

1.      Pursuant to this Motion, the Foreign Representative respectfully requests, pursuant to sections 105(a), 1504, 1507, 1509, 1510, 1515, 1517, 1520, 1521, 1522, and 1525(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), entry of an order substantially in the form attached hereto as <u>Exhibit A</u> (the "**Proposed Order**" and, when as entered, the "**Order**"):

     (a)     granting recognition of the Bermuda Proceeding as a "foreign main proceeding" (as defined in section 1502(4) of the Bankruptcy Code) of the Debtor, pursuant to section 1517 of the Bankruptcy Code, all relief included therewith as provided in section 1520 of the Bankruptcy Code, and related relief under section 1521(a)[3];

---

[2] Capitalized terms used but not defined herein shall have the meanings given to such terms in the Foreign Representative Declaration (as defined below) filed contemporaneously herewith.

[3] Alternatively, should the Court decline to recognize the Bermuda Proceeding as the Debtor's foreign main proceeding, the Foreign Representative respectfully requests that the Court recognize such proceeding as a "foreign nonmain proceeding" (as defined in section 1502(5) of the Bankruptcy Code), and grant appropriate relief to the same extent such relief would be granted pursuant to section 1520(a) of the Bankruptcy Code had the proceeding been recognized as a foreign main proceeding.

(b)     finding that the Foreign Representative is the duly appointed "foreign
representative" of the Debtor within the meaning of section 101(24) of the
Bankruptcy Code and that the Foreign Representative is authorized to act
on behalf of the Debtor for purposes of the Chapter 15 Case;

(c)     entrusting the Foreign Representative with the power to administer, realize,
and distribute all assets of the Debtor within the territorial jurisdiction of
the United States;

(d)     recognizing and enforcing the Scheme (as defined below) in the United
States and giving full force and effect, and granting comity in the United
States, to the Sanction Order (as defined below), including, without
limitation, giving effect to the Releases (as defined below) set forth in the
Scheme and to allow the Foreign Representative, the Debtor, and their
respective expressly authorized representatives and agents to take actions
necessary to consummate the Scheme and transactions contemplated
thereby;

(e)     permanently enjoining all entities (as that term is defined in section
101(15) of the Bankruptcy Code) other than the Foreign Representative,
the Debtor, and their respective expressly authorized representatives and
agents from (i) commencing, continuing, or taking any action in the
United States that contravenes or would interfere with or impede the
administration, implementation, and/or consummation of the Bermuda
Proceeding, Scheme, or Sanction Order, including, without limitation, to
obtain possession of, exercise control over, or assert claims against the

6

Debtor or its property or (ii) taking any action against the Debtor or its

property located in the territorial jurisdiction of the United States to

recover or offset any debt or claims that are assigned, subrogated,

discharged, extinguished, novated, canceled, or released under the Scheme

(including as a result of the laws of Bermuda or other applicable

jurisdiction, as contemplated under the Scheme) or the Sanction Order;

(f)      authorizing and directing the Directed Parties[4] and any successor trustees

to take any and all actions necessary to give effect to the terms of the

Scheme and transactions contemplated thereby;

(g)      exculpating and releasing the Directed Parties from any liability for any

action or inaction taken in furtherance of, and/or in accordance with the

Proposed Order or the Scheme, except for any liability arising from any

action or inaction constituting gross negligence, actual fraud, or willful

misconduct as determined by the Court (as defined below); and

(h)      granting such other and further relief as the Court deems just and proper.

The relief requested in this Motion is without prejudice to any additional relief the Foreign

Representative may request.[5]

---

[4] "**Directed Parties**" means The Depository Trust Company ("**DTC**") (*i.e.*, the record holder of the global notes representing all of the Existing Notes (as defined below)), the Indenture Trustee, the Indenture Trustees' agents, attorneys, successors, and assigns.

[5] The Foreign Representative is not seeking provisional relief at this time because he is not aware of any imminent threat to the Debtor's assets located within the territorial jurisdiction of the United States or to the Bermuda Proceeding by virtue of actions in the United States. If circumstances change or the Foreign Representative becomes aware of additional facts, the Foreign Representative reserves all rights to seek provisional relief pursuant to section 1519 of the Bankruptcy Code to protect the Debtor and their assets.

2.      In support of this Motion, the Foreign Representative refers the Court to the statements contained in: (a) the *Declaration of Lawrence Hickey in Support of the Motion for (I) Recognition of Foreign Proceeding, (II) Recognition of Foreign Representative, (III) Recognition of Sanction Order and Related Scheme, and (IV) Related Relief Under Chapter 15 of the Bankruptcy Code and Additional First Day Filings* (the "**Foreign Representative Declaration**"); (b) the *Declaration of C. Christian R. Luthi in Support of the Motion for (I) Recognition of Foreign Proceeding, (II) Recognition of Foreign Representative, (III) Recognition of Sanction Order and Related Scheme, and (IV) Related Relief Under Chapter 15 of the Bankruptcy Code and Additional First Day Filings* (the "**Foreign Law Declaration**"); and (c) the *Lists Pursuant to Federal Rules of Bankruptcy Procedure 1007(a)(4) and 7007.1 and Local Rule 1007-3* (the "**Bankruptcy Disclosures**" and, together with the Foreign Representative Declaration, and the Foreign Law Declaration, the "**Supporting Documents**"), which have been filed contemporaneously herewith and are incorporated herein by reference.

## PRELIMINARY STATEMENT

3.      The Debtor is a Bermuda incorporated non-operating holding company that directly or indirectly owns other holding and operating companies, which collectively comprise the Digicel group of companies (collectively, "**Digicel**" or the "**Group**").  The Debtor is the ultimate holding company in the Group's organizational structure.

4.      Digicel is a leading integrated communications and entertainment provider that operates in 25 markets in the Caribbean and Central America.  The Debtor's main assets are (a) approximately $171 million of cash held on its balance sheet as of the date of the entry of the Convening Order and (b) entitlement to certain earn-out payments from the previous sale of its South Pacific business, as further described below.  In addition, the Debtor ultimately owns the equity in the other Group companies.

8

5.      The Scheme represents the culmination of lengthy and extensive creditor negotiations and legal proceedings in Bermuda that have overwhelming creditor support.  On May 28, 2023, the Debtor and certain of its affiliates entered into the DGHL RSA (as defined below) with creditors holding approximately 83% of the DGHL Unsecured Notes and 85% of the DGHL Subordinated Notes (each as defined below), by value—well in excess of the 75% threshold required under Bermuda law to sanction a scheme of arrangement—whereby such creditors have agreed to, among other things, support and vote in favor of the Scheme.  As described in greater detail below, the Debtor has provided all relevant parties with required notice of the commencement of the Bermuda Proceeding, the Scheme, and the deadline for voting on and objecting to the Scheme.  With the requisite levels of creditor support already obligated pursuant to the DGHL RSA to vote in favor of the Scheme, the Debtor anticipates that it will receive sufficient creditor votes at the Scheme Meeting (as defined below) on September 25, 2023, so as to obtain the Bermuda Court's sanctioning of the Scheme at the Sanction Hearing (as defined below) on October 6, 2023.

6.      The purpose of the Scheme is to effectuate the distribution of the Debtor's assets through a compromise of the Debtor's (a) unsecured notes (the "**DGHL Unsecured Notes**," as further defined and discussed below) and (b) subordinated convertible notes (the "**DGHL Subordinated Notes**" as further defined and discussed below and, together with the DGHL Unsecured Notes, the "**Existing Notes**") in exchange for New Notes (as defined below).  An order from this Court recognizing the Bermuda Proceeding and enforcing the Scheme and the Sanction Order within the territorial jurisdiction of the United States is a condition precedent to the effectiveness of the Scheme.  Entry of the Proposed Order is required to ensure that the

transactions contemplated under the Scheme, including the mission-critical restructuring of the Existing Notes, is properly effectuated and fully binding in the United States.

## JURISDICTION AND VENUE

7.      The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* M-431 dated January 31, 2012, Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012) (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).  Venue is proper in this Court pursuant to 28 U.S.C. § 1410 because the Debtor's principal assets in the United States—a bank account located in Manhattan and a retainer deposited with counsel to the Foreign Representative that is being held in a Manhattan bank account for the benefit of the Debtor—are in this District.

8.      The Foreign Representative has properly commenced the Chapter 15 Case under sections 1504 and 1509 of the Bankruptcy Code by filing the Chapter 15 Petition (as defined below) seeking recognition of the Bermuda Proceeding under section 1515 of the Bankruptcy Code.

## BACKGROUND

9.      The following is an overview of the Debtor and the Group, the indebtedness to be compromised under the Scheme, the events leading up to the Bermuda Proceeding, the origins and development of the Scheme, the filing of the Bermuda Proceeding, and the entry of the Convening Order (as defined below).  The Foreign Representative respectfully refers the Court to the Foreign Representative Declaration and the Foreign Law Declaration for additional information.

10

A.    **Debtor's Business Operations and Preexisting Capital Structure**

10.     The Debtor was incorporated in Bermuda under the Bermuda Companies Act, as an exempt company with limited liability on April 1, 2020, under the name "Digicel Group 0.5 Limited," as part of the 2020 Restructuring (as defined below). On August 4, 2020, Digicel Group 0.5 Limited changed its name to "Digicel Group Holdings Limited." The Debtor has been and remains a Bermuda registered company, where it also maintains its books and records and periodically holds in-person board meetings. The Board consists of three members and a corporate secretary—Conyers Corporate Services (Bermuda) Limited, which is domiciled in Bermuda. Moreover, the Debtor's resident representative resides in Bermuda.[6]

11.     As a non-operating holding company, the Debtor directly or indirectly owns other holding and operating companies that comprise the Group. The Debtor's main assets are (a) approximately $172.04 million of cash held on its balance sheet as of September 6, 2023 and (b) the Future DPL Sale Proceeds, as described and defined below.

12.     Digicel was founded in early 2000 by the Group's chairman and majority shareholder, Denis O'Brien (the "**Supporting Shareholder**"). Since its founding, Digicel has evolved from a pure mobile telecommunications company into a leading integrated communications and entertainment provider. This evolution has included the expansion of Digicel's product offerings through developing Digicel's business solutions services and entering the cable television and broadband businesses, which have lower penetration rates than the mobile business in Digicel's markets. Digicel focuses on improving its competitive position in each of its markets by providing customers with access to better technology, more innovative

---

[6] A resident representative is a Bermuda statutory office under the Companies Act. They are a local resident and are qualified to accept service in Bermuda on the Debtor's behalf.

products, a superior customer experience, and better value compared to Digicel's competitors. As of today, Digicel operates in 25 markets in the Caribbean and Central America.

13.    The Debtor's equity is privately held by Digicel Investments Limited ("**DIL**"), which is a holding company and non-Debtor affiliate.  DIL is indirectly owned by the Supporting Shareholder (approximately 99.4%) and Sir Julian Horn-Smith (approximately 0.06%).   The simplified corporate structure chart below indicates the current corporate and organizational structure of the Debtor and certain non-debtor affiliates.



14.    DGHL is the sole shareholder of DL, which in turn is the sole shareholder of Digicel Holdings (Bermuda) Limited ("**DHL**").  DHL is the sole shareholder of Digicel Intermediate Holdings Limited ("**DIHL**"), which in turn is the sole shareholder of Digicel International Finance Limited ("**DIFL**").  Digicel operates its businesses primarily through

DIFL's direct and indirect subsidiaries.  DL, DHL, DIHL and DIFL are subject to a separate restructuring that is not the subject of this Chapter 15 Case.

15.     As a holding company, DGHL operates exclusively in Bermuda, where it is incorporated.  Its registered office is at Clarendon House, 2 Church Street, Hamilton, HM 11, Bermuda, and its corporate secretary, Conyers Corporate Services (Bermuda) Limited.

16.     Even more, while Digicel operates throughout the Caribbean and Central America, it has a significant presence in the Bermuda marketplace.  As of March 31, 2023, Digicel occupied the number one position in the mobile telecommunications services market in Bermuda, with over 49% of the market share and it generated approximately $84 million in revenue from its Bermuda operations for the year ended March 31, 2023.[7]

17.     The Debtor's outstanding funded indebtedness as of March 31, 2023 consisted of approximately $1.2 billion in aggregate principal amount, consisting of the following instruments:[8]

    a.   <u>DGHL Unsecured Notes.</u>   On June 23, 2020, DGHL issued approximately $400 million in principal amount of 8.00% Senior Cash Pay/PIK Notes due 2025 (the "**DGHL Unsecured Notes**" and, the holders thereof, the "**DGHL Unsecured Noteholders**") issued pursuant to that certain indenture, dated as of June 23, 2020, by and among DGHL, as issuer, and Wilmington Trust National Association, as the successor trustee to Deutsche Bank Trust

---

[7] The Group's latest audited year-end financials are for the year ending March 31, 2023.

[8] The summary of the Debtor's funded indebtedness provided herein are for informational purposes only and are qualified in its entirety by the specific terms and conditions of such debt's governing documents.

Company Americas[9] (the "**Indenture Trustee**") (as amended, supplemented, or otherwise modified from time to time, the "**DGHL Unsecured Notes Indenture**").    A true and correct copy of the DGHL Unsecured Notes Indenture is attached to the Foreign Representative Declaration as **Exhibit A**. The DGHL Unsecured Notes Indenture and the DGHL Unsecured Notes are governed by, and construed in accordance with, the laws of the State of New York.  As of March 31, 2023, the aggregate principal amount outstanding of the DGHL Unsecured Notes was approximately $438 million.

    b.   DGHL Subordinated Notes.  On June 23, 2020, DGHL issued approximately $200 million principal amount of 7.00% PIK Subordinated Convertible Notes (the "**DGHL Subordinated Notes**" and, the holders thereof, the "**DGHL Subordinated Noteholders**" and, the DGHL Subordinated Notes together with the DGHL Unsecured Notes, the "**Existing Notes**" and, the holders thereof, the "**Noteholders**" or the "**Scheme Creditors**")[10] pursuant to that certain indenture, dated as of June 23, 2020, by and among DGHL, as issuer, and the Indenture Trustee, as trustee (as amended, supplemented, or otherwise modified from time to time, the "**DGHL Subordinated Notes Indenture**" and, together with the DGHL Unsecured Notes Indenture, the "**Indentures**"). A true and correct copy of the DGHL Subordinated Notes Indenture is attached to the Foreign Representative Declaration as **Exhibit B**.  The DGHL

---

[9] Wilmington Trust, National Association replaced Deutsche Bank Trust Company Americas as trustee for both the Unsecured Notes and the Subordinated Notes on April 27, 2023.

[10] For the avoidance of doubt, DL and DIFL are not Scheme Creditors, and the Supporting Shareholder is only a Scheme Creditor because he holds a *de minimis* amount of the Existing Notes (approximately $517,000 in principal amount of the Unsecured Notes and $93,000 in principal amount of the Subordinated Notes).

Subordinated Notes are unsecured, subordinated to the DGHL Unsecured Notes, and have no maturity date on which principal is scheduled to be repaid—they are perpetual securities of DGHL, unless earlier converted into DGHL equity, redeemed, or repurchased. The DGHL Subordinated Notes Indenture and the DGHL Subordinated Notes are governed by, and construed in accordance with, the laws of the State of New York. As of March 31, 2023, the aggregate principal amount outstanding of the DGHL Subordinated Notes was approximately $216 million.

c.   DGHL Intercompany Claims. In addition to the Existing Notes, DGHL owes DL and DIFL certain intercompany claims (the "**Intercompany Claims**"). The balance of these Intercompany Claims fluctuates from time to time, but immediately following the 2020 Restructuring, it was $566 million. While the Intercompany Claims will not be compromised pursuant to the Scheme, and therefore DL and DIFL are not Scheme Creditors, it will be a condition precedent to the effectiveness of the Scheme that the Intercompany Claims are compromised on a contractual basis pursuant to a settlement agreement to be entered into between the Debtor, DL, and DIFL (the "**Settlement Agreement**").

18.    The 2020 Offering Memorandum (as defined below) and the Indentures include numerous terms and provisions that provide notice to the Debtor's creditors that a restructuring of the Debtor's obligations could take place in Bermuda, under Bermuda law, and that the ability of the Debtor to repay the Existing Notes is dependent, in part, on operations and revenues derived from Bermuda. For example, the Indentures identify the Debtor as a company

incorporated in Bermuda[11] and include "the bankruptcy law of Bermuda" within the definition of Bankruptcy Law.[12] Similarly, the 2020 Offering Memorandum makes clear that the Debtor is an exempted company incorporated under the laws of Bermuda with limited liability,[13] and that, because the Debtor is incorporated in Bermuda, a potential insolvency proceeding relating to the Debtor would likely involve the bankruptcy laws of Bermuda.[14] Moreover, the 2020 Offering Memorandum highlights, throughout various risks factors, how Noteholders' rights could be affected as a result of the application of Bermuda law,[15] and how the Group generated approximately $91 million in revenue in Bermuda for the year ended March, 31, 2019.[16]

## B.      The 2020 Restructuring

19.      In the years preceding the 2020 Restructuring, Digicel saw significant reductions in voice revenues, which was largely due to the industry-wide trend of voice services being substituted by users' data usage.  At the time, revenue from other related services, such as Digicel's business solutions and cable television and broadband businesses did not grow enough to offset the decline in voice revenues.  To remain competitive, Digicel continued to expand its business solutions and cable television and broadband businesses, which required significant

---

[11] Subordinated Notes Indenture, Recitals and Global Note for Subordinated Notes; Unsecured Notes Indenture, Recital and Global Note for Unsecured Notes.

[12] *Id.* at Subordinated Notes Indenture § 1.01; Unsecured Notes Indenture § 1.01.

[13] *See* Existing Notes OM at 19 ("Digicel is an exempted company with limited liability incorporated under the laws of Bermuda on February 5, 2007 and registered with the Registrar of Companies in Bermuda under registration number 39547. Digicel's registered office is located at Clarendon House, 2 Church Street, Hamilton HM 11, Bermuda.").

[14] *See id.* at 410 (including a section entitled "Certain Insolvency Law and Local Law Limitations" which discusses how the Existing Notes may be compromised pursuant to Bermuda insolvency law); *see id.* at XI ("Consent under Bermuda's Exchange Control Act of 1972 (and its related regulations) has been granted by the Bermuda Monetary Authority for the issue and transfer of securities of Bermuda companies (other than equity securities) to and between non-residents of Bermuda for exchange control purposes").

[15] *See generally id.*, Risks Factors, at 49-88.

[16] *See id.* at 115.

capital expenditures.  As a result, Digicel found itself with unsustainable levels of indebtedness. As of September 30, 2019, the Group's total outstanding debt was approximately $7.4 billion, which included, among other things, $1 billion in aggregate principal amount of 8.250% Senior Notes due 2022 (the "**DGL1 Notes**" and, the holders thereof, the "**DGL1 Noteholders**") issued by Digicel Group One Limited ("**DGL1**"), a non-operating holding company incorporated and with its registered office in Bermuda.

20.    In an effort to achieve a comprehensive restructuring of its balance sheet, at the beginning of 2020, the Group entered into discussions with an ad hoc group (the "**2020 Ad Hoc Group**") of holders of multiple series of the Group's notes with the goal of managing the maturity of and interest expense of the Group's indebtedness, so as to optimize the use of available cash for the foreseeable future and treating all stakeholders fairly.

21.    On April 1, 2020, after extensive negotiations, Digicel and the 2020 Ad Hoc Group entered into a lockup and support agreement (as amended, restated, supplemented or otherwise modified, the "**2020 Lockup and Support Agreement**").  Under the 2020 Lockup and Support Agreement, the members of the 2020 Ad Hoc Group agreed to, among other things, tender certain of their notes in the applicable 2020 tender offers, and Digicel agreed to meet various milestones and grant the members of the 2020 Ad Hoc Group certain consent rights.

22.    Concurrent with the signing of the 2020 Lockup and Support Agreement, the Debtor announced the commencement of, among other things, an offer to exchange the existing debt of DGL1 and Digicel Group Two Limited for the new securities, including the Existing Notes (the "**2020 Exchange Offer**"), pursuant to an offering memorandum also dated April 1, 2020 (the "**2020 Offering Memorandum**"), a true and correct copy of which is attached to the Foreign Representative Declaration as **Exhibit C**.  The purpose of the 2020 Exchange Offer was

to reduce Digicel's leverage, extend its debt maturities, reduce its interest costs, and improve its liquidity position.

23.     Through the 2020 Offering Memorandum, the Debtor's creditors were also informed that if more than 75% but less than 100% of the DGL1 Noteholders consented to the 2020 DGL1 Tender Offer, then DGL1 may commence a Bermuda scheme of arrangement, as DGL1 was a Bermuda registered and incorporated company.   About 98.6% of applicable noteholders tendered their notes in the 2020 Exchange Offer.

24.     Therefore, on April 28, 2020, DGL1 commenced a reorganization proceeding (the "**2020 Bermuda Proceeding**") ultimately entitled *In the Matter of Digicel Group One Limited (Provisional Liquidators Appointed for Restructuring Purposes) and In the Matter of Section 99 of the Companies Act 1981* concerning a scheme of arrangement (under section 99 of the Bermuda Companies Act 1981) between DGL1 and the DGL1 Noteholders (the "**2020 Scheme**" and, together with the 2020 Exchange Offer, the "**2020 Restructuring**") before the Supreme Court of Bermuda, Civil Jurisdiction (Commercial Court), 2020: No. 149.

25.     Pursuant to the 2020 Scheme, the DGL1 Noteholders were issued certain new secured notes (the "**Secured Notes**") in exchange for their DGL1 Notes and,[17] as part of a larger organizational restructuring consummated through the 2020 Scheme, DGL1 transferred all of its assets and liabilities (excluding the DGL1 Notes) to DGHL "including, without limitation, all of [DGL1]'s intra-Group receivables and payables, all of [DGL1]'s equity interests in its subsidiaries, all of [DGL1]'s cash and, to the extent permitted without consent or to the extent consent is received from the relevant third party, all of [DGL1]'s trade and other payables (but

---

[17] The Secured Notes were repaid with the proceeds from the DPL Sale Proceeds (as defined below).

excluding any Third Party Liabilities (as defined in the 2020 Scheme)." *In re Digicel Group One Limited*, No. 20-11207 (SCC) (Bankr. S.D.N.Y. May 15, 2020) [ECF No. 3]. The transferred intercompany payables, as disclosed in the 2020 Scheme based on the March 31, 2020 balance sheet, amounted to approximately $692 million and have subsequently increased and decreased in the ordinary course of business resulting in the amounts described in paragraph 13 above.

26.    On May 15, 2020, DGL1's foreign representatives commenced a chapter 15 case (the "**2020 Chapter 15 Case**") in the Bankruptcy Court for the Southern District of New York (the "**2020 Court**") seeking recognition and enforcement of the 2020 Bermuda Proceeding, the 2020 Scheme and the related sanction order (the "**2020 Recognition Motion**"). The 2020 Court entered an order granting the 2020 Recognition Motion in the territorial jurisdiction of the United States on June 17, 2020 (the "**2020 Recognition Order**"). *In re Digicel Group One Limited*, No. 20-11207 (SCC) (Bankr. S.D.N.Y. June 17, 2020) [ECF No. 29]. In the 2020 Recognition Order, the 2020 Court found, among other things, that (a) the 2020 Bermuda Proceeding and its related provisional liquidation proceeding were "'foreign proceedings' within the meaning of section 101(23) of the Bankruptcy Code" and (b) "Bermuda [] is the country where [DGL1's] center of main interests is located and, as such, the Bermuda Proceedings are entitled to recognition as 'foreign main proceedings' pursuant to section 1502(4) and 1517(b)(1) of the Bankruptcy Code." For reference, the 2020 Recognition Order is attached to the Foreign Representative Declaration as **Exhibit D**.

27.    Ultimately, the 2020 Scheme was consummated on June 18, 2020, the 2020 Chapter 15 Case closed on April 20, 2021, and the Group was able to reduce its debt burden by

almost $2 billion.  *In re Digicel Group One Limited*, No. 20-11207 (SCC) (Bankr. S.D.N.Y.

April 20, 2021) [ECF No. 39].

C.    **Digicel Pacific Sale**

28.    After the 2020 Restructuring, DGHL continued to own certain

telecommunications businesses in the Caribbean, Central America, and South Pacific, the latter

of which was operated by its direct subsidiary, Digicel Pacific Limited, and certain of Digicel

Pacific Limited's subsidiaries (collectively, "**DPL**").  However, on October 24, 2021, DGHL

announced that it had entered into an agreement (the "**Telstra SPA**") to sell its equity in DPL

(the "**Pacific Sale**") to a subsidiary of the Australian telecommunications company, Telstra

Corporation Limited ("**Telstra**").  A payment of approximately $1.6 billion (the "**DPL Sale**

**Proceeds**"), before deduction for customary working capital and other adjustments, was paid to

DGHL upon closing.

29.    The DPL Sale Proceeds were used to, among other things, redeem approximately

$1.1 billion in principal and accrued interest of the Secured Notes, repay a secured debt facility

of $78 million owed by a DPL subsidiary, and fund approximately $177 million into certain

escrow accounts pursuant to the Telstra SPA (the "**Escrow Amounts**").  Part of the

consideration for the DPL Sale was to be received as earn-out payments dependent upon the

performance of DPL following closing of the Pacific Sale ("**Earn-Out Payments**").  In addition,

a portion of the Escrow Amounts may be released to DGHL at various intervals in accordance

with the Telstra SPA (the "**Escrow Release Payments**" and, together with the Earn-Out

Payments, the "**Future DPL Sale Proceeds**").  As of the filing date of this Declaration, the

Company retains an interest in the Future DPL Sale Proceeds pursuant to, and subject to the

satisfaction of certain conditions under, the Telstra SPA.

D.    **Events Leading to the Scheme**

30.    After the Pacific Sale and the repayment of the Secured Notes, Digicel shifted its focus to the upcoming March 1, 2023, maturity of Digicel Limited's $925 million principal amount of 6.750% Senior Notes (the "**DL Notes**"), and accordingly, commenced discussions with certain large holders of the DL Notes in the summer of 2022.  Shortly thereafter, Digicel began working with its legal advisers, Davis Polk & Wardwell LLP ("**Davis Polk**"), as counsel under New York law, Conyers Dill & Pearman Limited, as counsel under the laws of Bermuda, and DC Advisory LLC ("**DCA**"), as investment banker, to evaluate various strategic alternatives to address the DL Notes' upcoming maturity.

31.    In September 2022, an ad hoc group of holders of the Group's debt (the "**Crossover AHG**"), currently represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, Akin Gump Strauss Hauer & Feld LLP, Akin Gump LLP, and Greenhill & Co. LLC, engaged with DL's parent board, DGHL, to discuss a consensual refinancing of the DL Notes.  However, in the midst of such negotiations, economic and political conditions in Haiti—which at the time was Digicel's largest single market in terms of revenue—materially worsened, and in November 2022, the Debtor announced that it "estimate[d] the financial impact [of the unrest] on Digicel Haiti in H2 FY23 (the six-month period ended March 31, 2023) would be significant.  On a reported basis, assuming recent trends, Digicel estimated that as of March 31, 2023 that its Adjusted EBITDA in Haiti would be in the region of US$25-35 million compared to US$74 million in the prior half year."[18]  The actual results for the period were in line with that forecast, and as a result the Group saw a significant reduction to the free cash flow it relied on to service

---

[18] *Digicel Provides Update on Trading Conditions in Haiti: H2 FY23 results for Digicel Haiti will be significantly impacted*, November 10, 2022. See Foreign Rep. Decl., **Exhibit E**.

the Group's debt. Consequently, the Group decided that a refinancing transaction that dealt only with DL's indebtedness would be insufficient, and a comprehensive restructuring of the Group's capital structure would be necessary for the long-term benefit of its various stakeholders and for the Group's financial and operational sustainability.

32.    In addition to engaging with the Crossover AHG, in January 2023, Digicel began engaging with an (a) ad hoc group of creditors represented by Paul Hastings, LLP and Evercore Group L.L.C. (the "**DIFL AHG**") and (b) ad hoc group of represented by Weil, Gotshal & Manges LLP (the "**DGHL AHG**" and, together with the Crossover AHG and the DIFL AHG, collectively, the "**AHGs**"). The DIFL AHG members hold primarily secured debt issued by DIFL, and the DGHL AHG members hold primarily the Existing Notes.

33.    In addition to negotiating against the backdrop of the March 1, 2023 DL Notes' maturity date and the Group's ongoing liquidity concerns, creditors—most acutely the DGHL AHG—became increasingly concerned about how the Group would utilize the approximately $313.9 million of cash held by DGHL as of March 10, 2023 (the "**DGHL Cash**"). This cash was necessary to fund the Group's operations and debt service payments before a restructuring or refinancing of its existing indebtedness could be consummated, but it was also an important source of value for the Debtor's creditors.

34.    On March 10, 2023, a member of the DGHL AHG (the "**Bermuda Petitioner**") presented a petition against the Debtor in order for it to apply for the appointment of joint provisional liquidators (the "**JPLs**") to the Debtor for restructuring purposes (the "**JPL Summons**"). The Debtor opposed the JPL Summons, as did the Crossover AHG. In the period between the issuing of the JPL summons and its hearing, the Debtor continued to negotiate with

its various stakeholders, including the DGHL AHG, the Crossover AHG and the Supporting Shareholder.

35.    On May 28, 2023, the Debtor, the Crossover AHG, the DGHL AHG, and the Supporting Shareholder entered into that certain Restructuring Support Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "**DGHL RSA**" and, the parties thereto, the "**DGHL RSA Parties**").[19]  On May 29, 2023, the Debtor issued a press release announcing entry into the DGHL RSA (the "**DGHL RSA Press Release**"), a true and correct copy of which is attached to the Foreign Representative Declaration as **Exhibit F**. Pursuant to the DGHL RSA, the Bermuda Petitioner withdrew the JPL Summons and the DGHL RSA Parties agreed to consummate the restructuring transactions contemplated first by the DGHL RSA and now the Scheme, as further described below.

36.    In sum, the negotiations with the AHGs were complex and heavily negotiated. They involved trying to balance the Group's interests with those of creditors with claims that varied in their level of structural and contractual priority, guarantees, and collateral packages. The comprehensive restructuring that the Group has negotiated in the RSAs represents a compromise between five different constituencies—the Crossover AHG, the DIFL AHG, the DGHL AHG, Digicel and the Supporting Shareholder—and with respect to over $4.4 billion of funded indebtedness.  In this context, it should be noted that the Scheme and its attendant restructuring transactions represent only a portion of the Group's comprehensive financial restructuring.

---

[19] The DGHL RSA contemplates that certain restructuring support agreement, dated as of June 27, 2023, entered into by and among DL, DHL, DIHL, DIFL, DIFL US Finance LLC, the Supporting Lenders (as defined therein) and the Supporting Shareholder (as amended, restated, supplemented or otherwise modified, the "**DL/DIFL RSA**" and, together with the DGHL RSA, the "**RSAs**").

E.      **The Interim Distribution**

37.      As part of the DGHL RSA, the DGHL RSA Parties also agreed that they would use reasonable best efforts to seek a validation order from the Bermuda Court approving an interim distribution of the DGHL Cash to (a) DIFL and DL in an amount equal to $76.5 million (the "**DIFL/DL Interim Distribution**") and (b) DGHL Unsecured Noteholders in an amount equal to $113.5 million (the "**DGHL Unsecured Notes Interim Distribution**" and, together with the DIFL/DL Interim Distribution, the "**Interim Distribution**").  The Interim Distribution was validated by the Bermuda Court pursuant to a validation order entered on June 16, 2023.  No validation order was sought in relation to the DGHL Subordinated Notes.

38.      On June 20, 2023, DGHL consummated the DIFL/DL Interim Distribution and made a payment to DIFL of $76.5 million on account of the Intercompany Claims.

39.      On August 18, 2023, DGHL consummated the DGHL Unsecured Notes Interim Distribution, pursuant to which $113.5 million of principal amount of the DGHL Unsecured Notes was paid.

40.      The Interim Distribution was made in contemplation of the Scheme and the execution of the Settlement Agreement.  Therefore, the consideration the Debtor proposes to make in respect of the Scheme and the Settlement Agreement each reflects the fact that holders of the DGHL Unsecured Notes and the Intercompany Claims received (in advance of the sanction of the Scheme and entry into the Settlement Agreement) a payment towards a purported discharge of their respective claims against the Debtor pursuant to the Interim Distribution.

F.      **The Bermuda Proceeding**

41.      On July 20, 2023, the Board duly adopted a resolution (the "**Resolution**"), a true and correct copy of which is attached to the Foreign Representative Declaration as **Exhibit G**,

which, among other things, permits the Debtor to propose (a) the Scheme, (b) appoint me as the Foreign Representative, and (c) commence this Chapter 15 Case.

42.     On July 24, 2023, the Debtor commenced the Bermuda Proceeding by issuing a practice statement letter (the "**Practice Statement Letter**") in accordance with Bermuda Court Circular N.18 of 2007 to the Scheme Creditors announcing that it was going to propose a scheme of arrangement under the Bermuda Companies Act, a true and correct copy of which is attached to the Foreign Representative Declaration as <u>**Exhibit H**</u>.   The same day, the Practice Statement Letter was (a) sent by the Debtor's information agent, Epiq Corporate Restructuring LLC ("**Epiq**"), to (i) DTC via email, (ii) the banks and brokerage firms holding the Existing Notes through DTC (the "**DTC Participants**") via email, and (iii) DTC and the DTC Participants via hard copy and with sufficient copies and instructions to forward such documents to the Noteholders, and (b) posted on the Debtor's scheme website, which is accessible to all Scheme Creditors at https://dm.epiq11.com/digicelgroup (the "**Scheme Website**").   Scheme Creditors may obtain access to the Scheme Website by emailing tabulation@epiqglobal.com, with reference to "Digicel Group Holdings Limited" in the subject line.   Scheme Creditors must provide proof of their holdings of the Existing Notes to receive access to the Scheme Website. Once access is obtained, Scheme Creditors may download documents relating to the Scheme from the Scheme Website.

43.     On August 18, 2023, the Debtor issued an originating summons to the Bermuda Court, a true and correct copy of which is attached to the Foreign Representative Declaration as <u>**Exhibit I**</u>, seeking, among other things, entry of an order directing the Debtor to convene meetings of the Scheme Creditors to, among other things, vote on the Scheme (the "**Scheme Meetings**").

44.     On August 22, 2023, a substantially finalized explanatory statement (the "**Explanatory Statement**") was submitted to the Bermuda Court along with other evidence. The Explanatory Statement includes a copy of the Scheme in Part F thereof.

45.     A hearing before the Bermuda Court was held on August 25, 2023, following which the Bermuda Court issued an order (a) to convene the Scheme Meetings and (b) that appoints me as the Debtor's Foreign Representative, a true and correct copy of which is attached to the Foreign Representative Declaration as **Exhibit J** (the "**Convening Order**").  Convening Order ¶¶ 1, 17.  The Scheme Meetings will be held consecutively on September 25, 2023, or such later date as the Debtor may decide, but not more than three months from the date of the Convening Order.  Convening Order ¶ 3.

46.     On August 28, 2023, and in accordance with the Convening Order, Epiq, in its capacity as the Debtor's information agent, sent a notice, a true and correct copy of which is attached to the Foreign Representative Declaration as **Exhibit K** (the "**Scheme Meetings Notice**"), to the Scheme Creditors (a) notifying them of the Scheme Meetings and (b) delivering the final version of the Explanatory Statement through (i) the DTC Participants, with sufficient copies and instructions to forward such documents to the Noteholders, and (ii) publication of the Scheme Meetings Notice and the Explanatory Statement on the Scheme Website.  A true and correct copy of the Explanatory Statement sent to Scheme Creditors is attached to the Foreign Representative Declaration as **Exhibit L**. The provisions of the Convening Order ensure that the Scheme Creditors will be properly notified of the Scheme Meetings and will have the opportunity to raise questions and objections to the Scheme at the Scheme Meetings and/or at a hearing before the Bermuda Court seeking sanction and approval of the Scheme expected to be held on or about October 6, 2023 (the "**Sanction Hearing**").

26

47.    All Scheme Creditors will have the opportunity to attend, be heard and vote at the Scheme Meetings, subject to compliance with the applicable procedures specified in the Convening Order, in person, by an authorized representative (if a corporate entity), or by proxy and to ask questions regarding the proposed Scheme.  Foreign Law Decl. ¶ 50.  The provisions of the Convening Order specify that the Scheme Meetings will be chaired by John Bosacco, a managing director at DCA.  Convening Order ¶ 11.

48.    At the Scheme Meetings, a vote will be held to determine whether the Scheme Creditors that are present and voting in person or by proxy approve the Scheme by a greater than 50% majority in number representing at least 75% in value of the Scheme Creditors present and voting.  If the Scheme Creditors do not approve the Scheme by the requisite majorities described in the foregoing sentence, the Scheme cannot be sanctioned by the Bermuda Court and will not take effect.  Foreign Law Decl. ¶ 51.

49.    If the Scheme is approved at the Scheme Meetings, the Sanction Hearing is expected to be held on or about October 6, 2023.  The Scheme Creditors and any other creditors of the Debtor will have an opportunity to be heard and raise objections at the Sanction Hearing.

50.    Assuming the Bermuda Court deems it appropriate to enter an order sanctioning the Scheme following the Sanction Hearing (the "**Sanction Order**"), the Sanction Order is expected, among other things, to (a) sanction and approve consummation of the Scheme and the transactions contemplated therein (the "**Restructuring Transactions**") and (b) authorize and effectuate the Releases (as defined below) set forth in the Scheme.  Foreign Law Decl. ¶ 52. Upon delivery of the Sanction Order to the Bermuda Registrar of Companies and satisfaction of the Scheme's other conditions precedent, including entry of a chapter 15 recognition order pursuant to this Chapter 15 Case, the Scheme will become effective and thereby binding on all

Scheme Creditors.  *Id.*  Accordingly, DGHL and the Scheme Creditors intend to consummate the Restructuring Transactions shortly after the Sanction Order and an order of this court (this "**Court**") recognizing and enforcing the Scheme under chapter 15 of the Bankruptcy Code are entered.

## G.   Connections to the United States and This District

51.   The Debtor has property in the United States, including in this jurisdiction. Foreign Rep. Decl. ¶ 58.  First, the Debtor has a bank account with JPMorgan Chase Bank N.A., which is located in the Borough of Manhattan in the City of New York (the "**U.S. Bank Account**").  *Id.*  Second, the Debtor has an interest in cash held by Davis Polk as a retainer for Davis Polk's services in connection with the Bermuda Proceeding and the Chapter 15 Case, again in a bank account located in Manhattan, New York (the "**U.S. Retainer Account**" and, together with the U.S. Bank Account, the "**New York Bank Accounts**").  *Id.*  Additionally, the Indentures are governed by New York law and contain provisions submitting the Debtor to the jurisdiction of any New York state or United States federal court sitting in the Borough of Manhattan in the City of New York.  *Id.* at ¶ 59.

## BASIS FOR RELIEF REQUESTED

52.   The Court should grant the Motion and recognize the Bermuda Proceeding as the foreign main proceeding for the Debtor.  Chapter 15 of the Bankruptcy Code is designed to, among other things, protect and maximize the value of a foreign debtor's assets and assist foreign representatives—such as the Foreign Representative—in the performance of their duties. In short, the central goal of chapter 15 is to "provide effective mechanisms for dealing with cases of cross-border insolvency while promoting international cooperation, legal certainty, fair and efficient administration of cross-border insolvencies, protection and maximization of debtors' assets, and the rescue of financially troubled businesses."  *In re Fairfield Sentry Ltd.*, 714 F.3d

127, 132 (2d Cir. 2013) (citing 11 U.S.C. § 1501(a)) (internal quotation marks omitted).

Consistent with these principles, the Foreign Representative commenced the Chapter 15 Case to

obtain recognition of the Bermuda Proceeding and recognition and enforcement of the Sanction

Order and Scheme within the territorial jurisdiction of the United States.

53.     As set forth below, each of the procedural requirements for recognition under

section 1515 of the Bankruptcy Code has been satisfied.  The Foreign Representative is the duly

appointed "foreign representative" of the Bermuda Proceeding with respect to the Debtor, and it

is well-established that Bermuda schemes of arrangement proceedings are considered "foreign

proceedings" for the purposes of chapter 15.  *Infra* ¶ 107.  Further, the Debtor's COMI (as

defined below) is in Bermuda—its registered office is in Bermuda, it is organized under the laws

of Bermuda, and its restructuring activities are centralized in Bermuda.  Foreign Rep. Decl. ¶ 11.

54.     In the alternative, although the Foreign Representative is confident that the

Bermuda Proceeding constitutes a foreign main proceeding with respect to each Debtor within

the definition set forth in section 1502(4) of the Bankruptcy Code, the Foreign Representative

also seeks recognition of the Bermuda Proceeding as a foreign nonmain proceeding with respect

to the Debtor, if the Court determines that there is not sufficient basis to recognize the Bermuda

Proceeding as a foreign main proceeding.  In such event, for the reasons set out below, the

Debtor is eligible for nonmain recognition and related relief, including the imposition of a stay in

accordance with sections 1521(a)(1) and (2) of the Bankruptcy Code, to the same extent such

stay would be granted under section 1520(a) of the Bankruptcy Code, to ensure a comprehensive

restructuring.

55.     For the reasons set forth below and in the Supporting Documents, the relief

sought herein is appropriate under chapter 15.

A.    **The Debtor Is Eligible for Chapter 15 Relief**

56.    To be eligible for chapter 15 relief, the Debtor must meet the general eligibility requirements under section 109(a) of the Bankruptcy Code as well as the more specific eligibility requirements under section 1517(a) of the Bankruptcy Code.    In addition, the petition for recognition must meet the requirements of section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4).    The Debtor meet all such eligibility requirements.

1.    *The Debtor Meets Eligibility Requirements of Section 109(a) of the Bankruptcy Code*

57.    Section 103(a) of the Bankruptcy Code provides that chapter 1, which includes section 109(a), "appl[ies] in a case under chapter 15."  11 U.S.C. § 103(a).  Thus, the Debtor must meet the eligibility requirements of section 109(a) of the Bankruptcy Code to obtain relief under chapter 15.  Section 109(a) of the Bankruptcy Code provides that "[n]otwithstanding any other provision of this section, only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under this title."  11 U.S.C. § 109(a).  Under section 109(a), a foreign debtor must reside or have a domicile, a place of business, or property in the United States to be eligible to file a chapter 15 petition.  *See Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238 (2d Cir. 2013).

58.    Section 109(a) of the Bankruptcy Code does not require a specific amount or dollar value of property in the United States, nor does it indicate when or for how long such property must have a U.S. situs.  *See, e.g.*, *In re Berau Cap. Res. Pte Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015).  Courts have accordingly held that attorney retainers deposited in New York satisfy the "property in the United States" eligibility requirement of section 109(a) of the Bankruptcy Code.  *See, e.g.*, *In re Poymanov*, 571 B.R. 24, 30 (Bankr. S.D.N.Y. 2017) ("A

debtor's funds held in a retainer account in the possession of counsel to a foreign representative constitute property of the debtor in the United States and satisfy the eligibility requirements of section 109(a)."); *In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 372–374 (Bankr. S.D.N.Y. 2014) (noting the "line of authority that supports the fact that prepetition deposits or retainers can supply 'property' sufficient to make a foreign debtor eligible to file in the United States" and holding that cash in a client trust account maintained by U.S. counsel to the foreign representative satisfied section 109(a) (citing *In re Cenargo Int'l PLC*, 294 B.R. 571, 603 (Bankr. S.D.N.Y. 2003)); *In re Yukos Oil Co.*, 321 B.R. 396, 401–03 (Bankr. S.D. Tex. 2005); *In re Glob. Ocean Carriers*, 251 B.R. 31, 39 (Bankr. D. Del. 2000)).

59.     Additionally, courts in this district have found that contracts (*e.g.*, indentures) governed by New York law or contracts containing provisions submitting parties to the jurisdiction of New York state and federal courts give rise to property rights supporting debtor eligibility under section 109(a) of the Bankruptcy Code.  *See, e.g.*, *In re Avanti Commc'ns*, 582 B.R. 603, 610–611 (Bankr. S.D.N.Y. 2018) (holding that the debtor's indenture "is governed by New York law, which separately satisfies the 'property in the United States' requirement for eligibility to file a chapter 15 case under section 109(a) of the Bankruptcy Code."); *Berau*, 540 B.R. at 83–84 ("The Court concludes that the presence of the New York choice of law and forum selection clauses in the Berau indenture satisfies the section 109(a) 'property in the United States' eligibility requirement.").

60.     Here, the Debtor satisfies the eligibility requirement of section 109(a) because the Debtor has property in the United States, in this jurisdiction.  Specifically, the Debtor holds approximately $172.04 million in its U.S. Bank Account and has an interest in certain funds deposited with its U.S. counsel, Davis Polk, as a retainer for its services in connection with the

Bermuda Proceeding and the Chapter 15 Case, which funds are held in a client trust account in the Borough of Manhattan in the City of New York, New York. Foreign Rep. Decl. ¶ 58. Additionally, the Indentures are governed by New York law and contain provisions submitting the parties to the jurisdiction of New York state and federal courts. *Id.* at ¶ 59.

61.     Accordingly, the Debtor meets the eligibility requirements of section 109(a) of the Bankruptcy Code.

### 2.     *The Debtor Meets Eligibility Requirements of Section 1517(a) of the Bankruptcy Code*

62.     Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, "an order recognizing a foreign proceeding shall be entered if . . . (1) such foreign proceeding for which recognition is sought is a foreign main proceeding . . . within the meaning of section 1502; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of section 1515." 11 U.S.C. § 1517(a). Each of those requirements has been satisfied for the reasons set forth below.

### i.     *The Bermuda Proceeding Is a "Foreign Proceeding"*

63.     The Bermuda Proceeding satisfies the general definition of "foreign proceeding" as set forth in section 101(23) of the Bankruptcy Code. Section 101(23) requires that a "foreign proceeding" be: (a) a collective judicial or administrative proceeding relating to insolvency or adjustment of debt; (b) pending in a foreign country; (c) under the supervision of a foreign court; and (d) for the purpose of reorganizing or liquidating the assets and affairs of the debtor. *See* 11 U.S.C. § 101(23); *see also In re ABC Learning Ctrs. Ltd.*, 728 F.3d 301, 308 (3d Cir. 2013); *In re Irish Bank Resolution Corp. (In Special Liquidation)*, 2014 Bankr. LEXIS 1990, *39-40 (Bankr. D. Del. Apr. 30, 2014). The Bankruptcy Code defines "foreign court" as a "judicial or other authority competent to control or supervise a foreign proceeding." 11 U.S.C. § 1502(3).

64.     *First*, the Bermuda Proceeding is a collective judicial proceeding relating to insolvency or adjustment of debt.  Foreign Law Decl. ¶ 22.  On July 24, 2023, the Debtor commenced the Bermuda Proceeding in the Bermuda Court, which court has exclusive jurisdiction over matters relating to the claims being restructured.  *Id.* at ¶ 45.  Moreover, the Bermuda Proceeding is "collective" in that it administers the claims of all creditors whose claims are being restructured in a single proceeding.  *Id.* at ¶ 22.

65.     *Second*, the Bermuda Proceeding is pending in a foreign country—Bermuda— under a law relating to insolvency, the Bermuda Companies Act (the "**Companies Act**").  *Id.* at ¶ 4.

66.     *Third*, through the Bermuda Proceeding, the Debtor's actions vis-à-vis the Restructuring, are subject to the supervision of the Bermuda Court.  *Id.* at ¶ 63.

67.     *Fourth*, the Bermuda Proceeding is for the purpose of restructuring the Existing Notes. Foreign Rep. Decl. ¶ 47.  The Bermuda Proceeding is intended to, among other things, protect the Debtor so that they may continue to pursue an orderly restructuring pursuant to the Scheme.

68.     Furthermore, it is well established by this Court that Bermuda schemes of arrangement under the Companies Act (and Bermuda provisional liquidations) constitute "foreign proceedings."  *See, e.g.*, *In re Markel CATCo Reinsurance Fund LTD.*, No. 21-11733 (LGB) (Bankr. S.D.N.Y. Nov. 4, 2021) [ECF No. 23] (recognizing a Bermuda scheme of arrangement); *In re Digicel Group One Ltd.*, No. 20-11207 (SCC) (Bankr. S.D.N.Y. June 15, 2020) [ECF No. 29] (same).[20]

---

[20] It is similarly well established by this Court that other Bermuda restructuring proceedings constitute "foreign proceedings."  *See, e.g.*, *In re Culligan Ltd.*, No. 20-12192 (JLG) (Bankr. S.D.N.Y. July 15, 2021) [ECF No. 60] (....continued)

### ii.        *The Foreign Representative Is a Proper "Foreign Representative"*

69.      The Foreign Representative is the proper "foreign representative" of Debtor, thereby satisfying sections 101(24) and 1517(a)(2) of the Bankruptcy Code.  Section 101(24) of the Bankruptcy Code provides that a foreign representative be a person authorized "to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24).  Moreover, Bankruptcy Code section 1516(a) provides that a bankruptcy court may presume that the person petitioning for chapter 15 recognition is a foreign representative if the decision or certificate from the foreign court indicates. *See id.* § 1516(a).

70.      Here, the Foreign Representative is an individual who has been duly appointed by the Debtor's board of directors, pursuant to the relevant corporate laws, as their foreign representative in accordance with section 101(24) of the Bankruptcy Code and to commence the Chapter 15 Case.  *See* Authorizing Resolution.  Moreover, under the Convening Order, the Foreign Representative was authorized by the Bermuda Court to act as the Debtor's foreign representative and to seek relief under chapter 15 of the Bankruptcy Code.  Convening Order ¶ 17-18.

71.      Courts in this district routinely recognize the appointment of foreign representatives in similar manners as acceptable for the purposes of commencing chapter 15 cases. *See, e.g.*, *In re ODN I Perfurações Ltda.*, No. 23-10557 (DSJ) (Bankr. S.D.N.Y. May 4,

---

(recognizing Bermuda liquidation proceedings as "foreign proceedings"); *In re VL Assurance (Bermuda) Ltd.*, No. 21-10682 (MG) (Bankr. S.D.N.Y. May 17, 2021) [ECF No. 13] (same); *In re PB Life & Annuity Co.*, No. 20-12791 (SCC) (Bankr. S.D.N.Y. Jan. 5, 2021) [ECF No. 33] (recognizing Bermuda provisional liquidation); *In re George's Bay Limited*, No. 20-10897 (Bankr. S.D.N.Y. May 28, 2020) [ECF No. 23] (recognizing Bermuda liquidation proceeding); *In re Spencer Capital Holdings Ltd.*, No. 20-12287 (JLG) (Bankr. S.D.N.Y. Nov. 24, 2020) [ECF No. 16] (recognizing Bermuda provisional liquidation); *In re PDV Ins. Co.*, No. 18-12216 (MEW) (Bankr. S.D.N.Y. Aug. 30, 2018) [ECF No. 11] (same).

2023) [ECF No. 24] (finding that a person appointed by each of the chapter 15 debtors' board of directors or shareholders, as applicable, was the duly appointed foreign representative within the meaning of section 101(24) of the Bankruptcy Code); *In re Andrade Gutierrez Engenharia S.A.*, No. 22-11425 (MG) (Bankr. S.D.N.Y. Dec. 2, 2022) [ECF No. 40] (same); *U.S.J. - Açúcar e Álcool S.A.*, No. 22-10320 (DSJ) (Bankr. S.D.N.Y. April 14, 2022) [ECF No. 21] (same); *In re Samarco Mineração S.A. – Em Recuperação Judical*, No. 21-10754 (LGB) (Bankr. S.D.N.Y. May 31, 2021) [ECF No. 22] (same); *In re Odebrecht Engenharia e Construção S.A.*, No. 20-12741 (MEW) (Bankr. S.D.N.Y. Dec. 30, 2020) [ECF No. 15] (same); *In re Digicel* [ECF No. 29] (finding that a foreign representative appointed by (a) the debtor's board of directors and (b) Bermuda court order was the duly appointed foreign representative); *In re SPhinX, Ltd.*, 351 B.R. 103, 116–17 (Bankr. S.D.N.Y. 2006), *aff'd sub nom. Krys v. Official Comm. of Unsecured Creditors of Refco Inc. (In re SPhinX Ltd.)*, 371 B.R. 10 (S.D.N.Y. 2007) (holding that section 101(24) of Bankruptcy Code was satisfied where foreign representatives submitted a "copy of the Cayman Court's order appointing them to administer the [d]ebtors' winding up under [Cayman law] and authorizing their commencement of these chapter 15 cases").

### iii. *The Petition Was Properly Filed Under Sections 1504 and 1509 and Meet the Requirements of Section 1515 and Bankruptcy Rule 1007(a)(4)*

72. The third and final requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the petition for recognition meets the procedural requirements of section 1515 of the Bankruptcy Code. *See* 11 U.S.C. § 1517(a)(3). Here, all of those procedural requirements are satisfied.

73. *First*, the Foreign Representative duly and properly commenced the Chapter 15 Case in accordance with sections 1504 and 1509(a) of the Bankruptcy Code by filing the *Official Form 401 Petition* (collectively, the "**Petition**") with all the documents and information required

by section 1515(b) and (c).  *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 127 (Bankr. S.D.N.Y. 2007) ("A case under chapter 15 is commenced by a foreign representative filing a petition for recognition of a foreign proceeding under section 1515 of the Bankruptcy Code.").

74.    *Second*, in accordance with section 1515(b)(1)–(2) and (d) of the Bankruptcy Code, the Foreign Representative has submitted evidence of the existence of the Bermuda Proceeding and the appointment of the Foreign Representative as foreign representative thereof. *See* Convening Order; Authorizing Resolution.

75.    *Third*, in accordance with section 1515(c) of the Bankruptcy Code, the Bankruptcy Disclosures filed contemporaneously herewith contain a statement that the Bermuda Proceeding is the only foreign proceeding currently pending with respect to the Debtor.

76.    *Fourth*, with the filing of the Bankruptcy Disclosures contemporaneously herewith, the Foreign Representative has also satisfied the additional filing requirements set forth in Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"): (a) corporate ownership statements containing the information described in Bankruptcy Rule 7007.1; and (b) lists containing the names and addresses of all persons or bodies authorized to administer the foreign proceedings of the Debtor and all parties to litigation pending in the United States in which the Debtor is a party at the time of the filing of the Petition.

### iv.    The Bermuda Proceeding Is a "Foreign Main Proceeding"

77.    **COMI**.  The Bermuda Proceeding is a "foreign main proceeding" as defined by Bankruptcy Code section 1502(4).  A "foreign main proceeding" is a "foreign proceeding pending in the country where the debtor has the center of its main interests," or "**COMI**."  11 U.S.C. § 1502(4); *see also id.* § 1517(b)(1) (providing that a recognition order for a foreign main proceeding will be entered if the foreign proceeding "is pending in the country where the debtor

has its center of main interests"); *see also, e.g.*, *In re Suntech Power Holdings Co.*, 520 B.R. 399, 416-17 (Bankr. S.D.N.Y. 2014) (overruling objection and holding that COMI of Cayman Islands exempted company was in the Cayman Islands even though COMI had been transferred to the Cayman Islands only months prior to the commencement of the schemes).

78.     COMI should be determined based on the debtor's activities "at or around the time the Chapter 15 petition is filed."  *See In re Fairfield Sentry Ltd.*, 714 F.3d at 137.  However, the restructuring or liquidation activities of the chapter 15 debtor up to the date of the chapter 15 filing are properly considered in determining its COMI.  *Id.* at 135 (considering the activities of the pre-filing liquidation committee in winding down the debtor's operations, as well as the actions of liquidators appointed under British Virgin Islands law in determining the entity's COMI.  Accordingly, as set forth below, commencing the Bermuda Proceeding and conducting the Convening Hearing in Bermuda in front of the Bermuda Court should be properly considered in determining the entity's COMI.  *Id.* at 132.

79.     **<u>Registered Office in Bermuda</u>**.  The Debtor's registered office is located in Bermuda, creating a presumption that Bermuda is the COMI for the Debtor.  *See* 11 U.S.C. § 1516(c) ("In the absence of evidence to the contrary, the debtor's registered office . . . is presumed to be the center of the debtor's main interests."); *see also In re Gerova Fin. Grp., Ltd.*, 482 B.R. 86, 91 (Bankr. S.D.N.Y. 2012).

80.     Additional factors relevant to the Court's assessment similarly suggest that Bermuda is the COMI of the Debtor.[21]  Indeed, the Debtor's and the Group's future as a going-

---

[21] Courts consider a variety of factors in identifying a debtor's COMI, none of which on their own are determinative, including: the location of a debtor's headquarters; the location of those persons or entities that actually manage a debtor; the location of a debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors would be affected by the case; and/or the jurisdiction whose law would apply to most (….continued)

concern depends on efforts to restructure debt that is in default. As set forth herein, these efforts are currently centered in Bermuda.

81.    **Organized Under the Laws of Bermuda**. As set forth above, the Debtor is an exempted company incorporated under the laws of Bermuda with limited liability, and publicly identifies as a Bermuda-incorporated company. The Debtor's historical corporate counsel is a Bermuda law firm, Conyers Dill & Pearman Limited, a Bermuda company ("**Conyers**"). Foreign Law Decl. ¶ 2. Conyers has advised the Debtor on various legal matters since the Debtor's incorporation in 2020, including on advising the Debtor with respect to the 2020 Restructuring where the Existing Notes were issued. *Id.* In addition, Conyers Corporate Services (Bermuda) Limited has served as the Debtor's corporate secretary since incorporation. *Id.* Moreover, the Debtor's resident representative resides in Bermuda.[22]

82.    **Restructuring Activities Centralized in Bermuda with Bermuda Court's Judicial Role Being Prevalent**. Furthermore, the Bermuda Proceeding has been commenced in Bermuda and is being conducted under the Companies Act and, pursuant to section 29 of the Scheme, the Scheme is governed by, and is to be construed in accordance with, the laws of Bermuda. Scheme at § 29. Pursuant to the Scheme, the Debtor, the Indenture Trustee, Epiq and each of the Scheme Creditors agreed that, to the fullest extent permitted by applicable law, any

---

disputes. *See In re SPhinX, Ltd.*, 351 B.R. at 117, *aff'd sub nom. Krys*, 371 B.R. 10. In *In re SPhinX*, the bankruptcy court explained that the factors should not be applied "mechanically" and "[i]nstead, they should be viewed in light of chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value." *Id.* Here, where the Debtor is a holding company with few if any activities other than the activities required to maintain itself as (a) an exempted holding company in Bermuda and (b) the issuer of the Existing Notes, many of these factors are arguably not that useful. For example, the location of its creditors or the Scheme Creditors would not appear to be of much importance in this cross-border case, even if they were known, especially when weighed against these same Scheme Creditors' expectations and overwhelming support for the Scheme taking place in Bermuda.

[22] A resident representative is a Bermuda statutory office under the Companies Act. They are a local resident and are qualified to accept service in Bermuda on the Debtor's behalf.

dispute between them shall be determined by the Bermuda Court. *Id.* Therefore, that is the law that would apply to most disputes. *See, e.g., In re Culligan Ltd.*, 2021 WL 2787926 at *13 (finding Bermuda COMI because, among other things, Bermuda restructuring proceeding made Bermuda law "applicable with respect to any disputes arising with respect to [that proceeding]"). When the Bermuda Court took jurisdiction over the Debtor, it implicitly recognized that the Debtor's COMI was in Bermuda. Furthermore, the Debtor's Bermuda counsel (Conyers) commenced the Bermuda Proceeding and prepared for and appeared at the Convening Hearing, and will appear at the Sanction Hearing, in front of the Bermuda Court. Foreign Law Decl. ¶ 48, 50. Since the Scheme was commenced, the Foreign Representative has exercised or will exercise certain powers conferred upon him by the Bermuda Court necessary for implementation of the Restructuring, including filing the Chapter 15 Case. As such, the restructuring activities have been and will be centralized in Bermuda and undertaken by Bermuda actors.

83. Moreover, the Bermuda Court's role in the Scheme is prevalent. *See, e.g., In re Modern Land (China) Co., Ltd.*, 641 B.R. 768, 789 (Bankr. S.D.N.Y. 2022) ("Another factor supporting COMI being in the Cayman Islands is the ongoing restructuring proceeding itself."); *In re E-House (China) Enterprise Holdings Limited*, Case No. 22-11326 (JPM) (Bankr. S.D.N.Y. Nov. 15, 2022) (finding that the debtor's COMI was in the Cayman Islands because, among other things, the debtor's restructuring activities were centralized in the Cayman Islands as a result of the Cayman Court's judicial role); *In re Suntech Power Holdings Co., Ltd.*, 520 B.R. at 417 (finding COMI shifted to Cayman Islands from China as a result of Cayman scheme restructuring proceeding).

84. The Restructuring is essential to the administration of the Debtor's interests because the Debtor believes that if the Restructuring does not proceed, the Debtor will be unable

to comply with its financial obligations under the Existing Notes.  Foreign Rep. Decl. ¶ 66.  The

Debtor has limited available cash and other assets and, if the Restructuring should fail, would be

unable to fully satisfy its debts.  *Id.*  Put another way, "as of the time of the filing of the Chapter

15 petition, the restructuring efforts [are] the Debtor's primary business activity . . . to ensure the

Debtor's survival.'"  *In re Modern Land*, 641 B.R. at 790 (quoting foreign representative's

supplemental brief) (second alteration in original).   If the Scheme is not approved and

implemented, it is likely that the Debtor will be wound up, resulting in a substantially lower

return to the Debtor's creditors than if the Restructuring is approved and implemented.  Foreign

Rep. Decl. ¶ 66.  As demonstrated herein, the interests of the Scheme Creditors have been and

will continue to be protected in the Bermuda Proceeding.  To hinder the Restructuring by not

recognizing the Bermuda Proceeding as a foreign main proceeding would serve no purpose.  *See,*

*e.g.*, *In re Suntech*, 520 B.R. at 413 ("Shutting the door on the Debtor, where it has no other

access, will hinder the restructuring of this multinational business as contemplated by chapter

15.").

      85.    **Support and Expectations of the Scheme Creditors**.   The expectation of the

Scheme Creditors is that the Debtor's COMI is in Bermuda.  On this factor, "[b]ecause their

money is ultimately at stake, one generally should defer . . . to the creditors' acquiescence in or

support of a proposed COMI."  *In re SPhinX, Ltd.*, 351 B.R. at 117.  Indeed, when a court

considers factors supporting COMI, the protection of the creditors' interests is paramount.  *See,*

*e.g.*, *In re Modern Land*, 641 B.R. at 789 ("Given the proclivity of Courts in the Second Circuit

to consider creditor expectations when making a COMI determination, therefore, this factor

supports a finding of the Cayman Islands being the [d]ebtor's COMI.").

86.     Here, the Debtor's COMI being in Bermuda has the support of the Scheme

Creditors who have demonstrated their overwhelming support for the Scheme as reflected by the

fact that as of the date of the filing of the Chapter 15 Case, approximately 83.6% of the DGHL

Unsecured Notes and 86.5% of the DGHL Subordinated Notes, by value, signed up to the DGHL

RSA, which requires them to support a Bermuda scheme of arrangement and provides, among

other things, that such holders will vote in favor of the Scheme.  Foreign Rep. Decl. ¶ 47.

87.     The fact that the Scheme Creditors—the only impaired creditors—emphatically

support a Bermuda scheme of arrangement should come as no surprise since a restructuring in

Bermuda has been reasonably ascertainable to these creditors since they received the Existing

Notes in the 2020 Restructuring, which itself was consummated through a Bermuda scheme of

arrangement.  Foreign Rep. Decl. ¶ 20.  Specifically, the Existing Notes Documents[23] identify

the Debtor as a company incorporated in Bermuda.  *Id.* at ¶ 14; *see also In re Serviços de

Petróleo Constellation S.A.*, 600 B.R. 237, 274 (Bankr. S.D.N.Y. 2019) (listing cases in which

offering memoranda and indentures were evaluated for purposes of determining creditors'

expectations).  Similarly, the 2020 Offering Memorandum states that the Debtor is an exempted

company incorporated under the laws of Bermuda with limited liability.[24]  Foreign Rep. Decl. ¶

14.  The 2020 Offering Memorandum also made clear that because the Debtor is incorporated in

Bermuda, its laws, including those with respect to a potential insolvency proceeding relating to

the Debtor would likely involve the bankruptcy law of Bermuda (the "**Bermuda Bankruptcy**

---

[23] "**Existing Notes Documents**" means, collectively, the Notes, the Indentures, and any related guarantees.

[24] *See* 2020 Offering Memorandum, p. 19 ("Digicel is an exempted company with limited liability incorporated under the laws of Bermuda on February 5, 2007 and registered with the Registrar of Companies in Bermuda under registration number 39547. Digicel's registered office is located at Clarendon House, 2 Church Street, Hamilton HM 11, Bermuda.").

Law").[25]  *Id.; see also In re Ascot Fund Ltd.*, 603 B.R. 271, 283 (Bankr. S.D.N.Y. 2019) (finding

the debtor's COMI in the Cayman Islands, in part, because "[f]rom the Ascot Fund investors'

point of view, and as a matter of fact and law, they invested in a Cayman fund and their rights

were to be determined under Cayman law").

88.    Moreover, since the Debtor publicly identifies as a company incorporated in

Bermuda, it is likely the Scheme Creditors knew they were investing in a holding company

registered in Bermuda and subject to its laws.  *See In re Modern Land*, 641 B.R. at 793 ("[T]he

[d]ebtor seeks recognition of a proceeding under Cayman law, a fact which the [s]cheme

[c]reditors likely factored into their decision to conduct business with the [d]ebtor in the first

place.").  Indeed, as a Bermuda-incorporated company, any disputes in relation to the internal

corporate affairs of the Debtor would be governed by Bermuda law.  Foreign Law Decl. ¶ 2.

Any attempt to liquidate and dissolve the Debtor would only be effective as against the Debtor if

such proceedings were held in Bermuda because Bermuda courts generally do not recognize

non-Bermuda liquidation as being capable of liquidating and dissolving a Bermuda company.

*Id.*; *see also In re Modern Land*, 641 B.R. at 791 ("When conducting a COMI analysis, [c]ourts

in this district additionally consider the jurisdiction whose law would apply to most disputes.");

*In re Olinda Star Ltd. (In Provisional Liquidation)*, 614 B.R. 28, 44 (Bankr. S.D.N.Y. 2020)

("[T]his factor weighs in favor of a COMI in" the jurisdiction whose law applies.).

89.    Finally, the existence of fair, well-known procedures for debt restructuring in

Bermuda, if necessary, was likely a positive factor in connection with the issuance of the

Existing Notes.  *See, e.g.*, *In re Suntech*, 520 B.R. at 418 ("The Debtor was incorporated in the

---

[25] *See id.* at p. 410 (including a section entitled "Certain Insolvency Law and Local Law Limitations" which discusses how the Existing Notes may be compromised pursuant to Bermuda insolvency law).

Cayman Islands and the Cayman Islands employed a predictable, flexible and cost-effective method for dealing with restructuring."). Such procedures were also likely a reason why the Debtor was structured as a holding company distinct from the operating companies it owned.[26]

90.     __Location of Administrative Documents and Corporate Records__. The Debtor maintains certain of its administrative documents in Bermuda. For example, the Debtor maintains certain of its books and records in Bermuda. Foreign Rep. Decl. ¶ 6. Furthermore, the Debtor is also required by the Companies Act to maintain a register of directors and officers at its registered office in Bermuda. Foreign Law Decl. ¶ 2. The Debtor also periodically holds in-person board meetings in Bermuda. Foreign Rep. Decl. ¶ 6.

91.     __Goals of Chapter 15__. Recognition of the Bermuda Proceeding as a foreign main proceeding would comport with the goals of Chapter 15. Indeed, Bankruptcy Code section 1508 requires that courts "consider [the] international origin of [Chapter 15] and the need to promote an application of [Chapter 15] that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C § 1508. Accordingly, considerations of judicial cooperation and support for the foreign main proceeding in Bermuda dictates that the Debtor should be allowed to avail itself of the protections set forth under chapter 15, and obtain recognition as a foreign main proceeding. The COMI requirement "should not be applied in a manner that would effectively establish a presumption against recognition of cases from offshore jurisdictions." *In re Millennium Glob. Emerging Credit Master Fund Ltd. (Millennium Glob. I)*, 458 B.R. 63, 83

---

[26] The fact that the Debtor is an exempted company is of no moment. *See, e.g.*, *In re Modern Land*, 641 B.R. at 790 ("[T]he fact that the [d]ebtor is an exempted company does not jeopardize its ability to have a COMI in the Cayman Islands."); *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 705 (Bankr. S.D.N.Y. 2017) (noting that "[i]t does not matter that [the debtor] is classified as 'exempted' under Cayman Companies Law, even though 'exempted' company status appears to limit that company's activities in the Cayman Islands" and concluding that the Cayman Islands was indeed the debtor's COMI and recognizing the Cayman Islands proceeding as a foreign main proceeding).

(Bankr. S.D.N.Y. 2011) ("Such a presumption would set the text of the statute on its head and construe chapter 15 to reverse a line of cases under the predecessor provision, § 304, that recognized proceedings from the Caribbean.").

92.     Denial of recognition of the Debtor's COMI in Bermuda may leave the Debtor with the alternative of converting a highly consensual Scheme into a Bermuda liquidation. Foreign Rep. Decl. ¶ 66.  Moreover, such an outcome would "diverge from Chapter 15's stated goal of maximizing the value of the debtor's assets, as well as facilitating the rescue of a financially troubled business" as it "would divert additional funds towards an entirely new insolvency process in an effort to potentially achieve the relief requested" herein.  *In re Modern Land*, 641 B.R. at 787.  Accordingly, recognition of the Debtor's COMI in Bermuda promotes the goals of chapter 15.

### v.     In the 2020 Chapter 15 Order, This Court Found that the Debtor's Affiliate Has its COMI in Bermuda

93.     This Court has previously found that the Debtor's affiliate, DGL1, has its COMI in Bermuda under facts nearly identical to those present here.  *See* 2020 Recognition Order.  For example, like DGL1, the Debtor is a holding company incorporated and with its registered office in Bermuda.  Foreign Rep. Decl. ¶ 11.  Additionally, similar to DGL1's creditors being aware of a potential Bermuda restructuring given notice in its offering memorandum, the Debtor's creditors have similarly been aware that a potential Bermuda restructuring of the Debtor's obligations was possible since the issuance of the Existing Notes.  *Id.*  Lastly, like DGL1, the Debtor holds itself as a Bermuda company.  *Id.*

94.     For all of the reasons set forth above, it is respectfully submitted that all of the requirements of section 1517(a) have been satisfied and that the Debtor is entitled to all of the relief provided by section 1520 of the Bankruptcy Code, as applicable, including the application

of section 362 of the Bankruptcy Code, which bars the commencement or continuation of actions against the Debtor and/or property of the Debtor located within the territorial jurisdiction of the United States. Accordingly, the Court should enter the Proposed Order recognizing the Bermuda Proceeding as a foreign main proceeding.

### 3. *In the Alternative, the Court Should Find that the Bermuda Proceeding Is a Foreign Nonmain Proceeding of the Debtor*

95.    For all the reasons set forth above, the Bermuda Proceeding should be recognized as the "foreign main proceeding" of the Debtor. Nevertheless, should this Court conclude that the Bermuda Proceeding is not a foreign main proceeding of the Debtor, in the alternative, the Bermuda Proceeding should be recognized as a "foreign nonmain proceeding" within the meaning of section 1502(5) for the Debtor pursuant to section 1517(b)(2) of the Bankruptcy Code.

96.    Courts will recognize a foreign proceeding as a "foreign nonmain proceeding" if "the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending." 11 U.S.C. § 1517(b)(2). Chapter 15 provides no evidentiary presumption as to whether a debtor has an establishment in a particular jurisdiction. *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 338 (S.D.N.Y. 2008). Thus, whether an establishment exists in a particular location is "essentially a factual question," *id.* at 338, and the Foreign Representative bears the burden of proof. *In re British Am. Ins. Co. Ltd.*, 425 B.R. 884, 915 (Bankr. S.D. Fla. 2010). Importantly, section 1502(2) of the Bankruptcy Code defines an "establishment" as "any place of operations where the debtor carries out a nontransitory economic activity," and courts have required proof of more than a "mail-drop presence." *In re Serviços de Petróleo Constellation S.A.*, 600 B.R. at 277 (internal citations omitted); 11 U.S.C. § 1502(2). At least one court—noting the "paucity of U.S.

45

authority" on the subject—has favorably cited a "persuasive" English law holding that the
presence of an asset and minimal management or organization can suffice to create an
establishment. *See Millennium Glob. I*, 458 B.R. at 84–85 (citing *Shierson v. Vlieland-Boddy*,
[2005] EWCA Civ. 974, [2005] W.L.R. 3966 (2005)).

97.     As with a determination of a debtor's COMI, whether a debtor has an
"establishment" in a country is determined at the time of filing the chapter 15 petition. *See
Beveridge v. Vidunas (In re O'Reilly)*, 598 B.R. 784, 803 (Bankr. W.D. Pa. 2019) (adopting
*Fairfield Sentry* and *In re Ran*, 607 F.3d 1017 (5th Cir. 2010) findings that "the presumptive date
from which [a c]ourt is to ascertain [a] debtor's center of main interests and/or establishment is
the date the Chapter 15 petition was filed").   Several factors "contribute to identifying an
establishment: the economic impact of the debtor's operations on the market, the maintenance of
a 'minimum level of organization' for a period of time, and the objective appearance to creditors
whether the debtor has a local presence." *Millennium Glob. I*, 458 B.R. at 85.   Showing the
economic impact of a debtor's activities on a foreign jurisdiction involves a "showing of a local
effect on the marketplace," *In re Creative Fin., Ltd. (In Liquidation)*, 543 B.R. 498, 520 (Bankr.
S.D.N.Y. 2016), evidenced by, among other things, engagement of "local counsel and
commitment of capital to local banks," *Millennium Glob. I*, 458 B.R. at 86-67; *see also In re
Modern Land*, 641 B.R. at 768, 786.

98.     Notably, a basis for recognition of a foreign nonmain proceeding has been found
in this district where the debtor's affiliates "have substantial and ongoing business connections"
in the jurisdiction, even though its COMI was determined to be in another country. *In re
Serviços de Petróleo Constellation S.A.*, 600 B.R. at 282 (granting recognition of a Brazilian
judicial reorganization proceeding as a foreign nonmain proceeding where the debtor's COMI

was found to be in Luxembourg).  In *Constellation*, the U.S. bankruptcy court found that "non-transitory ties to Brazil are sufficient to recognize the Brazilian Proceeding as a foreign nonmain proceeding with respect to [such non-Brazilian debtor]." *Id.*

99.     Here, the Debtor has, first and as described above, centralized its restructuring activities in Bermuda.  Second, through its ownership in its subsidiaries, the Debtor maintains a significant presence in the Bermuda marketplace.  Foreign Rep. Decl. ¶ 12.  Indeed, as of March 31, 2023, Digicel occupied the number one position in the mobile telecommunications services market in Bermuda with 49% of the market share and it generated approximately $84 million in revenue from Bermuda operations for the year ended March 31, 2023.  *Id.* Accordingly, these facts are sufficient to, at a minimum, support the finding of an "establishment" in Bermuda.  *See, e.g.*, *In re Serviços de Petróleo Constellation S.A.*, 600 B.R. at 278, 281–82 (recognizing that "COMI is a flexible determination and not a rigid application of factors" and finding that although the Luxembourg-registered parent company's COMI was Luxembourg, its subsidiaries had substantial and non-transitory ties to Brazil, which was sufficient to create an establishment in Brazil for the Luxembourg parent and "to recognize the Brazilian Proceeding as a foreign nonmain proceeding.").

100.     In addition, the Existing Notes Documents and other disclosures discussed above confirm that the Debtor objectively appears to creditors to have a local presence in Bermuda.  In the event that the Court determines that the Debtor lacks COMI in Bermuda, the facts set forth above provide sufficient evidence that the Debtor maintains an establishment in Bermuda.

101.     In addition, the relief a court may grant in a foreign nonmain proceeding is "nearly identical" to the relief provided to a foreign main proceeding. *Id.* at 272.  Accordingly, in the event that this Court finds that the Bermuda Proceeding is a

foreign nonmain proceeding with respect to the Debtor, the Foreign Representative respectfully requests that all relief requested in this Motion be granted as appropriate relief or additional assistance, pursuant to sections 1521 or 1507 of the Bankruptcy Code, respectively, for the reasons further detailed below.

**B.**      **Enforcement of the Sanction Order and Scheme and Related Relief**

102.    The Foreign Representative respectfully seeks entry of an order recognizing and enforcing the Scheme and Sanction Order and entrusting to the Foreign Representative the administration, realization, and distribution of the Debtor's assets within the territorial jurisdiction of the United States, in each case, pursuant to sections 1521(a) and (b), 1507 and 105 of the Bankruptcy Code.

103.    Upon the recognition of a foreign main proceeding (or nonmain proceeding) and at the request of a foreign representative, section 1521(a) of the Bankruptcy Code authorizes the Court, at the request of a recognized foreign representative, to grant "any appropriate relief," which may include, among other things, with limited exceptions, granting any additional relief that may be available to a trustee. *See* 11 U.S.C. § 1521(a)(7).

104.    In plenary chapter 11 proceedings, a trustee may obtain a court order directing any party to take "any act . . . necessary for the consummation of the plan," 11 U.S.C. § 1142(b), which can include provisions for the "issuance of securities of the debtor, . . . in exchange for claims or interests." 11 U.S.C. § 1123(a)(5)(D).  Accordingly, this requested relief is available to chapter 15 debtors.  Further, enforcement of the Scheme and the Sanction Order is the means for implementing the Scheme and Sanction Order in the United States, which is necessary to consummate the restructuring of the New York law-governed Existing Notes.  Therefore, the requested relief is available to the Foreign Representative and the Debtor, as applicable, in these proceedings.

105.    Beyond the specific relief listed in subsection 1521, a court may grant additional assistance "consistent with the principles of comity." 11 U.S.C. § 1507(b).    In determining whether to provide additional assistance under this title or under other laws of the United States for business (rather than personal) restructurings, [27] the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure: (a) just treatment of all holders of claims against or interests in the debtor's property; (b) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding; (c) prevention of preferential or fraudulent dispositions of property of the debtor; and (d) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title.    11 U.S.C. § 1507(b).    Additionally, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

106.    As a preliminary matter, courts in this district have routinely analyzed the substantive rules and procedural mechanisms prescribed by the Bermuda Bankruptcy Law and have found that it comports with the United States' fundamental notions of fairness.    *See In re PB* [ECF No. 50] (finding that relief requested in connection with Bermuda proceeding was "in the interests of public and international comity, consistent with the public policy of the United States"). Accordingly, there are numerous cases in which courts in this district have granted comity and given full force and effect to orders confirming Bermuda schemes of arrangements

---

[27] Section 1507(b)(5) of the Bankruptcy Code does not apply here because the Debtor is a business entity.    *See In re Bd. of Dirs. of Telecom Arg. S.A.*, 2006 WL 686867 n.11 (Bankr. S.D.N.Y. Feb. 24, 2006) (the provision of an opportunity for a fresh start factor only applies to individual debtors, not business entities); *In re Culmer*, 25 B.R. 621, 631 n. 4 (Bankr. S.D.N.Y. 1982) (the § 304(c)(6) factor "by its terms relates to individual debtors and thus has no application" in the case of a business entity).

and liquidations. *See, e.g.*, *In re Markel* [ECF No. 40] (enforcing a Bermuda scheme of arrangement); *In re Digicel* [ECF No. 29] (same); *In re Culligan* [ECF No. 60] (recognizing Bermuda liquidation proceedings as "foreign proceedings" and enforcing, among other things, an injunction against certain actions within the territorial jurisdiction of the United States); *In re George's Bay* [ECF No. 23] (same); *In re Spencer Capital* [ECF No. 16] (same). The Foreign Representative respectfully submits that this Court should follow the litany of precedents respecting Bermuda Bankruptcy Law and schemes of arrangements and grant the discretionary relief sought here. For the reasons that follow, the Foreign Representative requests that this Court assist in the implementation of the Scheme and the Sanction Order by exercising its discretion under sections 1521(a) and (b), 1507 and 105(a) of the Bankruptcy Code.

### 1.     *Assistance with Implementing the Scheme*

107.    Courts in this district have held that Bermuda schemes of arrangement constitute foreign proceedings. *See, e.g.*, *In re Markel* [ECF No. 23] (recognizing a Bermuda scheme of arrangement); *In re Digicel* [ECF No. 29] (same); *In re Hopewell*, 238 B.R. at 48-49 (holding that a proceeding in a Bermuda court for approval of a scheme of arrangement executed under the Companies Act was a "foreign proceeding" for purposes of chapter 15), *aff'd sub nom. In re Hopewell*, 275 B.R. 699.

108.    Therefore, "appropriate relief" under section 1521 or "additional assistance" under section 1507 should include recognizing and enforcing a restructuring plan approved by the Bermuda Court.

109.    Recognizing and enforcing the Scheme, including the Releases, and Sanction Order in the United States is a necessary and appropriate exercise of comity. As described above, extensive procedural protections in Bermuda have assured a rigorous, court-supervised restructuring. *Supra* ¶ 25; *see also* Foreign Law Decl. ¶ 25. The Foreign Representative now

requires additional protection and assistance from this Court to ensure the successful completion of the Debtor's restructuring through the Scheme, and thereby effectuate the purpose of chapter 15.

110.    Support from this Court is particularly important in the Chapter 15 Case, as the Debtor cannot otherwise successfully restructure its New York law-governed debt in accordance with the terms of the Scheme.  As a practical matter, companies such as the Debtor who have accessed the international and U.S. capital markets and issued debt governed by U.S. law, but are undergoing restructuring proceedings outside the United States, require assistance from U.S. courts.  This assistance is necessary to fully consummate their restructurings in order to "facilitat[e] . . . the rescue of financially troubled businesses . . .," which is one of the purposes of chapter 15 of the Bankruptcy Code.  *See* 11 U.S.C. § 1501(a)(5).  Moreover, the Scheme itself requires, as a condition to closing the Restructuring, the "entry of an order by the US Bankruptcy Court pursuant to Chapter 15 of the US Bankruptcy Code, recognising and enforcing the Scheme, with such order not having been reversed, stayed, modified or vacated on appeal."  Scheme at § 18.1(f).

### 2.    *Direction and Authority of Directed Parties*

111.    Pursuant to sections 105(a), 1507(a), and 1521(a) of the Bankruptcy Code, the Foreign Representative seeks additional assistance from the Court in authorizing and directing the Directed Parties to carry out all administrative actions required of them pursuant to the Scheme, Sanction Order, or that are necessary to consummate the terms of the Scheme and Sanction Order and the transactions contemplated thereby.  This is important because, as described above, the Existing Notes will be exchanged, depending on each Noteholder's Election, for the Plan Consideration, and the Existing Notes will be canceled and removed from DTC's and the Indenture Trustee's books and records.

51

112.    These actions will invariably require the assistance of the Directed Parties.  The Debtor believes that the Directed Parties may assert that they are not subject to Bermuda Court jurisdiction and, as such, may resist providing this assistance (including, for example, formally cancelling the Existing Notes and taking any steps to facilitate issuance of the Plan Consideration) without first obtaining an order from a U.S. court directing and authorizing such action. Accordingly, the Foreign Representative seeks assistance from the Court in authorizing and directing the Directed Parties to take all actions that are required of them to consummate the Scheme, including prompt assistance to facilitate the following: (a) exchange of the Existing Notes for Plan Consideration as elected by Noteholders pursuant to the terms of Election; and (b) cancellation and removal of all remaining positions on account of the Existing Notes on the books and records of the Indenture Trustee, other Existing Agents, and DTC.

113.    By providing this relief, the Court will give clear direction and authority under U.S. law to the Directed Parties to carry out the requirements of the Scheme in accordance with Bermuda Bankruptcy Law, other applicable law, and the Sanction Order.  This same relief was granted by courts in this District in previous chapter 15 cases.  *See, e.g.*, *In re ODN* [ECF No. 24] (directing and authorizing the existing notes trustee and DTC to take all actions necessary to cancel the debtor's existing notes and exchange them for new notes); *In re Andrade* [ECF No. 41] ("The Directed Parties are directed and authorized to take any and all lawful actions necessary to give effect to and implement the EJ Plan and the Brazilian Confirmation Order and the transactions contemplated thereunder, including, without limitation, the consummation of the New Money Investment, cancellation and discharge of the Notes and the Indentures, and the issuance of the Type 1 New Notes and the Type 2 New Notes."); *In re U.S.J.* [ECF No. 21] ("The DTC, the Indentures Trustees, their agents, attorneys, successors, and assigns are hereby

authorized and directed to take actions necessary to implement the restructuring transactions approved by the Brazilian Confirmation Order . . . ."); *In re Digicel* [ECF No. 29] (authorizing DTC and existing notes trustee "to take any actions or execute any documents each believes appropriate in furtherance of or in connection with consummating the transactions contemplated by the Bermuda Orders and the Scheme, including among other things, the cancellation and discharge of the Existing Notes and the Existing Notes Indentures").

### 3.    *Releases Supporting the Scheme in the United States*

114.    The Foreign Representative additionally requests that the Court enforce and give full force and effect to the Releases in the territorial jurisdiction of the United States.  Releasing the Released Parties (as defined in the Foreign Law Declaration) is necessary to prevent interference with the consummation of the Scheme and, in particular, the transfer of the Existing Notes in exchange for Plan Consideration.  This Court has routinely enforced releases similar to the Releases in various foreign proceedings.  *See, e.g.*, *In re ODN* [ECF No. 24] (enforcing third-party releases in connection with recognition and enforcement of foreign plan); *In re Andrade* [ECF No. 41] (same); *In re U.S.J.* [ECF No. 21] (same); *In re Markel* [ECF No. 40] (enforcing third-party releases contained in Bermuda schemes of arrangement); *In re Huachen Energy Co., Ltd.*, No. 22-10005 (LGB) (Bankr. S.D.N.Y. Feb. 2, 2022) [ECF No. 19] (enforcing third-party releases contained in reorganization plan approved in Chinese foreign proceeding); *In re Oi S.A.*, 587 B.R. 253, 266–67 (Bankr. S.D.N.Y. 2018) (enforcing third-party releases contained in Brazilian reorganization plan); *In re OAS S.A. et al*., No. 15-10937 (SMB) (Bankr. S.D.N.Y. Oct. 5, 2018) [ECF No. 170] (same); *In re Lehman Bros. Int'l (Europe)*, No. 18-11470 (SCC) [ECF No. 15] (Bankr. S.D.N.Y. June 19, 2018) (enforcing UK scheme and order of English court sanctioning third-party releases); *In re Odebrecht Óleo e Gás S.A.*, No. 17-13130 (JLG) (Bankr.

S.D.N.Y. Dec. 13, 2017) [ECF No. 28] (enforcing third-party release in connection with recognition and enforcement of Brazilian reorganization proceeding).

115.    Moreover, the Releases are narrow in scope and are consistent with the types of releases that are generally provided (and approved) in chapter 11 cases.  Broadly, the only claims released in connection with the Releases include releases of the Scheme Claims of the Scheme Creditors, the Depository Nominee, and the Indenture Trustee, the cancellation of obligations under the Existing Notes, as well as the releases covered by the Deed of Release. Foreign Law Decl. ¶ 57.  Importantly, however, the Releases do not release (a) the Group from (i) their obligations to implement and consummate the Scheme or (ii) any claims other than claims (including the Existing Notes) that are compromised under the Scheme or (b) the Released Parties from any claims arising out of fraud, gross negligence, willful misconduct, willful default, or dishonesty.  *Id.*  Accordingly, the Releases are narrowly tailored to achieve the purpose of the Scheme—to facilitate the restructuring of the Existing Notes.

116.    The Foreign Representative, therefore, respectfully requests that the Court enforce and give full force and effect to the Releases contained in the Scheme.  If the Court declines to enforce the Releases, then certain creditors could seek to obtain judgments in the United States against the Debtor or other Released Parties in contravention of the Scheme.  Such an outcome may result in prejudicial treatment of certain creditors and parties in interest to the detriment of the Debtor's reorganization efforts and would prevent the fair and efficient administration of the Restructuring.

### 4.    *Injunctions Supporting the Scheme in the United States*

117.    The Foreign Representative also requests permanent injunctions under section 1521 of the Bankruptcy Code enjoining any entities subject to this Court's jurisdiction from (a)(i) commencing, continuing, or taking any action in the United States that contravenes or would

interfere with or impede the administration, implementation, and/or consummation of the Bermuda Proceeding, Scheme, or Sanction Order, including, without limitation, to obtain possession of, exercise control over, or assert claims against the Debtor or its property or taking any action against the Debtor or its property located in the territorial jurisdiction of the United States to recover or offset any debt or claims that are assigned, subrogated, discharged, extinguished, novated, canceled, or released under the Scheme (including as a result of the laws of Bermuda or other applicable jurisdiction, as contemplated under the Scheme) or the Sanction Order.  The requested injunctive relief will not enjoin actions to enforce the Scheme or any rights granted under the Form of Note Agreement or any other documents that consummate the Scheme. Rather, the requested injunctive relief will help ensure the fair and efficient administration of the Scheme and that all of the Debtor's creditors are bound by the terms of the sanctioned Scheme.

118.    Section 1521(e) of the Bankruptcy Code provides that the standards for injunctive relief apply to certain relief available under section 1521. *In re Olinda Star Ltd.*, 614 B.R. at 47–48.  Permanent injunctive relief, such as the relief requested herein, is appropriate where the movant can show a likelihood of irreparable harm. This Court has found that a debtor or its estate would suffer irreparable harm where the orderly determination of claims and the fair distribution of assets are disrupted.  *See, e.g.*, *Victrix S.S. Co.*, 825 F.2d at 713–14 ("The equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail."); *In re Garcia Avila*, 296 B.R. 95, 114 (Bankr. S.D.N.Y. 2003) ("[I]rreparable harm is present when the failure to enjoin local actions will disrupt the orderly reconciliation of claims and the fair distribution of assets in a single consolidated forum.") (internal citations omitted); *In re MMG LLC*, 256 B.R. 544, 555 (Bankr.

S.D.N.Y. 2000) ("[I]rreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of the other creditors.").

119.    In the context of the enforcement of a foreign confirmation order, irreparable harm exists where the orderly determination of claims against a debtor and the fair distribution of its assets could be disrupted.  *See, e.g.*, *Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB*, 773 F.2d 452, 458 (2d Cir. 1985) ("Unless all parties in interest, wherever they reside, can be bound by the arrangement which it is sought to have legalized, the scheme may fail."); *In re Lloyd*, 2005 Bank. LEXIS 2794, at *5 (Bankr. S.D.N.Y. Dec. 7, 2005) ("Unless an injunction is issued, one or more parties may interfere with, or otherwise cause harm to, the administration, implementation and enforcement of the scheme of arrangement, including the satisfaction of the claims of Scheme Creditors, causing immediate and irreparable harm."); *In re MMG LLC*, 256 B.R. at 555 ("As a rule . . . irreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of the other creditors.").

120.    The Court has authority to grant the relief requested herein in the Chapter 15 Case. The United States Supreme Court, the United States Court of Appeals for the Second Circuit, and this Court have all recognized a federal court's authority to grant permanent injunctive relief to enforce foreign plans and discharges.  *See, e.g.*, *Can. S. Ry. Co. v. Gebhard*, 109 U.S. 527, 539 (1883) (actions brought in the United States by bondholders who did not participate in the Canadian insolvency proceedings of a Canadian railroad could not be maintained, even though the bonds were payable in New York); *In re Bd. of Dirs. of Telecom Arg., S.A.*, 528 F.3d 162, 174–76 (2d Cir. 2008) (affirming bankruptcy court decision granting full force and effect to Argentine plan); *In re ODN* [ECF No. 24] (granting permanent injunctive relief to enforce Brazilian EJ plan); *In re Andrade* [ECF No. 40] (same); *In re Odebrecht Engenharia* [ECF No.

15] (same); *In re Odebrecht Óleo* [ECF No. 28] (same); *In re Serviços de Petróleo Constellation S.A.* [ECF No. 192] (granting permanent injunctive relief to enforce Brazilian judicial reorganization (RJ) plan).

121.    Here, absent a permanent injunction, certain creditors may later take action against the Debtor or its property in the territorial jurisdiction of the United States in an attempt to circumvent the terms of the Scheme.  *In re Rede Energia S.A.*, 515 B.R. 69, 94 (Bankr. S.D.N.Y. 2014) (explaining that, absent a permanent injunction, creditors would "return to Brazil to attempt to renegotiate and seek a higher distribution, or would commence lawsuits against the Debtor in the United States to recover further"); *Aralco S.A. Indústria e Comércio*, No. 15-10419 (REG) (Bankr. S.D.N.Y. Apr. 21, 2015) [ECF No. 22] (finding that "absent permanent injunctive relief, the Brazilian Bankruptcy Proceedings and the Debtors' efforts to consummate the Brazilian Reorganization Plan could be thwarted by the actions of certain creditors").  Allowing evasion of the terms of the Scheme (including the Releases) or the Sanction Order would force the Debtor to defend against these suits, thus depleting its resources, and prejudicing its reorganized value.  Foreign Rep. Decl. ¶ 70.  For these reasons, an injunction would support implementation of the Scheme and the Sanction Order and would protect the interests of all creditors in having their claims valued and paid on a consistent, non-discriminatory basis as determined by the Bermuda Court.  *Id.*  An injunction will ensure that all parties in interest in the Bermuda Proceeding are bound within the United States by the Scheme to which they will be bound under Bermuda Bankruptcy Law.

**C.    Recognition of the Bermuda Proceeding and Enforcement of the Scheme and the Sanction Order Is Consistent with the Goals of Chapter 15**

122.    The relief requested herein is founded on the congressional mandate that U.S. courts should cooperate with foreign proceedings and foreign representatives to promote the

goals of chapter 15.  *See* 11 U.S.C. § 1525(a) ("Consistent with section 1501, the court shall

cooperate to the maximum extent possible with a foreign court or a foreign representative, either

directly or through the trustee.").  Moreover, the relief requested herein is "appropriate," as that

term is used in section 1521 of the Bankruptcy Code, because it is necessary to ensure the

success of the Bermuda Proceeding and the Scheme.

### 1.    *Creditors and Other Parties in Interest Will Be Sufficiently Protected*

123.    The Court may grant additional relief "only if the interests of the creditors and

other interested entities, including the debtor, are sufficiently protected."  11 U.S.C. § 1522(a)

(adopting Article 22 of the Model Law).  Although the Bankruptcy Code does not define

"sufficient protection," the legislative history indicates that the prohibition applies where "it is

shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors."

H.R. REP. No. 109-31(1), pt. 1, 116 (2005).  As a result, courts have focused on the procedural

fairness of the foreign proceeding in order to determine whether creditors are sufficiently

protected.  *See, e.g.*, *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y.

2010) (examining whether the procedures utilized in the foreign proceeding accorded the

American notions of fundamental fairness).

124.    A determination of sufficient protection "requires a balancing of the respective

parties' interests."  *In re AJW Offshore, Ltd.*, 488 B.R. 551, 559 (Bankr. E.D.N.Y. 2013); *In re

Qimonda AG Bankr. Litig.*, 433 B.R. 547, 556–58 (E.D. Va. 2010); *CT Inv. Mgmt. Co., LLC v.

Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012); *In re Tri-Cont'l Exch.*,

349 B.R. 627, 637 n.14 (Bankr. E.D. Cal. 2006) ("The idea underlying article 22 is that there

should be a balance between relief that may be granted to the foreign representative and the

interests of the persons that may be affected by such relief. This balance is essential to achieve

the objectives of cross-border insolvency legislation.") (quoting the Model Law);

Model Law at ¶ 161.  Section 1522 of the Bankruptcy Code "gives the bankruptcy court broad latitude to mold relief to meet specific circumstances."  *In re Int'l Banking Corp. B.S.C.*, 439 B.R. 614, 626 (Bankr. S.D.N.Y. 2010) (internal citations omitted).

125.    Here, the Debtor's creditors are "sufficiently protected" by the treatment afforded to them under the Scheme and the process by which the Scheme will be sanctioned.  *See generally* Foreign Law Decl.  The U.S. creditors, for example, are not being subjected to undue inconvenience or prejudice.  Rather, the Scheme treats all similarly situated creditors equally and distributes consideration under the Scheme in a manner substantially comparable to what might occur under U.S. law.  *Id.* at ¶ 36.  The relief requested herein "would [also] assist in the efficient administration of this cross-border insolvency proceeding, and it would not harm the interests of the debtors or their creditors."  *In re Grant Forest Prods., Inc.*, 440 B.R. 616, 621 (Bankr. D. Del. 2010).  That certain creditors "may be denied an advantage over the debtor's other . . . creditors is not a valid reason to deny relief to the foreign representative."  *In re Atlas Shipping A.S.*, 404 B.R. 726, 742 (Bankr. S.D.N.Y. 2009).

126.    The Debtor has successfully negotiated a consensual resolution with its creditors to adjust the terms of its funded indebtedness to the current financial status of its business activities and capabilities.  This resolution is subject to approval by the requisite majority of creditors and sanctioning by the Bermuda Court.  Additionally, throughout the restructuring process, all creditors and parties in interest have been and will continue to be kept abreast of the Bermuda Proceeding, and thereby have and will continue to have the opportunity to support the DGHL RSA, object, present evidence, and/or otherwise fully participate in the Bermuda Proceeding in a manner that is consistent with U.S. standards of due process.  *Supra* ¶ 5; Foreign Law Decl. ¶ 34, 45-51.  Indeed, creditors were provided and will continue to be provided robust

notice of the Bermuda Proceeding, including, among other things, through the DGHL RSA Press Release, Practice Statement Letter, Explanatory Statement, and Scheme Meeting Notice. Foreign Rep. Decl. ¶ 38-42.

127.    The Bermuda Proceeding provided affected creditors 30 days to object to the terms of the Scheme, including the Releases set forth therein.  That notice period is longer than the minimum 21-day objection period that would be provided under the law in this District to object to confirmation of a U.S. chapter 11 plan.  Bankruptcy Rule 2002(b) (requiring 28 days' notice of chapter 11 plan confirmation hearing); S.D.N.Y. Local Bankruptcy Rule 3020-1 (requiring objection to chapter 11 plan confirmation to be filed at least seven days before a confirmation hearing).

### 2.    *The Relief Requested Is Not Manifestly Contrary to the Public Policy of the United States*

128.    Although the Court may deny a request for any chapter 15 relief that would be "manifestly contrary to the public policy of the United States" (11 U.S.C. § 1506), this public policy exception is narrowly construed.  *See In re ABC Learning Ctrs.*, 728 F.3d at 309 (quoting H.R. Rep. No. 109-31(1) at 109 (2005)); *In re Sino-Forest Corp.*, 501 B.R. 655, 665 (Bankr. S.D.N.Y. 2013); *In re Toft*, 453 B.R. 186, 195 (Bankr. S.D.N.Y. 2011).  Importantly, the result achieved in a foreign proceeding does not have to be identical to that in the United States. Rather, "[t]he key determination . . . is whether the procedures used [in the foreign proceeding] meet our fundamental standards of fairness."  *In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. at 697; *see also In re Bd. of Dirs. of Telecom Arg. S.A.*, 2006 WL 686867, at *25 (Bankr. S.D.N.Y. 2006) ("Comity does not require that the foreign law be a carbon copy of our law; rather, [it] must not be repugnant to American laws and policies." (internal quotation marks omitted)).

129.    Furthermore, chapter 15 was drafted to "incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency." 11 U.S.C. § 1501(a).  Section 1501(a) provides that chapter 15 is intended to, among other things: (a) facilitate the cooperation between "courts and other competent authorities of foreign countries involved in cross-border insolvency cases"; (b) undergird the "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor"; and (c) "protect[] and maximiz[e] [] the value of the debtor's assets." *Id.*

130.    Here, the Bermuda Proceeding and Scheme are consistent with the public policy of the United States.  As further explained in the Foreign Law Declaration, schemes of arrangement under Bermuda Bankruptcy Law provide robust procedural protections to creditors, regardless of their location, including opportunities to object and support a scheme.  Foreign Law Decl. ¶ 25.  Thus, it is no surprise that courts in this District have repeatedly recognized Bermuda restructuring proceedings by finding that they are not "themselves [], by their nature, contrary to United States public policy."  *In re Culligan Ltd.*, 2021 WL 2787926 at *16 (recognizing a Bermuda scheme of arrangement over creditor objection that, among other things, such scheme violates U.S. public policy); *In re Markel* [ECF No. 23] (recognizing a Bermuda scheme of arrangement); *In re Digicel* [ECF No. 29] (same); *In re Hopewell*, 238 B.R. at 48-49 (same), *aff'd sub nom. In re Hopewell*, 275 B.R. 699 (S.D.N.Y. 2002).

131.    The relief requested pursuant to this Motion is analogous to the relief afforded to debtors under chapter 11 of the Bankruptcy Code.  Confirmed chapter 11 plans, for example, routinely permanently enjoin claims against a debtor and its successor(s) that have been released and discharged under a restructuring plan.  Moreover, U.S. courts regularly direct parties to take

necessary actions to carry out transactions contemplated by the plan on behalf of the estate. Thus, the requested relief that the Directed Parties be authorized and directed to take any actions necessary for the consummation of the Scheme would be available in chapter 11 cases and, therefore, should be granted here. *See In re Rede Energia S.A.*, 515 B.R. at 93 (finding injunctions emanating from chapter 11 plans and the issuance of instructions to indenture trustees and the DTC to take actions necessary to effectuate such plans to be among the relief granted in chapter 11 and, accordingly, available to foreign representatives in chapter 15 under section 1521).

132.    Furthermore, enforcing the Releases in the Scheme is not contrary to public policy. *See In re Sino-Forest Corp.*, 501 B.R. at 665 (holding that, in the Second Circuit, "where the third-party releases are not categorically prohibited, it cannot be argued that the issuance of such releases is manifestly contrary to public policy"). Indeed, no court has found that the grant of relief and additional assistance to enforce and give effect to third-party releases approved in a foreign proceeding is manifestly contrary to the public policy of the United States.[28] In fact, this Court has repeatedly recognized and enforced foreign plans that contain third-party releases, which is predicated on a finding that the same are not manifestly contrary to public policy. *See, e.g.*, *In re ODN* [ECF No. 24] (enforcing debtor and third-party releases contained in a foreign restructuring plan); *In re Andrade* [ECF No. 41] (same); *In re MIE Holdings Corp.*, Case No. 22-10216 (JLG) (Bankr. S.D.N.Y. Apr. 21, 2022) [ECF No. 14] (same); *In re Huachen* [ECF No. 19] (same); *In re PT Pan Brothers Tbk*, Case No. 22-10136 (MG) (Bankr. S.D.N.Y. Mar. 8, 2022) [ECF No. 12] (same); *In re Atlas Financial Holdings, Inc.*, Case No. 22-10260 (LGB) (Bankr.

---

[28] *Cf. In re PT Bakrie Telecom Tbk*, 628 B.R. 859, 890 (Bankr. S.D.N.Y. 2021) (granting recognition and denying relief to enforce third-party releases not expressly set forth in Indonesian PKPU plan, on grounds other than public policy exception of section 1506).

S.D.N.Y. Mar. 30, 2022) [ECF No. 18] (same); *In re Hidili Industry International Development Limited*, Case No. 22-10736 (DSJ) (Bankr. S.D.N.Y. July 12, 2022) [ECF No. 16] (same); *In re E-House (China) Enterprise Holdings Limited* [ECF No. 22] (same).

133.    In addition, as with proceedings under chapter 11, the Bermuda Proceeding provides for a centralized process to assert and resolve claims against the estate in one tribunal, the Bermuda Court, and to provide distributions to creditors in order of priority.    Foreign Law Decl. ¶ 22.    Thus, as required by the Model Law (and as incorporated in chapter 15), granting the relief requested here would foster cooperation between courts in Bermuda and the United States. For example, by granting the relief requested here, including giving effect to the Releases, this Court would be assisting the Bermuda Court in the orderly restructuring of the Existing Notes by enjoining creditors from commencing actions against the Debtor or its assets in the United States and by giving the Directed Parties the power that they believe they need to carry out their duties.

134.    For these reasons, the Bermuda Proceeding is patently fair, and it and the Scheme (including the Releases) comport with the United States' standards of fundamental fairness and with United States public policy.    Accordingly, the relief requested here should be granted.

### 3.    *Enforcement of the Scheme Is Consistent with the Principles of Comity*

135.    Courts in this district have routinely held that recognizing and enforcing a foreign plan and confirmation order falls within the scope of the relief available under section 1521 and section 1507.    *See, e.g.*, *In re U.S. Steel Canada Inc.*, 571 B.R. 600, 609 (Bankr. S.D.N.Y. 2017); *In re Cell C Proprietary Ltd.*, 571 B.R. 542, 551 (Bankr. S.D.N.Y. 2017); *In re Rede Energia*, 515 B.R. at 69.    In particular, bankruptcy courts in this district have enforced Bermuda schemes of arrangement in the United States.    *See, e.g.*, *In re Markel* [ECF No. 40] (enforcing a Bermuda of scheme of arrangement); *In re Digicel* [ECF No. 29] (same).    In addition, a bankruptcy court in this district has also explained in detail why a United Kingdom scheme of arrangement and

associated sanction order may properly be recognized and enforced in the United States under this theory. *See Avanti*, 582 B.R. at 619. And, as discussed above, the structure of United Kingdom schemes is acutely similar to that of Bermuda schemes. Foreign Law Decl. ¶ 39.

136. The decision of whether to grant appropriate relief or additional assistance by enforcing a scheme and sanction order is "guided by principles of comity and cooperation with foreign courts." *Avanti*, 582 B.R. at 616. The need to extend comity to foreign proceedings is particularly salient with respect to proceedings such as the Bermuda Proceeding that determines how property will be distributed in a collective proceeding because "[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding" to bind all creditors and comprehensively effectuate a plan of reorganization. *Atlas Shipping*, 404 B.R. at 737 (quoting *Victrix S.S. Co. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713–14 (2d Cir. 1987)); *Canada S. Ry. Co. v. Gebhard*, 109 U.S. 527, 539 (1883) ("Unless all parties . . . can be bound by the arrangement . . . the scheme may fail . . . . Under these circumstances, the true spirit of international comity requires that schemes of this character, legalized at home, should be recognized . . . ."); *Victrix S.S. Co.*, 825 F.2d at 714 ("The equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail.").

137. Comity is particularly important in the insolvency context notwithstanding the fact that recognition of a foreign restructuring proceeding may implicate certain rights under U.S. law. For example, in *In re. Bd. of Dirs. of Telecom Arg., S.A.*, then-Second Circuit Judge Sotomayor affirmed a bankruptcy court's order extending comity to Argentine insolvency proceedings, finding that those proceedings did not violate U.S. public policy considerations

manifest in the Trust Indenture Act ("**TIA**").  528 F.3d at 165.  The Second Circuit held that a

bankruptcy court may grant enforcement of foreign insolvency proceedings that result in the

restructuring of TIA-qualified notes so long as recognition of those proceedings is otherwise

valid under then-section 304 of the Bankruptcy Code.  Foreign insolvency proceedings can also

modify payment terms under an indenture notwithstanding noteholders' TIA rights.  See *In re Bd.*

*of Dirs. of Multicanal S.A.*, 307 B.R. 384 (Bankr. S.D.N.Y. 2004).  Citing prior Supreme Court

precedent, Judge Gropper rejected claims by noteholders:

> [I]f foreign law can under certain circumstances trump the U.S.
> Constitution and preclude bondholders from enforcing their
> contractual rights, as *Gebhard* holds, there is no basis for adopting
> the principle espoused by [the noteholders], that foreign law can
> under no circumstances override § 316(b) of the Trust Indenture
> Act (except perhaps if the foreign law is identical in all respects to
> U.S. law).  Nor can *Gebhard* be limited to the effect of a foreign
> proceeding on State rather than Federal rights.  It is the seminal
> decision on granting comity to foreign insolvency proceedings.

*Id.* at 390.

138.    In that regard, the Supreme Court has held that a foreign judgment should not be

challenged in the United States if the foreign forum provides:

> a full and fair trial abroad before a court of competent jurisdiction,
> conducting the trial upon regular proceedings, after due citation or
> voluntary appearance of the defendant, and under a system of
> jurisprudence likely to secure an impartial administration of justice
> between the citizens of its own country and those of other
> countries, and there is nothing to show either prejudice in the court,
> or in the system of laws under which it is sitting.

*Hilton v. Guyot*, 159 U.S. 113, 202–03 (1895); *Avanti*, 582 B.R. at 618–19 (extending comity to

a sanctioned scheme that: complied with applicable statutory requirements; fairly represented

creditors in classification; found the majority acted in a *bona fide* manner; was one that an

intelligent and honest man, acting in respect of his interests as a creditor, might reasonably

approve; and where jurisdiction was proper); *Metcalfe*, 421 B.R. at 698 (holding that a Canadian

65

order approving a release and injunction was enforceable in chapter 15 under principles of comity because "[t]he U.S. and Canada share the same common law traditions and fundamental principles of law. Canadian courts afford creditors a full and fair opportunity to be heard in a manner consistent with standards of U.S. due process. U.S. federal courts have repeatedly granted comity to Canadian proceedings."); *see also In re Sino-Forest Corp.*, 501 B.R. at 663–64 ("The same analysis [as *Metcalfe*], with the same conclusions, applies here.").

139. The Bermuda Proceeding easily meets the standard for extending comity. The facts and circumstances here are very similar to those in *Metcalfe* and *Sino-Forest*. The United States and Bermuda, as a territory of the United Kingdom, share the same common law traditions and fundamental principles of law. *See, e.g.*, *In re Olinda Star Ltd.*, 614 B.R. at 44 (finding that the "United States and [the British Virgin Islands, another territory of the United Kingdom], share common-law traditions and fundamental principles of law, including an emphasis on procedural fairness"). Moreover, in the Bermuda Proceeding in particular, the Scheme Creditors have a full and fair opportunity to vote on and be heard in connection with the Scheme, in a manner consistent with U.S. standards of due process. Foreign Law Decl. ¶ 34. The Scheme, similar to United Kingdom schemes, requires a greater than 50% majority in number representing not less than 75% in value of the single class of Scheme Creditors present and voting at the relevant Scheme Meeting to vote in favor of the Scheme to be legally binding. Foreign Law Decl. ¶ 51; *see also Avanti*, 582 B.R. at 618–19 (recognizing a foreign scheme with the same voting requirements). Accordingly, enforcing the Scheme and Sanction Order as appropriate relief or additional assistance under section 1521 or 1507 is an appropriate exercise of comity.

66

140.    Granting comity to the Scheme and Sanction Order should appropriately extend to the Releases provided for therein.  Importantly, such Releases need not be available to a chapter 11 debtor for granting comity to be appropriate in a chapter 15 proceeding.  "[P]rinciples of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of the third-party non-debtor release and injunction provisions [appropriately granted in a foreign proceeding], even if those provisions could not be entered in a plenary chapter 11 case." *In re Metcalfe & Mansfield*, 421 B.R. at 696.

141.    This Court has not hesitated to enforce third-party releases similar to the Releases in various foreign proceedings.  *See, e.g.*, *Sino-Forest*, 501 B.R. at 665 (enforcing foreign order containing third-party releases); *see also In re Ocean Rig UDW Inc.*, 570 B.R. at 687 (recognizing and enforcing terms of scheme that released subsidiary guarantees); *In re Towergate Fin. plc*, No. 15-10509 (SMB) (Bankr. S.D.N.Y. Mar. 27, 2015) [ECF No. 16] (same); *In re New World Res. N.V.*, No. 14-12226 (SMB) (Bankr. S.D.N.Y. Sept. 9, 2014) [ECF No. 20] (same); *Avanti*, 582 B.R. at 606 (recognizing and enforcing a United Kingdom scheme and sanction order where "failure of a U.S. bankruptcy court to enforce [certain third-party releases] could result in prejudicial treatment of creditors to the detriment of the Debtor's reorganization"); *supra* ¶ 73.  The same circumstances are present here.  If the Court declines to enforce the Releases of the Released Parties in the Scheme, then certain Scheme Creditors or other entities could seek to obtain judgments in the United States against the Debtor or other Released Parties.  Such an outcome will result in prejudicial treatment of certain creditors and parties in interest to the detriment of the Debtor's reorganization efforts and will prevent the fair and efficient administration of the Restructuring.

67

142.    Thus, principles of comity support enforcement of the Scheme and the Releases of the Released Parties therein, whether or not the same relief could be ordered in a plenary chapter 11 case. *See Avanti*, 582 B.R. at 619 (enforcing a scheme and sanction order including third-party releases); *Sino-Forest*, 501 B.R. at 665 ("[W]here third-party releases are not categorically prohibited, it cannot be argued that the issuance of such releases is manifestly contrary to public policy . . . ."); *Metcalfe*, 421 B.R. at 700 ("Principles of comity in chapter 15 cases support enforcement of the Canadian Orders in the United States whether or not the same relief could be ordered in a plenary case under chapter 11.").

## NOTICE

143.    In accordance with Rule 2002(q) of the Bankruptcy Rules, the Foreign Representative will provide notice of this Motion to (a) the Debtor, (b) the Office of the United States Trustee for Region 2 (the "**U.S. Trustee**"), and (c) the Notice Parties (as defined in the *Motion Pursuant to Fed. R. Bankr. P. 2002 and 9007 Requesting Entry of Order Scheduling Recognition Hearing and Specifying Form and Manner of Service of Notice*), filed contemporaneously herewith.  Draft copies of this Motion were also shared with counsel to the AHGs and the U.S. Trustee prior to filing this Motion.  The Foreign Representative submits that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

## NO PRIOR REQUEST

144.    No previous request for the relief sought herein has been made by the Foreign Representative to this Court or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Foreign Representative respectfully requests entry of the Proposed

Order granting the relief requested herein and such other and further relief as the Court may

deem just and appropriate.

Dated: September 11, 2023
       New York, New York

*/s/ Timothy Graulich*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Timothy Graulich, Esq.
Darren S. Klein, Esq.
Stephen D. Piraino, Esq.
Richard J. Steinberg, Esq.

*Counsel to the Foreign Representative*

## **Exhibit A**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

In re:

**DIGICEL GROUP HOLDINGS LIMITED,**[1]

**Debtor in a Foreign Proceeding**

</td><td>

**Case No. 23-11479 (JPM)**

**Chapter 15**

</td></tr>
</table>

## ORDER GRANTING (I) RECOGNITION OF FOREIGN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, (III) FULL FORCE AND EFFECT IN THE UNITED STATES TO THE SCHEME AND SANCTION ORDER, AND (IV) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE

Upon the *Motion for (I) Recognition of Foreign Proceeding, (II) Recognition of Foreign Representative, (III) Recognition of Sanction Order and Related Scheme, and (IV) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "**Motion**")[2] of Lawrence Hickey (the "**Foreign Representative**") of Digicel Group Holdings Limited ("**DGHL**" or the "**Debtor**"), which is subject to a reorganization proceeding entitled "In the Matter of Digicel Group Holdings Limited" concerning a scheme of arrangement under section 99 of the Bermuda Companies Act (the "**Scheme**") between DGHL and the Scheme Creditors, pending before the Supreme Court of Bermuda, Civil Jurisdiction (Commercial Court) (the "**Bermuda Court**"), 2023: No. 282 (the "**Bermuda Proceeding**"), for entry of a final order (this "**Order**"), pursuant to sections 105(a), 1504, 1507, 1509, 1510, 1515, 1517, 1520, 1521, 1522, and 1525(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), (a) granting the Motion and recognizing the Bermuda Proceeding as a "foreign main proceeding" (as defined in section 1502(4) of the Bankruptcy

---

[1] The Debtor in this chapter 15 case (the "**Chapter 15 Case**"), and the Debtor's registration number, are: Digicel Group Holdings Limited (55491).  The Debtor's registered office and mailing address are Clarendon House, 2 Church Street, Hamilton, HM 11, Bermuda.

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion.

1

Code) of the Debtor, pursuant to section 1517 of the Bankruptcy Code, all relief included

therewith as provided in section 1520 of the Bankruptcy Code, and related relief under section

1521(a); (b) finding that the Foreign Representative is the duly appointed "foreign representative"

of the Debtor within the meaning of section 101(24) of the Bankruptcy Code and that the Foreign

Representative is authorized to act on behalf of the Debtor for purposes of the Chapter 15 Case;

(c) entrusting the Foreign Representative with the power to administer, realize, and distribute all

assets of the Debtor within the territorial jurisdiction of the United States; (d) recognizing and

enforcing the Scheme in the United States and giving full force and effect, and granting comity

in the United States, to the Sanction Order, including, without limitation, giving effect to the

Releases set forth in the Scheme and to allow the Foreign Representative, the Debtor and their

respective expressly authorized representatives and agents to take actions necessary to

consummate the Scheme and transactions contemplated thereby; (e) permanently enjoining all

entities (as that term is defined in section 101(15) of the Bankruptcy Code) other than the

Foreign Representative, the Debtor and their respective expressly authorized representatives and

agents from (i) commencing, continuing, or taking any action in the United States that

contravenes or would interfere with or impede the administration, implementation, and/or

consummation of the Bermuda Proceeding, Scheme, or Sanction Order including, without

limitation, to obtain possession of, exercise control over, or assert claims against the Debtor or its

property or (ii) taking any action against the Debtor or its property located in the territorial

jurisdiction of the United States to recover or offset any debt or claims that are assigned,

subrogated, discharged, extinguished, novated, canceled or released under the Scheme (including

as a result of the laws of Bermuda or other applicable jurisdiction, as contemplated under the

Scheme) or the Sanction Order; (f) authorizing and directing the Directed Parties and any

successor trustees to take any and all actions necessary to give effect to the terms of the Scheme and transactions contemplated thereby; (g) exculpating and releasing the Directed Parties from any liability for any action or inaction taken in furtherance of and/or in accordance with this Order or the Scheme, except for any liability arising from any action or inaction constituting gross negligence, actual fraud, or willful misconduct as determined by the Court; and (h) granting such other and further relief as the Court deems just and proper, all as more fully set forth in the Motion; and the Court having determined that the legal and factual bases set forth in the Motion, the Foreign Representative Declaration, Foreign Law Declaration and all other pleadings and papers in these cases establishing just cause to grant the relief set forth herein and that such relief is in the best interests of the Debtor and its estate and creditors; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

THIS COURT HEREBY FINDS AND DETERMINES THAT:

A.    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P) and this Court has the statutory and constitutional authority to issue a final ruling

with respect to this matter. Venue for this proceeding is proper before this Court pursuant to 28 U.S.C. § 1410.

C.      The Foreign Representative, in his capacity as the Foreign Representative of the Debtor, has standing to make the Motion.

D.      The Debtor has property and property rights within this district, and therefore, the Debtor is eligible to be a debtor in a chapter 15 case pursuant to sections 109 and 1501 of the Bankruptcy Code.

E.      The Foreign Representative is the duly appointed "foreign representative" of the Debtor within the meaning of section 101(24) of the Bankruptcy Code.

F.      The Chapter 15 Case was properly commenced pursuant to sections 1504, 1509 and 1515 of the Bankruptcy Code, and the Foreign Representative has complied with section 1515 of the Bankruptcy Code and Bankruptcy Rules 1007(a)(4) and 2002 (except to the extent compliance with Bankruptcy Rule 1007(a)(4) has previously been waived by this Court).

G.      Due and proper notice of the Motion and Hearing have been provided in accordance with the Order Pursuant to Federal Rules of Bankruptcy Procedure 2002 and 9007 Scheduling Hearing and Specifying Form and Manner of Service and Notice [ECF No. ·] (the "**Scheduling Order**") and in compliance with the requirements of Bankruptcy Rule 2002(q), and no other or further notice need be provided.

H.      The Bermuda Proceeding is a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code.

I.      The Bermuda Proceeding is entitled to recognition by this Court pursuant to section 1517 of the Bankruptcy Code.

J.      Bermuda is the center of main interest of the Debtor, and accordingly, the Bermuda Proceeding is a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code and is entitled to recognition as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code.

K.      The Foreign Representative and the Debtor, as applicable, are entitled to the relief available pursuant to section 1520 of the Bankruptcy Code and to additional assistance and discretionary relief (including recognition and enforcement of the Scheme, the Releases contained therein, and the Sanction Order) pursuant to sections 1507 and 1521(a) of the Bankruptcy Code, to the extent set forth in this Order and subject to the limitations set forth in this Order.

L.      The Foreign Representative and the Debtor, as applicable, are entitled to the Court's cooperation under section 1525(a) of the Bankruptcy Code in implementing the Scheme in the form of relief granted by this Order on the terms provided herein.  The terms of the Scheme before the Bermuda Court provided creditors and parties in interest with appropriate due process and are not manifestly contrary to U.S. public policy.

M.      The relief granted hereby is necessary and appropriate to effectuate the purposes and objectives of Chapter 15 of the Bankruptcy Code and to protect the Debtor and the interests of their creditors and other parties in interest, and is consistent with the laws of the United States, international comity, public policy, and the policies of the Bankruptcy Code.

N.      The relief granted hereby (a) is essential to the success of the Bermuda Proceeding and Scheme; (b) is an integral element of the Bermuda Proceeding and the Scheme, and is integral to their effectuation; and (c) confers material benefits on and is in the best interests of the Debtor, its creditors and parties in interest.

O.     Absent the relief granted hereby, the Bermuda Proceeding and the Debtor's efforts to consummate the Scheme could be impeded by the actions of certain creditors and other persons, a result that would be contrary to the purposes of Chapter 15 of the Bankruptcy Code as set forth, *inter alia*, in section 1501(a) of the Bankruptcy Code.  If taken, such actions could threaten, frustrate, delay, and ultimately jeopardize the Bermuda Proceeding and implementation of the Scheme, and, as a result, the Debtor, its creditors, and such other parties in interest would suffer irreparable harm for which there is no adequate remedy at law.

P.     Each injunction contained in this Order (a) is within the Court's jurisdiction; (b) is necessary and appropriate to the success of the Bermuda Proceeding; (c) confers material benefits on, and is in the best interests of the Debtor and its creditors; and (d) is important to the overall objectives of the Debtor's restructuring.

Q.     Specifically, the injunctive relief set forth in this Order is appropriate and necessary to prevent the risk that the Bermuda Proceeding may be thwarted by the actions of particular creditors, a result inimical to the purposes of Chapter 15 of the Bankruptcy Code as set forth in section 1501(a) of the Bankruptcy Code.  Such actions could put in peril the Debtor's ability to successfully restructure.

R.     The relief granted herein will not cause undue hardship or inconvenience to any party in interest, and to the extent that any hardship or inconvenience may result to such parties, it is outweighed by the benefits of the requested relief to the Foreign Representative, the Debtor, its estate, and its creditors.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.     The petitions for recognition and other relief requested in the Motion are hereby GRANTED, as set forth in this Order.

2.      All objections, if any, to the Motion or the relief requested therein that have not

been withdrawn, waived, or settled as announced to this Court at the hearing on the Motion, if

any, or by stipulation filed with this Court, and all reservations of rights included therein, are

hereby overruled on the merits.

3.      The Foreign Representative is the duly appointed foreign representative of the

Debtor within the meaning of section 101(24) of the Bankruptcy Code and is authorized to act on

behalf of the Debtor in the Chapter 15 Case.

4.      The Bermuda Proceeding is granted recognition as a foreign main proceeding

pursuant to section 1517 of the Bankruptcy Code.

5.      All relief and protection afforded to a foreign main proceeding pursuant to section

1520 of the Bankruptcy Code is hereby granted to the Bermuda Proceeding, the Debtor, and the

Debtor's assets located within the territorial jurisdiction of the United States, as applicable,

including the application of section 362 of the Bankruptcy Code, which bars the commencement

or continuation of actions against the Debtor and/or property of the Debtor located within the

territorial jurisdiction of the United States.  The Debtor and its respective successors, agents,

representatives, advisors, and counsel are entitled to the protections contained in sections 306

and 1510 of the Bankruptcy Code.

6.      The Sanction Order, the Scheme (including the Releases), any amendments,

modifications, and all schedules, exhibits and other attachments to the Scheme, in each case

subject to all terms, conditions, and limitations set forth therein, are hereby recognized, granted

comity and given full force and effect within the territorial jurisdiction of the United States and

for purposes of U.S. law with respect to the Debtor, and each is binding on all creditors of the

Debtor, including all Scheme Creditors, the Directed Parties and any of their respective successors and assigns, subject to the terms of this Order.

7.      Except as provided by or as may be necessary to enforce the terms of the Scheme, the Sanction Order, or this Order, all entities (as such term is defined in section 101(15) of the Bankruptcy Code), other than the Foreign Representative, the Debtor and their respective expressly authorized representatives and agents are hereby permanently enjoined and restrained from:

(a)      execution against any of the Debtor's assets in contravention of the terms of the Scheme, the Sanction Order, or this Order;

(b)      the direct or indirect commencement or continuation, including the issuance or employment of process or discovery, of a judicial, administrative, arbitral, or other action or proceeding, or to recover a claim (as such term is defined in section 101(5) of the Bankruptcy Code), which in either case in any way relates to, or would interfere with, the administration of the Debtor's estate in the Bermuda Proceeding or the solicitation, implementation, or consummation of any transaction contemplated by the Scheme;

(c)      taking or continuing any act to create, perfect, or enforce a lien or other security interest, setoff, or other claim against the Debtor or any of its property with respect to any debt that is assigned, subrogated, discharged, extinguished, novated, canceled, released or otherwise being restructured pursuant to the Scheme, including, for the avoidance of doubt and without limitation, the Existing Notes;

8

(d)     transferring, relinquishing, or disposing of any property of the Debtor to any

entity (as such term is defined in section 101(15) of the Bankruptcy Code)

other than by the Foreign Representative and his authorized representatives

and agents or in any way attempting to obtain possession or control over any

property of the Debtor, in each case, other than in a manner consistent with

and not in contravention of the terms of the Scheme, the Sanction Order, or

this Order;

(e)     to the extent they have not been stayed pursuant to section 1520(a) and 362 of

the Bankruptcy Code, asserting any claims, commencing, or continuing any

action or proceeding (including, without limitation, bringing suit in any court,

arbitration, mediation, or any judicial or quasi-judicial, administrative or

regulatory action, proceeding, or process whatsoever), whether directly or by

way of counterclaim (and from seeking discovery of any nature related thereto)

concerning or otherwise relating to (i) the Debtor's property, assets, affairs,

rights, obligations, or liabilities or (ii) any debt or claims that are assigned,

subrogated, discharged, extinguished, novated, canceled or released under the

Scheme (including the Releases), the Sanction Order, or as a result of

Bermuda or other applicable law, including, for the avoidance of doubt and

without limitation, the Existing Notes and the Indentures.

8.      The Directed Parties are directed and authorized to take any and all lawful actions

necessary to give effect to and implement the Scheme and the Sanction Order and the

transactions contemplated thereunder, including, without limitation, the cancellation and

discharge of the Existing Notes and the Indentures, and the issuance of the New Notes, subject to

the terms and conditions of the documents under which they have or will be appointed to act. Further, the Directed Parties are hereby authorized to take any other lawful action as instructed by, and at the expense of, the Debtor that may be necessary to cancel the Existing Notes.

9.      Subject to the continuing effectiveness of the Scheme and the Sanction Order, and upon the issuance of the New Notes, the Indentures, Existing Notes, instruments and certificates, and other documents evidencing the Scheme Creditors' claims and rights related thereto (including claims against the Indenture Trustee) shall be deemed satisfied, discharged, and cancelled automatically and of no force or effect. Upon cancellation, all remaining positions on account of the Existing Notes on the books and records of the Indenture Trustee and DTC shall be terminated following the issuance of the New Notes.

10.      The Indenture Trustee, including its agents, attorneys, successors and assigns, are authorized and directed to provide DTC with the customary documentation accepted by it, as applicable, in order to cancel and remove the Existing Notes from DTC's records, as contemplated by the Scheme.

11.      The Directed Parties, including the Indenture Trustee, may conclusively rely upon and shall incur no liability and be exculpated and released from any liability for any action or inaction taken in connection with this Order, except for any liability arising from any action or inaction constituting gross negligence, actual fraud, or willful misconduct, in each case as finally determined by this Court.

12.      The Foreign Representative, the Debtor, and their respective expressly authorized representatives and agents in the United States are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order, including, without limitation, to implement the terms of the Scheme and related restructuring transactions and the Foreign Representative

and the Debtor, as applicable, are authorized to use any property and to continue operating any businesses within the territorial jurisdiction of the United States.

13.    The administration, realization, and distribution of all or part of the assets of the Debtor within the territorial jurisdiction of the United States is entrusted to the Foreign Representative, and the Foreign Representative is established as the exclusive representative of the Debtor in the United States pursuant to section 1521(a) of the Bankruptcy Code.

14.    No action taken by the Foreign Representative in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of the Scheme or any order entered in the Chapter 15 Case or in any adversary proceedings or contested matters in connection therewith, shall be deemed to constitute a waiver of the immunity afforded the Foreign Representative pursuant to sections 306 and 1510 of the Bankruptcy Code.

15.    Notwithstanding any provision in the Bankruptcy Rules to the contrary, (a) this Order shall be effective immediately and enforceable upon entry; (b) the Foreign Representative is not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; and (c) the Foreign Representative is authorized and empowered, and may in his discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

16.    A copy of this Order, confirmed to be true and correct, shall be served, within seven business days of entry of this Order, upon the Notice Parties, with such service being good and sufficient service and adequate notice for all purposes.

17.    This Court shall retain jurisdiction with respect to all matters arising from or relating to the interpretation, implementation, enforcement, amendment, or modification of this Order.

Dated:  [·], 2023
         New York New York

_____
UNITED STATES BANKRUPTCY JUDGE