**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

**DIGICEL GROUP HOLDINGS LIMITED,**[1]

Debtor in Foreign Proceeding

Case No. 23-11479 (JPM)

Chapter 15

## DECLARATION OF C. CHRISTIAN R. LUTHI IN SUPPORT OF THE MOTION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, (III) RECOGNITION OF SANCTION ORDER AND RELATED SCHEME, AND (IV) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

I, C. Christian R. Luthi, pursuant to section 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

### INTRODUCTION

1.     I am a barrister and attorney duly admitted to practice in Bermuda and a Director and the Chairman of the Bermuda law firm Conyers Dill & Pearman Limited ("**Conyers**")[2] as well as the Head of Conyers' Litigation & Restructuring Department, located at Clarendon House, 2 Church Street, Hamilton HM 11, Bermuda.  Conyers is serving as Bermuda counsel to Digicel Group Holdings Limited (an exempted company with limited liability), incorporated under the laws of Bermuda (the "**Debtor**," the "**Company**" or "**DGHL**," together with its directly or indirectly owned other holding and operating companies that comprise the Digicel group of companies, "**Digicel**" or the "**Group**").

---

[1] The Debtor in this chapter 15 case (the "**Chapter 15 Case**"), and the Debtor's registration number, are: Digicel Group Holdings Limited (55491).  The Debtor's registered office and mailing address are Clarendon House, 2 Church Street, Hamilton, HM 11, Bermuda.

[2] All capitalized terms used in this Declaration have the same meaning as given to such terms in the Foreign Representative Declaration (as defined below) unless otherwise specified herein.

2.       Conyers has served as the Debtor's Bermuda corporate counsel since the Debtor's inception, and has advised the Debtor on, among other things, the 2020 Restructuring and the issuance of the Existing Notes (as defined below).   Moreover, Conyers' affiliate Conyers Corporate Services (Bermuda) Limited has served as the Debtor's corporate secretary since incorporation.  As a Bermuda-incorporated company, (a) any restructuring of the Debtor itself must include a plenary proceeding in Bermuda, (b) any disputes in relation to the internal corporate affairs of the Debtor would be governed by Bermuda law, and (c) the Debtor is required by the Bermuda Companies Act (as defined below) to maintain a register of directors and officers at its registered office in Bermuda.

3.       I am over the age of eighteen and, except as otherwise indicated, all facts set forth in this declaration (this **"Declaration"**) are based upon my personal knowledge, my opinion based upon my experience and knowledge of the Debtor and my review of relevant documents or information supplied to me.   In preparing this Declaration, I have reviewed the (a) Chapter 15 Petition (as defined below), (b) Motion for Recognition (as defined below), (c) documents prepared and/or filed in connection with the Bermuda Proceeding (as defined below) and (d) relevant provisions of the Companies Act 1981 of Bermuda (as amended, the "**Bermuda Companies Act**") and other provisions of Bermuda law as they relate to chapter 15 of title 11 of the United States Code (the "**Bankruptcy Code**") and other aspects of U.S. bankruptcy law referred to in this Declaration.   If I were called upon to testify, I could and would testify competently to the facts set forth herein.

4.       As of the date hereof, the Debtor is subject to a reorganization proceeding entitled "In the Matter of Digicel Group Holdings Limited" concerning a scheme of arrangement under section 99 of the Bermuda Companies Act (the "**Scheme**") between DGHL and the Scheme

Creditors, pending before the Supreme Court of Bermuda, Civil Jurisdiction (Commercial Court) (the "**Bermuda Court**"), 2023: No. 282 (the "**Bermuda Proceeding**").

5.      I submit this declaration in support of the (i) *Official Form 401 Petition* (the "**Chapter 15 Petition**") and (ii) *Motion for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, (III) Recognition of Sanction Order and Related Scheme, and (IV) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "**Motion for Recognition**"), filed contemporaneously herewith.

6.      This Declaration comprises matters that are statements of my view of Bermuda law or statements of fact.  Where the matters stated in this Declaration are statements regarding Bermuda law, such statements represent my view of Bermuda law as a barrister admitted and authorized to practice in Bermuda.  Where the matters stated in this Declaration are statements of fact that are within my personal knowledge, they are true.  Where the matters stated in this Declaration that are statements of fact are not within my personal knowledge, they are derived, as appropriate, from documents maintained by the Registrar of Companies of Bermuda, from the records maintained by Conyers as a result of advising DGHL in connection with the Scheme and/or from information supplied to me by or on behalf of DGHL and are true to the best of my knowledge, information and belief.

## PERSONAL BACKGROUND AND QUALIFICATIONS

7.      I am the Head of Conyers' Litigation & Restructuring Department and the Chairman of Conyers with expertise in commercial litigation, insolvency and corporate restructurings.  I hold a B.A. in Philosophy from Trinity College and a Masters in Jurisprudence from Oxford University.  I joined Conyers as an associate in 1994, after being called to the Bar of England and Wales and became the Chairman in 2017.  I am a member in good standing of the Bermuda Bar Association.

3

8.      I have considerable experience in matters related to Bermuda insolvency law.  I have advised companies, creditors, and liquidators on a large number of winding-up proceedings, insolvent restructurings and multinational reorganizations, a number of which were implemented by way of schemes of arrangement that were sanctioned by the Bermuda Court.

9.      I am, together with other directors and associates at Conyers, Bermuda counsel to DGHL in connection with the Bermuda Proceeding.

**STATEMENTS OF BERMUDA LAW AND PRACTICE**

**A.      Sources of Bermuda Law**

10.      Bermuda is a British Overseas Territory.  As such, it is a self-governing but dependent territory of the United Kingdom.  In common with other British Overseas Territories and former colonies, English law was introduced to Bermuda at the date of its settlement in 1612. The system of law in Bermuda is therefore founded on the English legal system, although there is a distinct body of Bermudian statutory law and Bermudian case law that has developed over the past 400 years.

11.      In particular, section 15 of the Supreme Court Act 1905 provides that the systems of law administered in Bermuda consist of (a) the common law of England, (b) the doctrines of equity of England and (c) the Acts of the Parliament of England of general application which were in force in England at the date of Bermuda's settlement on July 11, 1612, except where those laws have been altered by (1) United Kingdom legislation, since 1612, expressly made applicable to Bermuda, (2) local Bermuda legislation and (3) expansion or restriction of Bermuda common law since the year 1612.  Law and equity are administered concurrently, and in any conflict, the rules of equity generally prevail.

B.      **The Bermuda Court System**

12.    The Bermuda Court is the court of first instance in Bermuda with unlimited jurisdiction for all civil and commercial disputes with a value in excess of BD$25,000.   The Bermuda Court determines any proceedings relating to the affairs of companies incorporated in Bermuda under the Bermuda Companies Act.   Relatedly, the Bermuda Court is also generally responsible for the resolution of insolvency cases in Bermuda.

13.    The Court of Appeal for Bermuda (the "**Court of Appeal**") is the first-tier appellate court in Bermuda, made up of three judges who sit in quarterly sessions.   It entertains appeals from the Bermuda Court.

14.    Appeals against decisions of the Court of Appeal are entertained by the Judicial Committee of the Privy Council (the "**Privy Council**"), which, although based in the United Kingdom, is Bermuda's highest appellate court.   The Privy Council is ordinarily made up of a five-judge tribunal that sits in London.   Its composition consists of members of the Supreme Court of the United Kingdom (formerly the House of Lords, and the highest appellate court for England and Wales, Scotland and Northern Ireland), as well as other senior judges from the Commonwealth jurisdictions.

C.      **The Common Law Principle of Precedent Is Applicable in Bermuda**

15.    Bermuda law, following English law in this regard, is based upon the common law principle of precedent.   Under the doctrine of precedent, certain judicial decisions are "binding" on other judges, and their reasoning or "*ratio decidendi*" must be followed and applied, unless they are properly capable of being distinguished.   A judge of the Bermuda Court is bound to follow and apply any relevant decision of the Court of Appeal and any relevant decision of the Privy Council.   The Court of Appeal, in turn, is bound by any relevant decision of the Privy Council.   Previous relevant decisions of the Privy Council are binding on the Privy Council itself,

except in exceptional circumstances.  The Privy Council can depart from a previous decision where it is right to do so, when, for example, the previous decision is thought to be wrong, there have been changes or developments to the law or the previous decision is thought to have led to results which were unjust or contrary to public policy.

16.     Under the doctrine of precedent, certain judicial decisions, or parts thereof (such as "ex parte" rulings or "obiter dicta"), may be "persuasive," and, depending on the facts of the case, the seniority and experience of the tribunal, and the quality of their reasoning, should ordinarily be followed and applied, unless they are plainly wrong or are properly capable of being distinguished.  In particular, decisions of the Bermuda Court are persuasive and should generally be followed by other judges of the Bermuda Court.

17.     Furthermore, Bermudian courts often treat English case law as being persuasive for three main reasons.

18.     Firstly, many Bermuda statutes are based upon current or former United Kingdom legislation.  As a result, decisions of the Superior Courts of England and Wales in respect of provisions of United Kingdom statute law that are identical to or similar to Bermuda law are considered in Bermuda to be highly persuasive authority.

19.     Secondly, the decisions of the United Kingdom Supreme Court on matters of common law and statutory interpretation are extremely persuasive in Bermuda since the United Kingdom Supreme Court, sitting as the highest appellate Court for the United Kingdom, and the Privy Council, sitting as the highest appellate Court for Bermuda, share common membership. *See De Lasala v De Lasala* [1980] A.C. 546, 558.

20.     Thirdly, where issues of common law in Bermuda have not been expressly considered by the Bermuda courts, the Bermuda courts often find assistance in the consideration

of such issues in reasoned judgments or rulings by judges of the Superior Courts of England and

Wales, whether in the High Court of Justice, the United Kingdom Court of Appeal or the United

Kingdom Supreme Court. Furthermore, depending on the facts and the circumstances (including

the legislative background, the jurisdictional and legal similarities, and the perceived quality of

the tribunal and its reasoning), the Bermuda courts often find assistance in the consideration of

issues in reasoned judgments by judges of the superior courts of other common law and offshore

jurisdictions, such as the British Virgin Islands, the Cayman Islands, Australia, New Zealand,

Hong Kong, Singapore and Canada. In practice, Privy Council decisions, on appeal from other

common law jurisdictions, are treated as highly persuasive if the relevant common law or

legislation is similar to the law of Bermuda.

### D.      Situs of Shares in a Bermuda Company

21.     The situs of shares in a Bermuda company is at the registered offices of the

company at which its register of members is kept. *See International Credit and Investment Co*

*(Overseas) Ltd and Another v Adham and Others* [1994] 1 BCLC 66. Section 65(2) of the

Bermuda Companies Act provides that a company's register must be kept at its registered offices.

The situs of shares in a Bermuda company is therefore Bermuda. *See id*. Title to shares is based

upon entries in the share register and a certificate of holdings of shares is merely *prima facie*

evidence of the existence on a share register of entries at the date on which the certificate was

given. *See id*. A share certificate is not evidence of proper title to shares, and in order to prove

title it is necessary to go to the share register. *See id*.

### E.      A Scheme of Arrangement Under the Laws of Bermuda

22.     A scheme of arrangement is a statutory process under Sections 99 and 100 of the

Bermuda Companies Act whereby a compromise or arrangement between a company and its

creditors (or members (i.e., equity holders) or any classes of its creditors (or members)

irrespective of where such creditors or members reside) can become binding on the company and all of its affected creditors through a collective judicial proceeding, if (i) approved by a Bermuda Court-directed meeting(s) of a majority in number, representing at least 75% in value, in each class of affected creditors (or members) and (ii) sanctioned by the Bermuda Court.  In other words, a scheme of arrangement proceeding, like the Bermuda Proceeding, provides for a centralized process to assert and resolve claims against a Bermuda estate in one tribunal, the Bermuda civil court, and to provide distributions to creditors in order of priority.

23.     A scheme of arrangement under the Bermuda Companies Act, like an English scheme of arrangement, is a flexible mechanism that can be used to encompass a large variety of compromises or arrangements between a company, whether solvent or insolvent, and its creditors (or members).  A scheme of arrangement is a useful tool for restructuring all or a certain part of a company's debt.  A company does not need to be insolvent, or near insolvency, to propose and implement a scheme of arrangement.  In fact, schemes of arrangement under Section 99 of the Bermuda Companies Act have typically been used to implement solvent restructurings in Bermuda in recent years.

24.     A compromise or arrangement of the type envisaged by the proposed Scheme has the effect of discharging liabilities of the company concerned and, therefore, can facilitate the winding-up or restructuring of the company, as applicable.  In this particular instance, it is intended that the Debtor will, following consummation of the Scheme (and satisfaction of its purpose), enter into liquidation in accordance with Part XIII of the Bermuda Companies Act, as set forth in the Explanatory Statement (as defined below) that is attached to the Foreign Representative Declaration as **Exhibit L**.

25.     The Bermuda Court supervises the entire scheme of arrangement process, in order to provide procedural protection for both a company and its creditors alike.  Specifically, the Bermuda Companies Act requires the following to occur in order for a scheme of arrangement to become legally binding on the company and on all of the creditors to whom it applies:

(i)      the convening by the Bermuda Court of meeting(s) of the class or classes of creditors affected by the scheme of arrangement to vote on its approval;

(ii)     the issuance of an "explanatory statement" to the affected creditors explaining the effect of the scheme of arrangement and addressing certain other statutory requirements;

(iii)    notification to creditors of the date and time of the court-directed scheme meeting(s);

(iv)    the approval of the scheme of arrangement by a majority in number representing at least 75% in value of the class or classes of creditors present and voting in person or by proxy at the scheme meeting(s) convened for such purpose;

(v)     the sanction of the scheme of arrangement by the Bermuda Court following a full hearing of a petition to sanction the scheme; and

(vi)    the delivery of an official copy of the scheme and the order of the Bermuda Court sanctioning the scheme to the Registrar of Companies within such period as may be specified by order of the Bermuda Court or the scheme itself.

26.     A scheme of arrangement cannot be sanctioned by the Bermuda Court unless the Bermuda Court is satisfied, among other things, that (a) the scheme of arrangement is in all

circumstances fair and reasonable and (b) the classes of creditors voting in respect of the scheme

of arrangement have been properly constituted.  *See Re Telewest Communications* (No. 2) Ltd

[2005] 1 BCLC 772.  Absent the Bermuda's Court sanction of a scheme, a company cannot

implement such scheme.

F.    **Practice Statement Letter and Convening Order**

27.    The scheme process typically begins when a company issues a practice statement

letter in accordance with Bermuda Court Circular N.18 of 2007 to the creditors (or members)

affected by the scheme and subsequently files an application to the Bermuda Court seeking a

hearing of the Bermuda Court to convene a scheme meeting(s) of the relevant class or classes of

the company's creditors (or members) proposed to be subject to the scheme to enable such

parties to consider and vote on the proposed scheme of arrangement.  The purpose of a practice

statement letter is to inform the creditors subject to the scheme of (i) the company's intention to

promote a scheme, (ii) the purpose that the scheme is designed to achieve, (iii) the class

composition of the creditors subject to the scheme for the purpose of voting on the scheme at the

scheme meeting(s) and (iv) a company's intention to apply to the Bermuda Court to seek an

order convening a meeting or meetings of the creditors (or members) subject to the scheme for

the purpose of voting on the scheme.  Although affected scheme parties may be put on notice

that a convening hearing is scheduled to occur through a practice statement letter, applications

for a convening order at a convening hearing are usually heard *ex parte*.

28.    In designating and determining the appropriate class or classes of creditors for the

purpose of voting on a scheme of arrangement, the company must consider whether the rights of

the creditors within such class are not so dissimilar with respect to the company, both as such

rights exist before the scheme and afterward, so as to make it impossible for them to consult

together in relation to the proposed compromise or arrangement with a view to their common

interest. *See* Practice Direction No. 18 of 2007; *Re Hawk Insurance Co Ltd* [2001] 2 B.C.L.C. 480; *Re UDL Holding Ltd* [2002] 1 HKC 172 at 185–94 (Lord Millett NPJ); *Re T&N Ltd (No. 4)* [2007] Bus. L.R. 1411 at 85–87; *Re Lehman Brothers International* (Europe) (in administration) [2018] EWHC 1980 (Ch) at 70.

29.     At a convening hearing, the Bermuda Court will consider the composition of the proposed class or classes of creditors, the nature of the proposed restructuring, and the contents of the explanatory statement prior to making an order convening any scheme meeting.

## G.    Notice of Scheme Meeting(s) and Explanatory Statement

30.     Once an order convening the scheme meeting(s) has been issued, notice of the scheme meeting(s) must be given to all affected creditors prior to the meeting(s) in accordance with that order and the Bermuda Companies Act.  Such notice must be accompanied by an explanatory statement that contains sufficient information regarding the company and explaining the effect of the scheme of arrangement following consummation, so as to allow a typical creditor to make a reasonable decision whether or not to support the proposed scheme of arrangement. *See* s100 (1) of the Bermuda Companies Act; *Re APP China Group Ltd* [2003] Bda LR 50.  The explanatory statement provides disclosure regarding the procedures to take place in the scheme.  In particular, it must set out information regarding the proposals for the scheme, the affected creditors, the constitution of the creditor class or classes, the scheme meeting or meetings, voting, and guidance on how scheme creditors may participate in the scheme of arrangement.  I understand and have been advised by Davis Polk & Wardwell LLP ("**U.S. Counsel**") that an explanatory statement is comparable to the disclosure statement required under section 1125 of the Bankruptcy Code for solicitation of votes on a chapter 11 plan. Creditors are entitled to attend the scheme meeting(s) in person, by authorized representative (if

a corporate entity) or by proxy and may ask the scheme meetings' chairperson questions regarding the proposed scheme of arrangement.

**H.      Voting**

31.      As noted above, each class of affected creditors will consider and vote on the proposed scheme of arrangement.  Similar to United Kingdom schemes, Bermuda schemes require a majority in number representing at least 75% in value of those present and voting in person or by proxy at the scheme meeting(s) of each class or classes of creditors to vote in favor of the scheme of arrangement in order for the Bermuda Court to have jurisdiction to sanction the scheme of arrangement.  If any class of affected creditors does not approve the scheme (by the requisite majorities described in the foregoing sentence), the scheme cannot be sanctioned by the Bermuda Court and will not take effect.  In other words, nonconsenting affected creditors can be bound by the terms of a scheme of arrangement only if all of the classes of affected creditors vote by the requisite majorities in favor of the scheme.  Thus, unlike the confirmation provisions of chapter 11 of the Bankruptcy Code, as explained to me by U.S. Counsel, cross-class cramdown is not permissible.

32.      The voting majorities are confirmed by the chairperson at the scheme meeting(s). To confirm the voting majorities, the chairperson tabulates the votes of affected creditors submitted at each scheme meeting.  The chairperson is often assisted in this task by an adviser appointed specifically to assist the company with, among other things, the task of tabulating votes.  The value of each creditor's claim for voting purposes will typically be the face value of the actual and contingent claim of that creditor against the company under the existing debt document as of a specific date fixed prior to the scheme meeting(s).  If the requisite majorities of attending and voting creditors approve the scheme of arrangement, the chairperson provides a report and sworn statement as evidence thereof.

12

33.     In this particular case, the value of the Scheme Creditor's claims will consist of claims arising directly or indirectly out of, in relation to and/or in connection with the currently outstanding (a) $324.5 million in aggregate principal amount of 8.0% Senior Cash Pay/PIK Notes due 2025 (the "**Unsecured Notes**") issued pursuant to that certain Indenture dated as of June 23, 2020, between DGHL, as issuer, and Wilmington Trust, National Association, as the successor trustee to Deutsche Bank Trust Company Americas, and (b) $215 million 7.00% PIK Perpetual Convertible Notes issued pursuant to that certain Indenture dated as of June 23, 2020, between DGHL, as issuer, and Wilmington Trust, National Association as the successor trustee to Deutsche Bank Trust Company Americas (the "**Subordinated Notes**" and, together with the Unsecured Notes, the "**Existing Notes**").[3]

## I.    Bermuda Court Sanction of the Scheme of Arrangement

34.     Assuming the requisite majorities have been obtained at the scheme meeting(s), the company must petition the Bermuda Court to sanction the scheme of arrangement at a sanction hearing in order for it to become binding on all of the affected creditors, whether or not they voted in favor of the scheme of arrangement.  I understand and have been advised by U.S. Counsel that a sanction hearing is comparable to a confirmation hearing on a chapter 11 plan of reorganization under section 1128 of the Bankruptcy Code.  Similar to a confirmation hearing, at a sanction hearing all of the creditors of a company have, subject to compliance with the Bermuda Court's directions, an opportunity to raise objections to the scheme of arrangement and to present evidence, which is consistent with U.S. standards of due process.

35.     Following the sanction hearing, the Bermuda Court may sanction a scheme of arrangement unconditionally, sanction a scheme of arrangement conditional upon certain

---

[3] Wilmington Trust, National Association replaced Deutsche Bank Trust Company Americas as trustee for both the Unsecured Notes and the Subordinated Notes on April 27, 2023.

modifications or amendments to the scheme of arrangement, or refuse to sanction the scheme of arrangement.

36.     The Bermuda Court will consider five criteria in exercising its discretion as to whether or not to sanction a scheme. *See Re Telewest Communications (No. 2) Ltd* [2005] 1 BCLC 772.   In particular, the Bermuda Court must be satisfied that:

> (i)     sufficient steps have been taken to identify and notify all interested parties;
>
> (ii)    the statutory requirements and all directions of the Bermuda Court have been complied with;
>
> (iii)   the class or classes of creditors (or members as the case may be) are properly constituted;
>
> (iv)    no issue of coercion must arise; and
>
> (v)     the compromise or arrangement proposed under the scheme of arrangement is such that an intelligent and honest man, being a member of the relevant class of scheme creditors concerned and acting in respect of his interests, might reasonably approve it.

37.     Further, the Bermuda Court will not sanction a scheme of arrangement unless it is satisfied that the scheme is in all circumstances fair and reasonable.  *See id.*; Practice Direction No. 18 of 2007; *Re Hawk Insurance Co Ltd* [2001] 2 B.C.L.C. 480; *Re UDL Holding Ltd* [2002] 1 HKC 172 at 185–94 (Lord Millett NPJ); *Re T&N Ltd (No. 4)* [2007] Bus. L.R. 1411 at 85–87; *Re Lehman Brothers International* (Europe) (in administration) [2018] EWHC 1980 (Ch) at 70. In addition, the Bermuda Court will not sanction a scheme that is *ultra vires.  See Re Oceanic Steam Navigation Company Ltd* [1939] 1 Ch 41.   The Bermuda Court does not judge the

business merits of proposed schemes and generally refrains from second-guessing commercial decisions made at a scheme meeting or meetings.

38.    If the Bermuda Court issues a sanction order thereby sanctioning a scheme of arrangement, the scheme will only take effect once a copy of the Bermuda Court's order sanctioning the scheme has been delivered to the Bermuda Registrar of Companies.  Upon such delivery, the scheme is binding and effective on all affected creditors according to its terms, irrespective of whether such creditor (a) actually received notice pursuant to the methods of notice required by and approved in the convening order, (b) participated at any scheme meeting or (c) voted at any scheme meeting.  The ultimate legal effect of the arrangement envisaged by the scheme of arrangement can, in limited circumstances, be subject to additional conditions as agreed to between the company and its creditors.  For example, in this particular case, one such condition is the recognition and enforcement of the Scheme in the United States pursuant to a chapter 15 recognition order.

**J.      Similarity to Schemes of Arrangement Under the Laws of the United Kingdom**

39.    The provisions of the Bermuda Companies Act governing schemes of arrangement under the laws of Bermuda are modeled after and similar to the provisions of the laws of the United Kingdom governing schemes of arrangement, which are set forth in Part 26 of the Companies Act, 2006 of the United Kingdom.  Indeed, Sections 99 and 100 of the Bermuda Companies Act are copied from the English Companies Act 1948.  The Companies (Winding-Up) Rules 1982 and Bermuda common law are also similar to the English Companies Act 1948, related statutory rules and English common law.

40.    Courts in Bermuda have recognized how closely the relevant provisions of the Bermuda Companies Act and the Companies Act, 2006 of the United Kingdom parallel each other.  As a result, decisions of the courts of England and Wales regarding schemes of

23-11479-jpm   Doc 5   Filed 09/11/23   Entered 09/11/23 17:22:45   Main Document
Pg 16 of 22

arrangement under the Companies Act, 2006 of the United Kingdom have persuasive effect before the Bermuda Court. *See, e.g.*, *Re APP China Group Ltd* [2003] Bda LR 50.

41.     In addition, a Bermuda scheme is, like an English scheme, an extremely flexible tool and could, among other things, provide creditors and certain third parties with releases of any claims they have or may have in the future arising in connection with the scheme itself (and/or related restructuring, if applicable).  Such a release would ensure, among other things, that the company is free from claims of counter-indemnity that might otherwise be brought against it, which would undermine the intended finality of the compromises effectuated by the scheme of arrangement.  The Bermuda Court has sanctioned schemes that contained third-party releases.  In *In Re Noble Limited* [2018] No 34, counsel cited a multitude of English cases where third-party releases were approved.  *Re Lehman Brothers International* (Europe) (No. 2) [2010] Bus LR 489 at 65 (Patten LJ), *La Seda de Barcelona* [2010] EWHC 1364 (Ch) at 20–22, *Re Magyar Telecom BV* [2014] BCC 448 at 33 (David Richards J) and *In Far East Capital S.A.* [2017] EWHC 2878 (Ch) at 14.  More recently, in *In Re Markel CATco Reinsurance Fund Limited [2022] 12 Com (25 February 2022)*, the Bermuda Court considered, among other cases, *Noble*, and sanctioned a scheme with wide-ranging releases that were held to be "necessary in order to give effect to the proposed arrangement," "necessary for the Schemes to achieve their purpose," and found that there was a "sufficient nexus" for the releases to fall within the jurisdiction of the Bermuda Companies Act.  As the foregoing showcases, there are English scheme precedents where third-party releases were granted, which have persuasive effect before the Bermuda Court, and there is also Bermuda precedent in which third-party releases were granted.

42.    Further, I understand that Lawrence Hickey, as the Debtor's duly authorized foreign representative ("**Foreign Representative**") intends to request that the hearing before this court (this "**Court**") on the Motion for Recognition be scheduled to occur after the Bermuda Court issues an order (the "**Sanction Order**") sanctioning the Scheme.  If such Sanction Order is made by the Bermuda Court, it will represent a determination by the Bermuda Court that the terms of the Scheme, including the third-party releases contemplated thereby, are consistent with Bermuda law.

## THE SCHEME

43.    I respectfully refer the Court to the Motion for Recognition and the *Declaration of Lawrence Hickey in Support of the Motion for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, (III) Recognition of Sanction Order and Related Scheme, and (IV) Related Relief Under Chapter 15 of the Bankruptcy Code and Additional First Day Filings* (the "**Foreign Representative Declaration**"), filed contemporaneously herewith, for a description of the Debtor's history, business, and the specific terms of its restructuring. Along with the Motion for Recognition and Foreign Representative Declaration, I also respectfully refer the Court to the Explanatory Statement, which, as stated above, I understand from U.S. Counsel, serves a comparable function with respect to the Scheme that a disclosure statement serves with respect to a chapter 11 plan.

44.    Among other things, the Scheme includes certain Releases (as defined below), which, as set out above, are customarily included in schemes of arrangement.  Broadly, the claims released in connection with the Scheme include (i) the releases of the Scheme Claims of the Scheme Creditors, the Depository Nominee, and the Indenture Trustee, (ii) the cancellation of the Existing Notes, and (iii) the releases covered by the Deed of Release, substantially in the form attached to the Explanatory Statement as Appendix 7, which is to be entered into at Closing

17

(together, the "Releases"). Importantly, however, the Releases do not release (a) the Group from (i) their obligations to implement and consummate the Scheme or (ii) any claims other than claims (including the Existing Notes) that are compromised under the Scheme or (b) the Released Parties from any claims arising out of fraud, gross negligence, willful misconduct, willful default, or dishonesty.

## DIGICEL'S BERMUDA PROCEEDING

45.     On July 24, 2023, the Debtor, through Conyers, issued a practice statement letter (the "**Practice Statement Letter**") in accordance with Bermuda Court Circular N.18 of 2007 to the Scheme Creditors announcing that it was going to propose a scheme of arrangement under the Bermuda Companies Act, a true and correct copy of which is attached as **Exhibit H** to the Foreign Representative Declaration. The same day, the Practice Statement Letter was (a) sent by the Debtor's information agent, Epiq Corporate Restructuring LLC ("**Epiq**"), to (i) The Depository Trust Company ("**DTC**") via email, (ii) the banks and brokerage firms holding the Existing Notes through DTC (the "**DTC Participants**") via email, and (iii) DTC and the DTC Participants via hard copy and with sufficient copies and instructions to forward such documents to the Noteholders, and (b) posted on the Debtor's scheme website: https://dm.epiq11.com/digicelgroup (the "**Scheme Website**"). Foreign Rep. Decl. ¶ 38. Scheme Creditors may obtain access to the Scheme Website by emailing tabulation@epiqglobal.com, with reference to "Digicel Group Holdings Limited" in the subject line. *Id.* Scheme Creditors must provide proof of their holdings to receive access to the Scheme Website. *Id.* Once access is obtained, Scheme Creditors may download documents relating to the Scheme from the Scheme Website. *Id.*

46.     On August 18, 2023, the Debtor, through Conyers, issued an originating summons to the Bermuda Court, a true and correct copy of which is attached to the Foreign

Representative Declaration as **Exhibit I**, seeking, among other things, entry of an order directing the Debtor to convene a meeting of Scheme Creditors to, among other things, vote on the Scheme (the "**Scheme Meetings**").

47.    On August 22, 2023, on behalf of the Debtor, Conyers submitted a substantially finalized explanatory statement to the Bermuda Court along with other evidence. The Explanatory Statement includes a copy of the Scheme in Part F thereof.

48.    A hearing before the Bermuda Court was held on August 25, 2023 (the "**Convening Hearing**"), which Conyers prepared for and at which it appeared.  Although Scheme Creditors were put on notice that the Convening Hearing was scheduled to occur by the issuance of the Practice Statement Letter, no objections were raised by any of the Scheme Creditors at the Convening Hearing.  Following the Convening Hearing, the Bermuda Court issued an order (a) to convene the Scheme Meetings and (b) that appoints Lawrence Hickey as the Debtor's Foreign Representative, a true and correct copy of which is attached to the Foreign Representative Declaration as **Exhibit J** (the "**Convening Order**").  Convening Order ¶¶ 1, 17. The Bermuda Court's entry of the Convening Order providing for two voting classes of Scheme Creditors signals that any differences in their legal rights with respect to the Company, both before and after the effectiveness of the Scheme, made it impossible for them to consult together in relation to the proposed compromise arrangement with a view to their common interest as a single class.  Therefore, the Bermuda Court scheduled two Scheme Meetings, which will be held consecutively on September 25, 2023, or such later date as the Debtor may decide, but not more than three months from the date of the Convening Order.  Convening Order ¶ 3.

49.    On August 28, 2023, and in accordance with the Convening Order, Epiq, in its capacity as the Debtor's information agent, sent a notice, a true and correct copy of which is

attached to the Foreign Representative Declaration as **Exhibit K** (the "**Scheme Meetings Notice**"), to the Scheme Creditors (a) notifying them of the Scheme Meetings and (b) delivering the final version of the explanatory statement (the "**Explanatory Statement**") through (i) the DTC Participants, with sufficient copies and instructions to forward such documents to the Noteholders, and (ii) publication of the Scheme Meetings Notice and the Explanatory Statement on the Scheme Website. A true and correct copy of the Explanatory Statement sent to Scheme Creditors is attached to the Foreign Representative Declaration as **Exhibit L**. The provisions of the Convening Order ensure that the Scheme Creditors will be properly notified of the Scheme Meetings and will have the opportunity to raise questions and objections to the Scheme at the Scheme Meetings and/or at a hearing before the Bermuda Court seeking sanction and approval of the Scheme (the "**Sanction Hearing**").

50.     All Scheme Creditors will have the opportunity to attend, be heard and vote at the Scheme Meetings, subject to compliance with the applicable procedures specified in the Convening Order, in person, by authorized representative (if a corporate entity), or by proxy and to ask questions regarding the proposed Scheme. The provisions of the Convening Order specify that the Scheme Meetings will be chaired by John Bosacco, a managing director at DCA. Convening Order ¶ 11. Further, Conyers will appear at the Sanction Hearing, in front of the Bermuda Court on the Debtor's behalf.

51.     As discussed above, a vote will be held at the Scheme Meetings to determine whether the Scheme Creditors that are present and voting in person or by proxy approve the Scheme by a greater than 50% majority in number representing at least 75% in value of the Scheme Creditors present and voting. If the Scheme Creditors do not approve the Scheme by the requisite majorities described in the foregoing sentence, the Scheme cannot be sanctioned by the

Bermuda Court and will not take effect.  If the Scheme is approved at the Scheme Meetings, the

Sanction Hearing is expected to be held on or about October 6, 2023.  The Scheme Creditors and

any other creditors of the Company will have an opportunity to be heard and raise objections at

the Sanction Hearing.

52.    Assuming that the Bermuda Court deems it appropriate to enter an order

sanctioning the Scheme following the Sanction Hearing (the "**Sanction Order**"), the Sanction

Order is expected, among other things, to (a) sanction and approve consummation of the Scheme

and the transactions contemplated therein (the "**Restructuring Transactions**") and (b) authorize

and effectuate the Releases set forth in the Scheme.  Upon delivery of the Sanction Order to the

Bermuda Registrar of Companies and satisfaction of the Scheme's other conditions precedent,

including entry of a chapter 15 recognition order pursuant to this Chapter 15 Case, the Scheme

will become effective and thereby binding on all Scheme Creditors.  Accordingly, DGHL and the

Scheme Creditors intend to consummate the Restructuring Transactions shortly after the

Sanction Order and an order of this Court recognizing and enforcing the Scheme under chapter

15 of the Bankruptcy Code are entered.  Foreign Rep. Decl. ¶ 46.

[*Remainder of page intentionally left blank.*]

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on this 11th day of September 2023
in Hamilton, Bermuda

*/s/ C. Christian R. Luthi*
C. Christian R. Luthi
CONYERS DILL & PEARMAN LIMITED
Clarendon House, 2 Church Street
Hamilton HM 11
Bermuda