**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Case No. 23-11479 (JPM)** |
| **DIGICEL GROUP HOLDINGS LIMITED,**[1] | |
| **Debtor in a Foreign Proceedings** | **Chapter 15** |

**SUPPLEMENTAL DECLARATION OF C. CHRISTIAN R. LUTHI IN SUPPORT OF THE MOTION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, (III) RECOGNITION OF SANCTION ORDER AND RELATED SCHEME, AND (IV) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

I, C. Christian R. Luthi, pursuant to Section 28 U.S.C. § 1746, hereby declare

under penalty of perjury as follows:

**INTRODUCTION**

1.      I am a barrister and attorney duly admitted to practice in Bermuda and a

Director and the Chairman of the Bermuda law firm Conyers Dill & Pearman Limited

("**Conyers**") as well as the Head of Conyers' Litigation & Restructuring Department,

located at Clarendon House, 2 Church Street, Hamilton HM 11, Bermuda.  Conyers is

serving as Bermuda counsel to Digicel Group Holdings Limited (an exempted company

with limited liability), incorporated under the laws of Bermuda (the "**Debtor,**" the

"**Company**" or "**DGHL**").  I am over the age of 18 and, except as otherwise indicated,

all facts set forth in this declaration (this "**Supplemental Declaration**") are based upon

---

[1] The Debtor in this chapter 15 case (the "**Chapter 15 Case**"), and the Debtor's registration number, are: Digicel Group Holdings Limited (55491).  The Debtor's registered office and mailing address are Clarendon House, 2 Church Street, Hamilton, HM 11, Bermuda.

my personal knowledge, my opinion based upon my experience and knowledge of the operations and financial condition of the Debtor, and my review of relevant documents or information supplied to me.

2.      All capitalized terms used in this Supplemental Declaration have the same meaning as given to such terms in the *Motion for (I) Recognition of Foreign Proceeding, (II) Recognition of Foreign Representative, (III) Recognition of Sanction Order and Related Scheme, and (IV) Related Relief Under Chapter 15 of the Bankruptcy Code* (ECF No. 3) (the "**Recognition Motion**").

3.      I submit this Supplemental Declaration in further support of the Chapter 15 Petition (ECF No. 1) and the Recognition Motion.

## SUPPLEMENTAL STATEMENTS OF FACT

4.      Attached hereto as **Exhibit 1** is a true and correct copy of the Sanction Order made on October 19, 2023 by the Bermuda Court in the Bermuda Proceeding.

5.      Attached hereto as **Exhibit 2** is a true and correct copy of the Chairman's Report filed by the Chairman of the Scheme Meetings in the Bermuda Proceeding, which describes the voting results of the Scheme Meetings.

6.      Attached hereto as **Exhibit 3** is a true and correct copy of the First Affidavit of Jane Sullivan (excluding Tab 1 thereto, which includes the Explanatory Statement filed as Exhibit L to the Foreign Representative Declaration (ECF No. 4)) filed in the Bermuda Proceeding, which describes the notices sent and the service of documents undertaken pursuant to the Convening Order and the voting results of the Scheme Meetings.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct to the best of my knowledge, information and belief.


Executed on this 19th day of October 2023
in Hamilton, Bermuda

*/s/ C. Christian R. Luthi*
C. Christian R. Luthi
CONYERS DILL & PEARMAN LIMITED
Clarendon House, 2 Church Street
Hamilton HM 11
Bermuda

## Exhibit 1

### Sanction Order

## IN THE SUPREME COURT OF BERMUDA

## COMMERCIAL COURT

### 2023: No. 282

**IN THE MATTER OF DIGICEL GROUP HOLDINGS LIMITED**

**AND IN THE MATTER OF SECTION 99 OF THE COMPANIES ACT 1981**

---

### SANCTION ORDER

---

**UPON THE PETITION** dated 29th September 2023 of Digicel Group Holdings Limited (the "**Company**") whose registered office is at Clarendon House, 2 Church Street, Hamilton, Bermuda, for the sanction of a Scheme of Arrangement set out in the First Schedule hereto (the "**Scheme**")

**AND UPON HEARING** Counsel for the Company and Counsel for the Ad Hoc Groups (as defined in the Scheme)

**AND UPON READING** the Order dated 25 August 2023 (pursuant to which the Company convened the Scheme Meetings), the Scheme, the report of the Chairman of the Scheme Meetings, the evidence in support of the Petition, and the Petition

**AND UPON** the Scheme Meetings having taken place on 25 September 2023, at which the Scheme of Arrangement was approved by the requisite statutory majorities of the Scheme Creditors

**AND UPON** the Court adopting in this Order, for ease of reference only, the defined terms contained in the Scheme of Arrangement hereinafter mentioned proposed to be made between the Company and the Scheme Creditors

**THE COURT HEREBY SANCTIONS** the Scheme of Arrangement set forth in the Schedule to this Order

**AND IT IS HEREBY ORDERED** that there be liberty to apply with regard to the terms of the Order and the implementation of the Scheme of Arrangement.

**DATED** this 19th day of October 2023



CHIEF JUSTICE

<u>Schedule 1</u>

(Scheme of Arrangement)

IN THE SUPREME COURT OF BERMUDA

CIVIL JURISDICTION

(COMMERCIAL COURT)

2023 No. 282

IN THE MATTER OF THE COMPANIES ACT 1981

IN THE MATTER OF DIGICEL GROUP HOLDINGS LIMITED

---

## SCHEME OF ARRANGEMENT

**(under section 99 of the Companies Act 1981)**

BETWEEN

DIGICEL GROUP HOLDINGS LIMITED

AND

THE DGHL SCHEME CREDITORS (as defined herein)

---

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 1 | Definitions and Interpretation | 4 |
| 2 | The Company | 22 |
| 3 | The Purpose of the Scheme | 22 |
| 4 | The Existing Notes | 23 |
| 5 | The Existing Notes Trustee and the Scheme | 23 |
| 6 | Application and Effectiveness of the Scheme | 24 |
| 7 | Reserves | 24 |
| 8 | The Scheme – Existing Unsecured Notes | 24 |
| 9 | The Scheme – Existing Subordinated Notes | 27 |
| 10 | Adjustment to Noteholder Cash Distributions | 29 |
| 11 | Holding Period Trust Arrangements | 29 |
| 12 | No Right to Commence Proceedings | 30 |
| 13 | Instructions, Authorisations and Directions | 31 |
| 14 | DGHL Scheme Creditor Undertakings and Releases | 32 |
| 15 | Sales, Assignments or Transfers | 35 |
| 16 | Provision of information | 35 |
| 17 | The Information Agent and the Holding Period Trustee | 35 |
| 18 | Conditions to the Effectiveness of the Scheme | 37 |
| 19 | Termination of the Scheme | 39 |
| 20 | Securities Law Considerations | 39 |
| 21 | Scheme Costs | 39 |
| 22 | Modifications of the Scheme | 39 |
| 23 | Limitations of Liability | 40 |
| 24 | Further Assurance | 40 |
| 25 | Notices | 40 |

26   **Conflict and Inconsistency** ........................................................................ 42

27   **Severability** .................................................................................................. 42

28   **Announcements** ............................................................................................ 43

29   **Governing Law and Jurisdiction** .............................................................. 43

30   **Tax Treatment** .............................................................................................. 43

**1    DEFINITIONS AND INTERPRETATION**

1.1    In this Scheme:

| | |
|---|---|
| **"Ad Hoc Groups"** | means collectively, the DGHL Ad Hoc Group and the PCG Ad Hoc Group. |
| **"Additional Assets"** | means all and any assets of the Company other than (a) cash as of the Scheme Effective Date, and (b) Future DPL Proceeds. |
| **"Additional Assets Proceeds"** | means the aggregate amount of proceeds received by the Company from the sale of any Additional Assets, less any amounts (a) authorised to be paid in accordance with the Post-Closing Budget or as otherwise permitted to be incurred by the Company in accordance with the Note Agreement and the Company's bye-laws, or (b) to reimburse any Cash Allocation Shortfall. |
| **"Administrative Party"** | means each of the Holding Period Trustee, the New Notes Agent, the New Notes Paying Agent, the New Notes Registrar, the Cash Manager, the Security Agent. |
| **"Advisors"** | means collectively, (a) the DGHL Ad Hoc Group Advisors, (b) the PCG Ad Hoc Group Advisors; (c) the Digicel Advisors; and (d) the GLAS Advisors. |
| **"Affiliates"** | means: <br><br>(A) an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities— <br><br>(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or <br><br>(ii) solely to secure a debt, if such entity has not in fact exercised such power to vote; <br><br>(B) a company or corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities— <br><br>(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or |

| | |
|---|---|
| | (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote; |
| | (C) a person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor; or |
| | (D) an entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement. |
| **"AHG Board Nominees"** | means the two independent directors nominated by the Majority PCG Ad Hoc Group and the Majority DGHL Ad Hoc Group to the board of directors of the Company. |
| **"Allowed Proceedings"** | means any Proceedings brought or commenced by a DGHL Scheme Creditor:<br><br>(a)   to enforce its rights under the Restructuring Support Agreement, the Restructuring Documents or the Scheme where any person fails to comply with the terms of, or perform its obligation(s) under, the Restructuring Support Agreement, the Restructuring Documents or the Scheme;<br><br>(b)   in respect of any Liability arising under the Scheme or a Restructuring Document which may arise or accrue in relation to acts, omissions, events and/or circumstances occurring after the Scheme Effective Date; and<br><br>(c)   to enforce its rights in respect of any Excluded Claims. |
| **"Amended and Restated Bye-laws"** | means the amended and restated bye-laws of the Company to be adopted on the Scheme Effective Date in substantially the same form as that appended to the Explanatory Statement. |
| **"Beneficial Interest"** | means a beneficial interest (whether or not it is the ultimate economic interest) in the principal amount outstanding of the Existing Notes (as applicable), which interest is held (directly or indirectly) in book-entry form through DTC, a DTC Participant and/or another Intermediary. |
| **"Business Day"** | means a day (other than a Saturday or Sunday) on which banks are open for general business in London, New York and Bermuda (provided that the |

5

| | |
|---|---|
| | availability of internet banking shall not constitute being open for general business). |
| **"Cash Allocation Shortfall"** | has the meaning given to such term in Clause 10.1(a). |
| **"Cash Allocation Shortfall Pro-Rata"** | means in respect of (i) the DGHL Unsecured Noteholders, an amount equal to the Cash Allocation Shortfall multiplied the product of (163.5/293.2); and (ii) in respect of the DGHL Subordinated Noteholders, an amount equal to the Cash Allocation Shortfall multiplied by the product of (19.5/293.2). |
| **"Cash Manager"** | means Global Loan Agency Services Limited in its capacity as cash manager. |
| **"Claim"** | means all and any actions, causes of action, claims, counterclaims, suits, debts, sums of money, accounts, contracts, agreements, promises, damages, judgments, executions, demands, remedies or rights whatsoever or howsoever arising, whether present, future, prospective (including after the Scheme Effective Date) or contingent, known or unknown, whether or not for a fixed or unliquidated amount, whether or not involving the payment of money or the performance of an act or obligation or any failure to perform any obligation or any omission, whether assertable directly or derivatively, whether arising at common law, contract, tort, in equity or by statute in or under the laws of New York or Bermuda, or under any other law or in any other jurisdiction howsoever arising, and "Claims" shall be construed accordingly. |
| **"Class Pro-Rata Share"** | means, in respect of a given amount as it pertains to (a) the DGHL Unsecured Noteholders, a number, expressed as a percentage, that is equal to the result of (163.5/183); and (b) the DGHL Subordinated Noteholders, a number, expressed as a percentage, that is equal to the result of (19.5/183). |
| **"Companies Act"** | means the Companies Act 1981 of Bermuda. |
| **"Company"** | means DGHL. |
| **"Convening Order"** | means the order of the Court containing directions for the convening of the Scheme Meetings. |
| **"Court"** | means the Supreme Court of Bermuda. |
| **"Deed of Release"** | means the deed of release executed by the Company in favour of the Released Parties in substantially the |

6

| | same form as that appended to the Explanatory Statement; which, for the avoidance of doubt, shall not release Excluded Claims. |
|---|---|
| **"Deed of Release Parties"** | means the Released Party as such term is defined in the Deed of Release. |
| **"DGHL"** | means Digicel Group Holdings Limited, an exempted company incorporated in Bermuda with registration number 55491, and with its registered office at Clarendon House, 2 Church Street, Hamilton, Bermuda. |
| **"DGHL Ad Hoc Group"** | means the ad hoc group of DGHL Subordinated Noteholders and the DGHL Unsecured Noteholders advised by the DGHL Ad Hoc Group Advisors from time to time. |
| **"DGHL Ad Hoc Group Advisors"** | means (a) Weil, Gotshal & Manges LLP (and its affiliates), (b) Carey Olsen Bermuda Limited, (c) any St Lucia counsel retained by (or on behalf of) the DGHL Ad Hoc Group and (d) any barrister retained (or on behalf of) the DGHL Ad Hoc Group. |
| **"DGHL-DIFL Intercompany Claim"** | means any Claims owed by DGHL to DIFL (including any such Claims assigned or transferred by DIFL subsequent to the date of the Explanatory Statement) as at the Scheme Effective Date (but immediately prior to the Settlement Agreement becoming effective) and prior to any DIFL/DL Cash Distribution, Future DPL Proceeds or Additional Assets Proceeds being paid to DIFL. |
| **"DGHL/DIFL Services Agreement"** | means the services agreement dated on or about the Scheme Effective Date between the Company and DIFL, pursuant to which DIFL shall provide administrative and financial reporting services to the Company. |
| **"DGHL-DL Intercompany Claim"** | means any Claims owed by DGHL to DL (including any such Claims assigned or transferred by DL subsequent to the date of the Explanatory Statement) as at the Scheme Effective Date (but immediately prior to the Settlement Agreement becoming effective) and prior to any DIFL/DL Cash Distribution, Future DPL Proceeds or Additional Assets Proceeds being paid to DL. |
| **"DGHL Noteholder"** | means a DGHL Unsecured Noteholder and/or a DGHL Subordinated Noteholder, as the case may be. |

7

| | |
|---|---|
| "DGHL Scheme Consideration" | means (a) the Noteholder Cash Distributions; and (b) the New Notes to be distributed to the DGHL Scheme Creditors in accordance with the terms of the Scheme. |
| "DGHL Scheme Creditors" | means the DGHL Noteholders and (without double counting in each case), the Existing Depository Nominee and the Existing Notes Trustee and any Intermediaries. |
| "DGHL Subordinated Noteholder" | means a person who has a Beneficial Interest in the Existing Subordinated Notes and who is the owner of the ultimate economic interest in any of the Existing Subordinated Notes. |
| "DGHL Subordinated Notes Cash Distribution" | means the cash distribution of $19,500,000 payable by the Company to the DGHL Subordinated Noteholders in accordance with the terms of the Scheme. |
| "DGHL Unsecured Noteholder" | means a person who has a Beneficial Interest in the Existing Unsecured Notes and who is the owner of the ultimate economic interest in any of the Existing Unsecured Notes. |
| "DGHL Unsecured Notes Cash Distribution" | means the cash distribution of $163,500,000 (less any amount received as an Interim Distribution prior to the Scheme Effective Date) payable by the Company to the DGHL Unsecured Noteholders in accordance with the terms of the Scheme. |
| "DIFL" | means Digicel International Finance Limited, originally incorporated in St. Lucia as an international business company on 7 December 2004, and continued into Bermuda as an exempted company under the Companies Act on 11 July 2023 with registration number 202302649 and with its registered office at Clarendon House, 2 Church Street, Hamilton, Bermuda. |
| "DIFL/DL Cash Distribution" | means the cash distribution of $110,200,000 (less any amount received as an Interim Distribution prior to the Scheme Effective Date) payable by the Company to DIFL and DL or either of their successors, assigns or transferees (to be allocated between themselves in proportions to be agreed) on the Scheme Effective Date pursuant to the Settlement Agreement. |
| "Digicel Advisors" | means (a) DC Advisory LLC, (b) Island Capital Management Services Limited, (c) Davis Polk & |

8

| | |
|---|---|
| | Wardwell LLP, (d) Conyers, Dill & Pearman Limited, and (e) the Information Agent. |
| **"Distributions Allocation Funds Flow"** | means the funds flow prepared by the Digicel Advisors as the funds flow for the purpose of the Scheme which sets out the entitlements to the Work Payments, the Noteholder Cash Distributions, the DIFL/DL Cash Distribution, the Professional Fees, the Existing Notes Trustee's Fees and Expenses, the Reserves and any other payments required to be made in accordance with the Restructuring Support Agreement or the Scheme, provided always that it is consistent in all material respects with the terms of this Scheme. |
| **"DL"** | means Digicel Limited, an exempted company incorporated in Bermuda with registration number 53898 and with its registered office at Clarendon House, 2 Church Street, Hamilton, Bermuda, including as it may be reorganised from time to time. |
| **"DTC"** | means The Depository Trust Company. |
| **"DTC Participant"** | means the holder recorded directly in the records of DTC as holding a Beneficial Interest in any Existing Notes in an account held with DTC, either for that person's own account or on behalf of another person. |
| **"Eligible Recipient"** | means a DGHL Noteholder that has (a) submitted a validly completed Registration Form to the Information Agent in accordance with the instructions set out therein by the Registration Deadline; (b) made securities law representations customary for private placements; and (c) has provided all relevant "know-your-client" documentation to the reasonable satisfaction of the New Notes Paying Agent as described in the Explanatory Statement. |
| **"Excluded Claims"** | means (a) Scheme Costs; (b) any Claims on account of, under or in connection with the DGHL Scheme Consideration; (c) any Claim in respect of rights created under the Scheme and/or which arise as a result of a failure by the Company or any party to the Scheme to comply with any terms of the Scheme from and after the Scheme Effective Date; (d) any Claim under or in connection with the Work Payments; (e) any Claim which any member of the Ad Hoc Groups may have against any of the PCG Ad Hoc Group Advisors or DGHL Ad Hoc Group Advisors respectively, arising under a duty of care, and (f) any Claim arising from or relating to fraud, |

9

| | |
|---|---|
| | gross negligence, wilful misconduct, wilful default, or dishonesty. |
| **"Existing Depository Nominee"** | means Cede & Co as the entity in whose name the Existing Notes are registered and who acts as the depository and nominee for DTC with respect to the Existing Notes. |
| **"Existing Notes"** | means the Existing Unsecured Notes and the Existing Subordinated Notes. |
| **"Existing Notes Indentures"** | means the Existing Unsecured Notes Indenture and the Existing Subordinated Notes Indenture. |
| **"Existing Notes Trustee"** | means Wilmington Trust, National Association, in its capacity as indenture trustee, and in each other capacity for which it serves, under or in connection with either Existing Notes Indenture, provided that if the context requires only certain of the foregoing capacities, then only in such capacity(ies). |
| **"Existing Notes Trustee's Fees and Expenses"** | means the reasonable and documented compensation, fees, expenses, disbursements and indemnity claims, including without limitation, attorneys' fees, expenses and disbursements, accrued or incurred by the Existing Notes Trustee in any and all capacities to the extent payable or reimbursable under either the Existing Notes Indenture or any related documents. |
| **"Existing Subordinated Notes"** | means the 7.00% PIK perpetual convertible notes issued by the Company under the Existing Subordinated Notes Indenture. |
| **"Existing Subordinated Notes Election"** | means that certain election that shall occur through the DTC's automated tender offer program (ATOP) or the Deposit or Withdrawal at Custodian process (DWAC) pursuant to which each DGHL Subordinated Noteholder will be able to elect, prior to the New Notes Election Deadline, to receive either the New 3A Notes and New 3B Notes or New 4A Notes and New 4B Notes. |
| **"Existing Subordinated Notes Indenture"** | means that certain indenture originally dated as of 23 June 2020 (as amended, modified, or supplemented from time to time in accordance with the terms thereof) by and among the Company (formerly known as Digicel Group 0.5 Limited) as issuer and the Existing Notes Trustee (as successor to Deutsche Bank Trust Company Americas) as trustee, pursuant |

10

| | |
|---|---|
| | to which the Existing Subordinated Notes were issued. |
| **"Existing Unsecured Notes"** | means the 8.0% senior cash pay/PIK Notes due 2025 issued by the Company under the Existing Unsecured Notes Indenture. |
| **"Existing Unsecured Notes Election"** | means that certain election that shall occur through the DTC's automated tender offer program (ATOP) or the Deposit or Withdrawal at Custodian process (DWAC) pursuant to which each DGHL Unsecured Noteholder will be able to elect, prior to the New Notes Election Deadline, to receive either the New 1A Notes and New 1B Notes or New 2A Notes and New 2B Notes. |
| **"Existing Unsecured Notes Indenture"** | means that certain indenture originally dated as of 23 June 2020 (as amended, modified, or supplemented from time to time in accordance with the terms thereof) by and among the Company (formerly known as Digicel Group 0.5 Limited) as issuer and the Existing Notes Trustee (as successor to Deutsche Bank Trust Company Americas) as trustee, pursuant to which the Existing Unsecured Notes were issued. |
| **"Expense Reserve"** | means a reserve as shown in the Post-Closing Budget for the purposes of funding the ongoing costs and expenses of the Company in accordance with the Post-Closing Budget, including the solvent liquidation of the Company. |
| **"Explanatory Statement"** | means that composite explanatory document (including all appendices) dated 25 August 2023, relating to the Scheme and mailed to DGHL Scheme Creditors pursuant to the Convening Order (and which will also be accessible via the Scheme Website), which is required to be issued to DGHL Scheme Creditors pursuant to section 100 of the Companies Act. |
| **"Foreign Representative"** | means Lawrence Hickey, or such other person as the Company may nominate and authorise as such. |
| **"Future DPL Proceeds"** | means all cash and cash equivalents (including, but not limited to, pursuant to the earn-out provisions and escrow arrangements) paid to the Company at any time on or after May 28, 2023 pursuant to the terms of the Telstra SPA. |
| **"GLAS Advisors"** | means McDermott Will & Emery UK LLP. |

11

| "GLAS Fees and Expenses" | means the reasonable and documented compensation, fees, expenses, disbursements and indemnity claims, including without limitation, attorneys' fees, expenses and disbursements, accrued or incurred by the Administrative Parties in any and all capacities. |
|---|---|
| "Group" | means collectively, the Company and each of its subsidiaries. |
| "Holding Period" | means a period of 18 months after the Scheme Effective Date. |
| "Holding Period Trust" | means the trust established on or around the Scheme Effective Date for the purposes of holding any New Notes for and on behalf of any Ineligible Recipients. |
| "Holding Period Trust Deed" | means the trust deed constituting the Holding Period Trust in substantially the same form as that appended to the Explanatory Statement. |
| "Holding Period Trustee" | means GLAS Trustees Limited in its capacity as Holding Period Trustee in relation to the Holding Period Trust. |
| "Ineligible Recipient" | means a DGHL Noteholder that is not an Eligible Recipient. |
| "Information Agent" | means Epiq Corporate Restructuring, LLC. |
| "Intercompany Claims" | means (a) the DGHL-DIFL Intercompany Claim, and (b) the DGHL-DL Intercompany Claim. |
| "Intercreditor Agreement" | means the intercreditor agreement to be entered into on the Scheme Effective Date by and among DGHL, DIFL, DL, the Security Agent, the New Notes Agent, the New Notes Paying Agent, the Supporting Shareholder, and Digicel Investments Limited to regulate the Liabilities of the Company post Scheme Effective Date to the DGHL Scheme Creditors, DL/DIFL and the Supporting Shareholder, in substantially the same form as that appended to the Third Affidavit of Lawrence Hickey. |
| "Interim Distribution" | means the payments made by the Company (a) in an aggregate amount of $113,500,000 on 18 August 2023 to the DGHL Unsecured Noteholders and (b) in an aggregate amount of $76,500,000 to DIFL and DL on 20 June 2023 in respect of the Intercompany Claims, in each case pursuant to the Restructuring Support Agreement. |

12

| | |
|---|---|
| "**Intermediary**" | means, in respect of the Existing Unsecured Notes or the Existing Subordinated Notes, a person who is not a DGHL Noteholder because it is not the owner of the ultimate economic interest in such Existing Unsecured Notes or the Existing Subordinated Notes (as applicable) but who holds a Beneficial Interest in the Existing Unsecured Notes or the Existing Subordinated Notes (as applicable) on behalf of another person or persons. |
| "**Liability**" or "**Liabilities**" | means any debt, liability or obligation of a person whether it is present, future, prospective, actual or contingent, whether it is known or unknown, whether or not it is fixed or undetermined, whether incurred solely or jointly or as principal or surety or in any other capacity, whether or not it involves the payment of money or performance of an act or obligation and whether it arises by contract, at common law, in equity or by statute or otherwise, in Bermuda or any other jurisdiction, or in any manner whatsoever. |
| "**Longstop Time**" | means 14 November 2023 at 5:00 pm (New York time). |
| "**Majority DGHL Ad Hoc Group**" | means, at any time, such members of the DGHL Ad Hoc Group holding more than 50.0% of the total aggregate outstanding amount of the Existing Notes held by the DGHL Ad Hoc Group collectively at the relevant time. |
| "**Majority PCG Ad Hoc Group**" | means, at any time, such members of the PCG Ad Hoc Group holding more than 50.0% of the total aggregate outstanding amount of the Existing Notes held by the PCG Ad Hoc Group collectively at the relevant time. |
| "**New 1A Notes**" | means the senior series of New Senior Notes to be issued under the Note Agreement as "New 1A Notes" to each of the New Note 1 Recipients. |
| "**New 1B Notes**" | means the junior series of New Senior Notes to be issued under the Note Agreement as "New 1B Notes" to each of the New Note 1 Recipients. |
| "**New 2A Notes**" | means the senior series of New Senior Notes to be issued under the Note Agreement as "New 2A Notes" to each of the New Note 2 Recipients. |

13

| | |
|---|---|
| "New 2B Notes" | means the junior series of New Senior Notes to be issued under the Note Agreement as "New 2B Notes" to each of the New Note 2 Recipients. |
| "New 3A Notes" | means the senior series of New Subordinated Notes to be issued under the Note Agreement as "New 3A Notes" to each of the New Note 3 Recipients. |
| "New 3B Notes" | means the junior series of New Subordinated Notes to be issued under the Note Agreement as "New 3B Notes" to each of the New Note 3 Recipients. |
| "New 4A Notes" | means the senior series of New Subordinated Notes to be issued under the Note Agreement as "New 4A Notes" to each of the New Note 4 Recipients. |
| "New 4B Notes" | means the junior series of New Subordinated Notes to be issued under the Note Agreement as "New 4B Notes" to each of the New Note 4 Recipients. |
| "New Notes" | means eight series of new limited recourse senior secured notes to be issued by DGHL to holders of the Existing Notes under the Note Agreement, being collectively, New 1A Notes, New 1B Notes, New 2A Notes, New 2B Notes, New 3A Notes and New 3B Notes and New 4A Notes and New 4B Notes. |
| "New Note 1 Recipients" | means those DGHL Unsecured Noteholders who have elected or are deemed to have elected to receive New 1A Notes and New 1B Notes under the terms of the Scheme. |
| "New Note 2 Recipients" | means those DGHL Unsecured Noteholders who have elected to receive New 2A Notes and New 2B Notes under the terms of the Scheme. |
| "New Note 3 Recipients" | means those DGHL Subordinated Noteholders who have elected or are deemed to have elected to receive New 3A Notes and New 3B Notes under the terms of the Scheme. |
| "New Note 4 Recipients" | means those DGHL Subordinated Noteholders who have elected to receive New 4A Notes and New 4B Notes under the terms of the Scheme. |
| "New Notes Agent" | means GLAS Trustees Limited in its capacity as agent for the New Notes. |

14

| | |
|---|---|
| "New Notes Election Deadline" | means 5:00 p.m. (New York time) on 18 October 2023. |
| "New Notes Paying Agent" | means Global Loan Agency Services Limited in its capacity as paying agent for the New Notes. |
| "New Notes Registrar" | means Global Loan Agency Services Limited in its capacity as registrar for the New Notes. |
| "New Senior Notes" | means the limited recourse senior secured notes issued by the Company on substantially the same terms as those set forth in Part C (*Overview of Scheme Consideration, Intercreditor Agreement and Proposed Governance*) of the Explanatory Statement, being collectively, New 1A Notes, New 1B Notes, New 2A Notes and New 2B Notes. |
| "New Subordinated Notes" | means the limited recourse subordinated notes issued by the Company on substantially the same terms as set forth set forth in Part C (*Overview of Scheme Consideration, Intercreditor Agreement and Proposed Governance*) of the Explanatory Statement, being collectively, New 3A Notes, New 3B Notes, New 4A Notes and New 4B Notes. |
| "Note Agreement" | means the single note agreement in substantially the same form as that appended to the Explanatory Statement under which the New Notes will be issued by the Company. |
| "Notes Collateral Documents" | means the Collateral Documents as defined in the Note Agreement, together with any other documents reasonably required to grant valid security interests in respect of the Liabilities under the New Notes. |
| "Noteholder Cash Distributions" | means the DGHL Unsecured Notes Cash Distribution and the DGHL Subordinated Notes Cash Distribution. |
| "PCG Ad Hoc Group" | means the ad hoc group of holders of Beneficial Interests in the Existing Subordinated Notes and the Existing Unsecured Notes advised by the PCG Ad Hoc Group Advisors from time to time. |
| "PCG Ad Hoc Group Advisors" | means (a) Greenhill & Co, LLC, (b) Paul, Weiss, Rifkind, Wharton & Garrison LLP, (c) Akin Gump LLP and Akin Gump Strauss Hauer & Feld LLP, (d) Walkers (Bermuda) Limited, and (e) any barrister or other law firm retained on behalf of the PCG Ad Hoc |

15

| | |
|---|---|
| | Group from time to time, as advisors to the PCG Ad Hoc Group. |
| **"Personnel"** | means, in relation to any person, its current and former officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professional advisers. |
| **"Post"** | means delivery by pre-paid first-class post or air mail or generally recognised commercial courier service, and **"Posted"** shall be construed accordingly. |
| **"Post-Closing Budget"** | means the budget agreed by DGHL, the PCG Ad Hoc Group and the DGHL Ad Hoc Group prior to the Scheme Effective Date for the ongoing costs and expenses of DGHL, including in respect of the solvent liquidation of DGHL. |
| **"Proceeding"** | means any process, action, legal or other proceeding including any arbitration, mediation, alternative dispute resolution, judicial review, adjudication, demand, execution, distraint, forfeiture, re-entry, seizure, lien, enforcement of judgment or enforcement of any security or other right. |
| **"Professional Fees"** | means, collectively, the reasonable and documented fees, costs and expenses incurred in connection with the Restructuring, together with applicable taxes thereon (if any) of the following agreed professionals: (a) the PCG Ad Hoc Group Advisors, (b) the DGHL Ad Hoc Group Advisors, (c) the Digicel Advisors, and (d) the GLAS Advisors. |
| **"Record Date"** | means 4:00 p.m. (New York time) on 28 August 2023, solely for the purposes of determining an entitlement to vote in respect of the Scheme. |
| **"Registrar of Companies"** | means the Registrar of Companies of Bermuda appointed pursuant to section 3 of the Companies Act. |
| **"Registration Deadline"** | means 9.00 am (New York Time) on 19 October 2023. |
| **"Registration Form"** | means the registration form to be submitted in connection with an Existing Unsecured Notes Election and/or Existing Subordinated Notes Election (as the case may be). |

16

| | |
|---|---|
| "Related Party" | means predecessors, successors and assigns, Affiliates, managed accounts or funds, and all of their respective current and former officers, directors, managers, investment committee members, special or other committee members, principals, stockholders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, investment advisors, participants, subsidiaries, members, partners, limited partners, general partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors or managers, and other professionals and advisors, and such persons' respective heirs, executors, estates, servants, and/or nominees. |
| "Released Claim" | means (a) in respect of the Deed of Release Parties any past, present and/or future Claim released pursuant to the Deed of Release; or (b) in respect of any other Released Party, or to the extent a Claim is not otherwise released pursuant to the Deed of Release for whatever reason, any past, present and/or future Claim arising out of, relating to or in respect of: (i) either Existing Notes Indenture, (ii) the Existing Notes; (iii) the Scheme Claims and any of the facts and matters giving rise to the Scheme Claims; (iv) the Interim Distribution; and (v) all actions and/or decisions taken by any Deed of Release Party prior to the Scheme Effective Date in connection with the Company, the management and/or business of the Company, the preparation, negotiation, sanction or implementation of the Scheme, the Restructuring Documents and the Restructuring, and the execution and the carrying out of the steps and transactions contemplated therein in accordance with their terms, other than, in each case, Excluded Claims. |
| "Released Party" | means each of the following and in each case solely in its capacity as such: (a) the Deed of Release Parties; (b) the Administrative Parties; and (c) to the extent not falling within paragraph (a) of this definition, each DGHL Scheme Creditor and their respective Scheme Creditor Parties, Affiliates and Advisors (including, in respect of the foregoing, each of their Personnel). |
| "Reserves" | means the Expense Reserve and the Telstra Reserve. |

17

| "Reserves Share" | means an amount calculated by multiplying the aggregate amount of the Reserves by the product of (183/293.2). |
| --- | --- |
| "Restructuring" | has the meaning given to that term in the Explanatory Statement. |
| "Restructuring Documents" | means the Note Agreement, the Notes Collateral Documents, the Intercreditor Agreement, the Deed of Release, the Settlement Agreement, the Holding Period Trust Deed, the DGHL/DIFL Services Agreement and any other documents that the Company and the Majority DGHL Ad Hoc Group and Majority PCG Ad Hoc Group consider to be reasonably required to effectuate the terms of the Scheme, in form and substance consistent with the terms and consent rights in the Restructuring Support Agreement. |
| "Restructuring Support Agreement" | means that certain restructuring support agreement entered into between the Company, DL, DIFL, the Supporting Shareholder and the DGHL Noteholders named therein, dated as of 28 May, 2023. |
| "Sanction Order" | means the order of the Court sanctioning the Scheme (with or without modification). |
| "Scheme" | means this scheme of arrangement between the DGHL Scheme Creditors and the Company pursuant to section 99 of the Companies Act in its present form or subject to any modifications, additions, or conditions that the Court may approve or impose consistent with Clause 22. |
| "Scheme Claim" | means any Claim of a DGHL Scheme Creditor against the Company arising directly or indirectly out of, in relation to and/or in connection with the Existing Notes, and/or either of the Existing Notes Indentures, other than, in each case, Excluded Claims (provided that for voting purposes, each DGHL Noteholders' Scheme Claims shall be determined by reference to the principal amount of the relevant Existing Notes held by that DGHL Noteholder, excluding any accrued interest or other amounts due pursuant to the relevant Existing Notes or the relevant Existing Notes Indenture.) |
| "Scheme Costs" | means the Liability of the Company in respect of the fees, costs and expenses of the Advisors (including the Professional Fees), the Existing Notes Trustee's Fees and Expenses and the GLAS Fees and Expenses, |

18

|  | which Liabilities are not subject to the arrangements and compromises to be effected by the Scheme. |
|---|---|
| "Scheme Creditor Parties" | means, in respect of a DGHL Scheme Creditor, each of its predecessors, successors, assigns, transferees, Affiliates and Personnel. |
| "Scheme Effective Date" | means the date upon which all of the conditions to the effectiveness of the Scheme as set forth in Clause 18 have been satisfied and the Scheme becomes effective. |
| "Scheme Meetings" | means the meetings of DGHL Scheme Creditors convened by the Court in order to consider, and if thought fit, approve the Scheme pursuant to the Convening Order. |
| "Scheme Website" | means https://dm.epiq11.com/digicelgroup. |
| "SEC" | means the U.S. Securities and Exchange Commission. |
| "Security Agent" | means GLAS Trust Corporation Limited in its capacity as Security Agent in respect of the Notes Collateral Documents. |
| "Settlement Agreement" | means the settlement agreement between the Company, DIFL and DL (or their successors or assigns) pursuant to which the Intercompany Claims are compromised, such settlement agreement being in substantially the same form as that appended to the Explanatory Statement. |
| "Supporting Shareholder" | means Denis O'Brien. |
| "Telstra Claims" | means any Claims by BidCo (S) Pte. Ltd and/or Telstra Corporation Limited against the Company arising out of or pursuant to the Telstra SPA. |
| "Telstra Escrow Top-Up" | means the obligation of DGHL under the Telstra SPA to increase the amount of the Telstra General Escrow by the Telstra Reserve in the event that a change of control of DL occurs prior to January 14, 2024. |
| "Telstra General Escrow" | means an escrow required under the Telstra SPA to generally cover Telstra Claims arising thereunder. |

19

| | |
|---|---|
| "Telstra Reserve" | means a reserve in an amount of $70,000,000 to be reserved by the Company for the purpose of funding the Telstra Escrow Top-Up. |
| "Telstra SPA" | means that certain share purchase agreement, dated October 24, 2021, entered into between BidCo (S) Pte. Ltd., Telstra Corporation Limited and the Company, relating to the purchase and sale of Digicel Pacific Limited. |
| "United States Code" | means the Code of Laws of the United States of America. |
| "US Bankruptcy Code" | means title 11 of the United States Code. |
| "US Bankruptcy Court" | means the United States Bankruptcy Court for the Southern District of New York. |
| "US Securities Act" | means U.S. Securities Act of 1933, as amended, including the rules and regulations promulgated by the SEC thereunder. |
| "Work Payments" | means those payments the Company is obligated to make to the members of the Ad Hoc Groups pursuant to that certain work payment letter between the Company and the members of the Ad Hoc Groups dated as of 29 May, 2023. |

1.2    In this Scheme, unless the context otherwise requires or otherwise expressly provides:

(a)    references to Recitals, Parts, Clauses and Sub-Clauses are references to the recitals, parts, clauses and sub-clauses, respectively of or to the Scheme;

(b)    references to the Information Agent, the Existing Notes Trustee, the DGHL Scheme Creditors, the New Notes Agent, the New Notes Paying Agent, the Holding Period Trustee, the New Notes Registrar, the Security Agent, the Cash Manager, or any other person will be construed as to include its successors in title, permitted assigns and permitted transferees;

(c)    references to a "**person**" include references to an individual partnership, company, corporation, other legal entity, unincorporated body of persons or any state or state agency;

(d)    references to a statute or a statutory provision include the same as subsequently modified, amended or re-enacted from time to time;

(e)    references to an agreement, deed or document shall be deemed also to refer to such agreement, deed or document as amended, supplemented, restated, verified, replaced and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto provided that such

20

amendment, supplement, restatement, verification, replacement and/or novation has, to the extent it relates to the Scheme, been made in accordance with the terms of the Scheme;

(f)    references to an agreement, deed or document will include any schedules, annexes and appendices to such agreement, deed or document;

(g)    references to (or to any specified provision of) the Scheme will be construed as references to the Scheme as in force for the time being;

(h)    the singular includes the plural and *vice versa* and words importing one gender shall include all genders;

(i)    headings to Recitals, Parts, Clauses and Sub-Clauses are for ease of reference only and shall not affect the interpretation of the Scheme;

(j)    references to "**$**" or "**US$**" are references to the lawful currency of the United States of America;

(k)    the words "**include**" and "**including**" are to be construed without limitation, general words introduced by the word "**other**" are not to be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things and general words are not to be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words;

(l)    a company is a "**subsidiary**" of another company, its "**holding company**", if that other company: (a) holds a majority of the voting rights in it; (b) is a member of it and has the right to appoint or remove a majority of its board of directors; or (c) is a member of it and controls alone, pursuant to an agreement with other members, a majority of the voting rights in it, or, if it is a subsidiary of a company that is itself a subsidiary of that other company;

(m)    an "**undertaking**" means a body corporate or partnership; or an unincorporated association carrying on a trade or business, with or without a view to profit; and an undertaking is a parent undertaking in relation to another undertaking, a "**subsidiary undertaking**", if: (a) it holds the majority of voting rights in the undertaking; (b) it is a member of the undertaking and has the right to appoint or remove a majority of its board of directors; (c) it has the right to exercise a dominant influence over the undertaking: (i) by virtue of provisions contained in the undertaking's articles; or (ii) by virtue of a control contract; or (d) it is a member of the undertaking and controls alone, pursuant to an agreement with other shareholders or members, a majority of the voting rights in the undertaking;

(n)    unless otherwise stated, all references in the Scheme to times are to Bermuda time; and

(o)    where any amount is specified in this Scheme (including in any definition) in respect of any DGHL Scheme Consideration, that amount is subject to rounding in accordance with the terms of this Scheme.

21

## PART A
## RECITALS

**2    THE COMPANY**

2.1    The Company was incorporated in Bermuda under the Companies Act as an exempted company with limited liability on 1 April 2020 with registration number 55491 under the name "Digicel Group 0.5 Limited". The Company changed its name to "Digicel Group Holdings Limited" on 4 August 2020.

2.2    The Company's registered office is at Clarendon House, 2 Church Street, Hamilton, HM11, Bermuda.

2.3    The authorised share capital of the Company is US$100,000,000, consisting of 100,000,000 common shares of US$1.00 each, of which 50,001,000 are issued.

2.4    The Company is the issuer of the Existing Notes pursuant to the Existing Notes Indentures. The Scheme seeks to effect a compromise of the Company's Liabilities under the Existing Notes and the Existing Notes Indentures.

**3    THE PURPOSE OF THE SCHEME**

3.1    The principal object and purpose of the Scheme is to effect a compromise and arrangement between the Company and the DGHL Scheme Creditors in respect of the Scheme Claims in consideration for the issuance of the New Notes and the Noteholder Cash Distributions and to provide for an agreed methodology for the distribution as between the DGHL Scheme Creditors of the Future DPL Proceeds and the Additional Assets prior to DGHL's ultimate dissolution on a solvent basis. The arrangement and compromise of the Scheme Claims effected pursuant to the Scheme will accelerate payments to the DGHL Scheme Creditors in lieu of, and on a more cost effective basis than, a protracted liquidation of the Company.

3.2    On the Scheme Effective Date, among other things, the Existing Notes will be cancelled and discharged in full in exchange for the Company causing the DGHL Scheme Consideration to be issued to the DGHL Scheme Creditors, and all rights and obligations of any party under the Existing Notes and/or the Existing Notes Indentures (including, for the avoidance of doubt, all rights and obligations of any person that acquires an interest in the Existing Notes after the Record Date) will terminate.

3.3    Prior to the Scheme Effective Date, the Foreign Representative will be authorised to and will make an application on behalf of the Company for a suitable order from the US Bankruptcy Court under Chapter 15 of the US Bankruptcy Code (or under any other applicable law, legal doctrine or Proceeding concerning cross-border recognition) and such other additional relief and/or assistance as may be required or as the Foreign Representative may find necessary to obtain for the purposes of obtaining foreign recognition of the Scheme outside of Bermuda.

#97000160v26
Legal - 23383938.1

**4    THE EXISTING NOTES**

The Existing Notes are held under customary arrangements whereby:

(a)    the Existing Notes were issued pursuant to the Existing Notes Indentures;

(b)    all Existing Notes are registered in the name of the Existing Depository Nominee;

(c)    Beneficial Interests in the Existing Notes are held initially by DTC Participants (whose identities are recorded directly in the books or other records maintained by DTC), through DTC under electronic systems designed to facilitate paperless transactions in respect of dematerialised securities; and

(d)    each DTC Participant may be holding its recorded Beneficial Interest in the Existing Notes (in full or in part) either on its own behalf or on behalf of another person, which person may in turn also be holding such interest on its own behalf or on behalf of another person.

**5    THE EXISTING NOTES TRUSTEE AND THE SCHEME**

The Court has ordered that neither the Existing Notes Trustee, any Intermediaries nor the Existing Depository Nominee (as registered holder of the Existing Notes), none of whom own any economic interest in the Existing Notes to be compromised in the Scheme, shall be entitled to vote on the Scheme in respect of the Existing Notes at the Scheme Meetings and, accordingly, they will not vote on the Scheme at such meetings. For voting purposes in respect of the Scheme, the DGHL Scheme Creditors shall therefore consist solely of the DGHL Noteholders. Notwithstanding the foregoing, anything to the contrary herein, or any term of the Scheme, the Existing Notes Trustee shall be entitled to payment of the Existing Notes Trustee's Fees and Expenses, including its right to assert its charging lien, priority payment and indemnification rights under the Existing Notes Indentures, the Existing Notes and related documents against distributions to the holders of the Existing Notes and to establish, withhold and require reasonable reserves. For the further avoidance of doubt, the Existing Notes Trustee and its agents shall be Released Parties hereunder.

#97000160v26
Legal - 23383938.1

**PART B**
**THE SCHEME**

**6      APPLICATION AND EFFECTIVENESS OF THE SCHEME**

6.1      The compromises and arrangements effected by the Scheme, including the Restructuring Documents entered into pursuant hereto, shall apply to all Scheme Claims and shall be binding on all DGHL Scheme Creditors (and each of the Scheme Creditor Parties) and the Company.

6.2      Subject to Clause 18, the terms of the Scheme shall become effective on the Scheme Effective Date and shall take effect in accordance with the terms of the Scheme and all of the rights, title and interests of the DGHL Scheme Creditors in respect of the Scheme Claims will be subject to the compromise and arrangement set out in the Scheme in accordance with its terms.

6.3      The Company shall promptly notify the Information Agent in writing of the occurrence of the Scheme Effective Date and provide a form of written notice to the Information Agent, and the Information Agent shall promptly notify the DGHL Scheme Creditors of the Scheme Effective Date by:

(a)      providing such written notice to the Existing Notes Trustee;

(b)      circulating such written notice to the DGHL Scheme Creditors via DTC; and

(c)      posting such written notice on the Scheme Website.

**7      RESERVES**

7.1      On the Scheme Effective Date, the Company shall cause the Reserves to be funded. The Reserves Share shall be deducted from the DGHL Unsecured Notes Cash Distribution and the DGHL Subordinated Notes Cash Distribution in the amounts equal to the respective Class Pro-Rata Share (the amount of each such reduction, the "**Reserve Reduction Amount**"). A reduction will also be made from the DIFL/DL Cash Distribution for the purposes of funding the Reserves. No Reserve shall be used to make any payments or distributions to the DGHL Scheme Creditors, DL or DIFL on the Scheme Effective Date.

7.2      The Reserves are intended to be used by the Company as provision against any potential Claims by Telstra arising out of the Telstra SPA, to ensure that the Company has sufficient capital to continue its corporate existence in order to remain entitled to the Future DPL Proceeds and to realise the Additional Assets. Once the Reserves are no longer required for these purposes, they will be released and paid to DGHL Scheme Creditors, DIFL and DL (or their successor or assigns) in accordance with the terms of the New Notes and the Intercreditor Agreement.

**8      THE SCHEME – EXISTING UNSECURED NOTES**

8.1      On the Scheme Effective Date:

24

(a) the Company shall distribute to the Existing Notes Trustee for further distribution to DTC the DGHL Unsecured Notes Cash Distribution (subject to such deductions and/or adjustment made prior to payment to DTC in accordance with the terms of the Scheme) for payment to DGHL Unsecured Noteholders. Any payment made pursuant to this paragraph (a) shall be without prejudice to a DGHL Unsecured Noteholder's right to receive such further amounts as may become payable pursuant the terms of the Scheme (and such further amounts shall be distributed pursuant to the Intercreditor Agreement); and

(b) immediately following the payments in paragraph (a) above, the Company shall issue the New Senior Notes pursuant to the Note Agreement. The New Senior Notes shall be issued to each DGHL Unsecured Noteholder who is an Eligible Recipient in an amount equal to such DGHL Unsecured Noteholder's pro rata portion (based upon their Scheme Claim relative to the aggregate amount of all Scheme Claims of all DGHL Unsecured Noteholders on the New Notes Election Deadline) of the aggregate principal amount of the Existing Unsecured Notes (calculated in accordance with Clause 8.3 below). Any DGHL Unsecured Noteholder who is an Eligible Recipient but failed to make an Existing Unsecured Notes Election by the New Notes Election Deadline and any Ineligible Recipient shall be deemed to have elected to receive New 1A Notes and New 1B Notes in respect of their entitlements and shall not receive New 2A Notes or New 2B Notes. New 1A Notes and New 1B Notes shall be issued in the name of the New Note 1 Recipients and New 2A Notes and New 2B Notes shall be issued in the name of the New Note 2 Recipients (as applicable). The New Notes Registrar shall maintain a register of New Note 1 Recipients' and New Note 2 Recipients' respective interests in the New Senior Notes. The New Senior Notes shall exist in book-entry form and no physical notes or certificates shall be issued or delivered. To the extent a DGHL Unsecured Noteholder is an Ineligible Recipient, such DGHL Unsecured Noteholder's interests in the New Senior Notes shall be issued in the name of the Holding Period Trustee and held by the Holding Period Trustee subject to the terms of the Holding Period Trust.

8.2    Immediately following the steps described in Clause 8.1 and conditional upon such steps occurring, all Scheme Claims of the DGHL Unsecured Noteholders (together with any Scheme Claim that the Existing Notes Trustee and/or the Existing Depository Nominee may have in relation to the Existing Unsecured Notes and/or the Existing Unsecured Notes Indenture) shall be released and compromised as follows:

(a) the Existing Unsecured Notes, the Existing Unsecured Notes Indenture, and all other related instruments, certificates, agreements and other documents will be cancelled, released, terminated, extinguished and discharged without any further act or action by either the Company, the Existing Notes Trustee, any DGHL Unsecured Noteholder or any other DGHL Scheme Creditor, provided, however, that such documents shall continue in effect for the limited purpose of (i) allowing each DGHL Unsecured Noteholder to receive their respective DGHL Scheme Consideration and if applicable, Work Payment, and (ii) preserving all rights of the Existing Notes Trustee thereunder with respect to the Existing Notes Trustee's Fees and Expenses;

(b) the Existing Unsecured Notes shall be deemed surrendered without any

25

further act or action by the Company, the Existing Notes Trustee, any DGHL Unsecured Noteholder or any other DGHL Scheme Creditor; and

(c)     the respective rights and obligations of the DGHL Unsecured Noteholders, any Intermediary holding any Beneficial Interest in any of the DGHL Unsecured Notes (including, for the avoidance of doubt, any person that acquires an interest in the DGHL Unsecured Notes after the Record Date), the Company, and the Existing Notes Trustee towards one another under the Existing Unsecured Notes Indenture and the DGHL Unsecured Notes shall be deemed fully satisfied, discharged and terminated; provided, however, that such rights and obligations shall continue for the limited purpose of (i) allowing the DGHL Unsecured Noteholders to receive their respective DGHL Scheme Consideration and (ii) preserving all rights of the Existing Notes Trustee thereunder with respect to the Existing Notes Trustee's Fees and Expenses.

8.3     The total principal amount of:

(a)     New 1A Notes and New 1B Notes issued by DGHL on the Scheme Effective Date shall in aggregate be equal to the total principal amount (and accrued unpaid interest and default interest, if any) outstanding as at the New Notes Election Deadline under the Existing Unsecured Notes of those DGHL Unsecured Noteholders who elect, pursuant to an Existing Unsecured Notes Election by the New Notes Election Deadline (and including, for the avoidance of doubt, any Ineligible Recipients) to receive New 1A Notes and New 1B Notes, together with those do not make an Existing Unsecured Notes Election prior to the New Notes Election Deadline, less any amounts paid to such DGHL Unsecured Noteholders in respect of the DGHL Unsecured Notes Cash Distribution paid on or before the Scheme Effective Date, rounded to the nearest $1.00;

(b)     New 2A Notes and New 2B Notes issued by DGHL on the Scheme Effective Date shall in aggregate be equal to the total principal amount (and accrued unpaid interest and default interest, if any) outstanding as at New Notes Election Deadline under the Existing Unsecured Notes of those DGHL Unsecured Noteholders who elect, pursuant to an Existing Unsecured Notes Election made by the New Notes Election Deadline, to receive New 2A Notes and New 2B Notes, less any amounts paid to such DGHL Unsecured Noteholders in respect of the DGHL Unsecured Notes Cash Distribution paid on or before the Scheme Effective Date, rounded to the nearest $1.00.

(c)     Following the Scheme Effective Date, any Additional Assets Proceeds and/or Future DPL Proceeds realised or received by or paid to the Company shall be paid to the holders of the New Senior Notes in accordance with the terms of the Intercreditor Agreement.

8.4     For U.S. federal income tax purposes, the aggregate amount of applicable DGHL Scheme Consideration distributed to DGHL Unsecured Noteholders pursuant to this Scheme shall be allocated first to the principal amount of the Existing Unsecured Notes

26

(as determined for federal income tax purposes), with any excess allocated to unpaid interest that accrued on the Existing Unsecured Notes, if any.

## 9    THE SCHEME – EXISTING SUBORDINATED NOTES

9.1    On the Scheme Effective Date:

   (a)    the Company shall distribute to the Existing Notes Trustee for further distribution DTC the DGHL Subordinated Notes Cash Distribution (subject to such deductions and/or adjustment made prior to payment to DTC in accordance with the terms of the Scheme) for payment to DGHL Subordinated Noteholders. Any payment made pursuant to this paragraph (a) shall be without prejudice to a DGHL Subordinated Noteholder's right to receive such further amounts as may become payable pursuant to the terms of the Scheme (and such further amounts shall be distributed pursuant to the Intercreditor Agreement); and

   (b)    immediately following the payments in paragraph (a) above, the Company shall issue the New Subordinated Notes pursuant to the Note Agreement. The New Subordinated Notes shall be issued to each DGHL Subordinated Noteholder who is an Eligible Recipient in an amount equal to such DGHL Subordinated Noteholder's pro rata portion (based upon their Scheme Claim relative to the aggregate amount of all Scheme Claims of all DGHL Subordinated Noteholders as of the New Notes Election Deadline) of the aggregate principal amount of the Existing Subordinated Notes (calculated in accordance with Clause 9.3 below). Any DGHL Subordinated Noteholder who is an Eligible Recipient but failed to make an Existing Subordinated Notes Election by the New Notes Election Deadline and any Ineligible Recipient shall be deemed to have elected to receive New 3A Notes and New 3B Notes in respect of their entitlements and shall not receive New 4A Notes or New 4B Notes. New 3A Notes and New 3B Notes shall be issued in the name of the New Note 3 Recipients and New 4A Notes and New 4B Notes shall be issued in the name of the New Note 4 Recipients (as applicable). The New Notes Registrar shall maintain a register of New Note 3 Recipients' and New Note 4 Recipients' respective interests. The New Subordinated Notes shall exist in book-entry form and no physical notes or certificates shall be issued or delivered. To the extent a DGHL Subordinated Noteholder is an Ineligible Recipient, such DGHL Subordinated Noteholder's interests in the New Subordinated Notes shall be issued in the name of the Holding Period Trustee and held by the Holding Period Trustee subject to the terms of the Holding Period Trust.

9.2    Immediately following the steps described in Clause 9.1 and conditional upon such steps occurring, all Scheme Claims of the DGHL Subordinated Noteholders (together with any Scheme Claim that the Existing Notes Trustee and/or the Existing Depository Nominee may have in relation to the Existing Subordinated Notes and/or the Existing Subordinated Notes Indenture) shall be released and compromised as follows:

   (a)    the Existing Subordinated Notes, the Existing Subordinated Notes Indenture, and all other related instruments, certificates, agreements and other documents will be cancelled, released, terminated, extinguished and discharged without any further act or action by either the Company, the

27

Existing Notes Trustee, any DGHL Subordinated Noteholder or any other DGHL Scheme Creditor, provided, however, that such documents shall continue in effect for the limited purpose of (i) allowing each DGHL Subordinated Noteholder to receive its respective DGHL Scheme Consideration and, if applicable, Work Payment, and (ii) preserving all rights of the Existing Notes Trustee thereunder with respect to the Existing Notes Trustee's Fees and Expenses;

(b)    the Existing Subordinated Notes shall be deemed surrendered without any further act or action by the Company, the Existing Notes Trustee, any DGHL Subordinated Noteholder or any other DGHL Scheme Creditor; and

(c)    the respective rights and obligations of the DGHL Subordinated Noteholders, any Intermediary holding any Beneficial Interest in any of the Existing Subordinated Notes (including, for the avoidance of doubt, any person that acquires an interest in the Existing Subordinated Notes after the Record Date), the Company, and the Existing Notes Trustee towards one another under the Existing Subordinated Notes Indenture and the Existing Subordinated Notes shall be deemed fully satisfied, discharged and terminated, provided, however, that such rights and obligations shall continue for the limited purpose of (i) allowing the DGHL Subordinated Noteholders to receive their respective DGHL Scheme Consideration and (ii) preserving all rights of the Existing Notes Trustee thereunder with respect to the Existing Notes Trustee's Fees and Expenses.

9.3    The total principal amount of:

(a)    New 3A Notes and New 3B Notes issued by DGHL on the Scheme Effective Date shall in aggregate be equal to the total principal amount (and accrued unpaid interest and default interest, if any) outstanding as at the New Notes Election Deadline under the Existing Subordinated Notes of those DGHL Subordinated Noteholders who elect, pursuant to an Existing Subordinated Notes Election made by the New Notes Election Deadline, to receive the New 3A Notes and New 3B Notes, together with those do not make an Existing Unsecured Notes Election prior to the New Notes Election Deadline, less any amounts paid to such DGHL Subordinated Noteholders in respect of the DGHL Subordinated Notes Cash Distribution paid on the Scheme Effective Date, rounded to the nearest $1.00; and

(b)    New 4A Notes and New 4B Notes issued by DGHL on the Scheme Effective Date shall in aggregate be equal to the total principal amount (and accrued unpaid interest and default interest, if any) outstanding as at the New Notes Election Deadline under the Existing Subordinated Notes of those DGHL Subordinated Noteholders who elect, pursuant to an Existing Subordinated Notes Election made by the New Notes Election Deadline, to receive New 4A Notes and New 4B Notes, less any amounts paid to such DGHL Subordinated Noteholders in respect of the DGHL Subordinated Notes Cash Distribution paid on the Scheme Effective Date, rounded to the nearest $1.00.

28

(c)     Following the Scheme Effective Date, any Additional Assets Proceeds and/or Future DPL Proceeds realised or received by or paid to the Company shall be paid to the holders of the New Subordinated Notes in accordance with the terms of the Intercreditor Agreement.

## 10     ADJUSTMENT TO NOTEHOLDER CASH DISTRIBUTIONS

10.1    To the extent that, after the payment of the Existing Notes Trustee's Fees and Expenses, the Professional Fees, the Work Payments and funding of the Reserves and payment of any other amounts shown as payable on the Scheme Effective Date in the Distributions Allocations Funds Flow, the Company has insufficient available cash to make the full Noteholder Cash Distributions and the full DIFL/DL Cash Distribution then:

(a)     the Company shall calculate the aggregate shortfall between:

(i)   its available cash; and

(ii) the sum of the Noteholder Cash Distributions and the DIFL/DL Cash Distribution,

(such amount a "**Cash Allocation Shortfall**");

(b)     the Company shall deduct from the DGHL Unsecured Notes Cash Distribution and the DGHL Subordinated Notes Cash Distribution, the relevant Cash Allocation Shortfall Pro-Rata; and

(c)     those reduced amounts shall be the cash payable by the Company to the DGHL Unsecured Noteholders and the DGHL Subordinated Noteholders pursuant to Clauses 8.1(a) and 9.1(a) respectively.

10.2    Subject to 10.3 below, the DGHL Unsecured Noteholders and the DGHL Subordinated Noteholders shall be reimbursed in respect of the amounts used to fund any Cash Allocation Shortfall from any Additional Assets Proceeds as set out in the Intercreditor Agreement.

10.3    To the extent the DGHL Subordinated Notes Cash Distribution paid (or in the process of being paid) to the DGHL Subordinated Noteholders as of the Scheme Effective Date is less than USD 13,536,719, DGHL Subordinated Noteholders shall be reimbursed from any Additional Assets Proceeds prior to the reimbursement of the Cash Allocation Shortfall contemplated in 10.2 above, as set out in the Intercreditor Agreement.

## 11     HOLDING PERIOD TRUST ARRANGEMENTS

11.1    From the Scheme Effective Date, the Holding Period Trust shall be constituted in accordance with the Holding Period Trust Deed. The Holding Period Trust shall consist of (a) the New Notes representing the DGHL Scheme Consideration that is payable or attributable to Ineligible Recipients pursuant to the terms of the Scheme, and (b) following the Scheme Effective Date, any cash distributions paid in respect of all New Notes held on behalf of any Ineligible Recipients at that time, including any cash payments in respect of Additional Assets Proceeds and/or Future DPL Proceeds.

#97000160v26
Legal - 23383938.1

11.2    During the Holding Period, after submitting a validly completed Registration Form, an Ineligible Recipient shall be entitled to receive their pro rata portion (calculated in accordance with 8.1 or 9.1 as the case may be) of (a) the New Notes and (b) any cash distributions paid following the Scheme Effective Date up to and including the date of receipt of such New Notes by such Ineligible Recipients in respect of the New Notes, in accordance with the terms of the Scheme and Holding Period Trust Deed.

11.3    If an Ineligible Recipient has not become an Eligible Recipient by the expiration of the Holding Period, then such Ineligible Recipient shall be deemed to have irrevocably waived its entitlement to the New Notes and any cash distribution made in respect of the New Notes, and shall be deemed to give the releases set out in the Holding Period Trust Deed and in Clause 14 in respect of such Ineligible Recipient's Scheme Claim or entitlement to any New Notes and related cash distributions. Upon such release, (a) all New Notes that were held for the benefit of the relevant DGHL Noteholders shall be irrevocably cancelled, (b) any related cash distributions that were received in respect of the New Notes during the Holding Period and were formerly held for the benefit of the relevant DGHL Noteholders shall be returned to the Company and shall be deemed Additional Assets Proceeds and treated accordingly, and (c) the Holding Period Trust shall terminate.

11.4    The Holding Period Trustee shall have the power to appoint an additional or replacement trustee at any time, subject to any additional or replacement trustee agreeing to be bound by the terms of the Scheme and the Holding Period Trust Deed.

## 12    NO RIGHT TO COMMENCE PROCEEDINGS

12.1    From and after the Scheme Effective Date, no person or entity, including, without limitation, the Scheme Creditor Parties, shall be entitled to commence, continue, threaten or procure the commencement or continuation of any Proceeding in respect of any Released Claim, whether directly or indirectly, against any of the Released Parties or in respect of any property of any of the Released Parties.

12.2    Nothing in Clause 12.1 shall extinguish or otherwise affect any rights or remedies in respect of any Allowed Proceedings.

12.3    The Company shall be fully entitled to enforce Clause 12.1 in its own name.

12.4    Without prejudice to the Deed of Release, each Released Party (other than the Company) shall be fully entitled to enforce Clause 12.1 in its own name, (whether by way of a Proceeding or by way of defense or estoppel (or similar theory) in any jurisdiction whatsoever) as if it were a party hereto, pursuant to the provisions of the Contracts (Rights of Third Parties) Act 2016 of Bermuda and/or any other applicable law which so permits.

12.5    Each DGHL Scheme Creditor is deemed to acknowledge that if it, or any person claiming through it (including any Scheme Creditor Party), takes any Proceedings against any Released Party in breach of Clause 12.1, the Released Party shall be entitled to obtain an order as of right staying those Proceedings and providing for payment, by the DGHL Scheme Creditor (and/or to the extent applicable, any Scheme Creditor Party) concerned and any person claiming through it, of any costs, charges or other

expenses howsoever incurred by such Released Party as a result of or in connection with taking such Proceedings on a full indemnity basis.

## 13    INSTRUCTIONS, AUTHORISATIONS AND DIRECTIONS

13.1    Pursuant to the Scheme, each DGHL Scheme Creditor is deemed to provide the instructions, authorisations and directions contained in this Clause 13.

13.2    Each DGHL Scheme Creditor in respect of its interest in the Existing Notes hereby irrevocably authorises and instructs DTC and the Existing Notes Trustee to, on or after the Scheme Effective Date, take whatever action is necessary or reasonably appropriate to give effect to the terms of the Scheme.

13.3    On and from the Scheme Effective Date, in exchange for the DGHL Scheme Consideration and notwithstanding any term of any document, each DGHL Scheme Creditor hereby appoints the Company in respect of any and all Scheme Claims arising under or in connection with the Existing Notes, and/or the Existing Notes Indentures as its attorney and agent and irrevocably authorises, directs, instructs and empowers the Company (represented by any authorised representative) to:

(a)    enter into, execute and deliver (whether as a deed or otherwise) for and on behalf of each DGHL Scheme Creditor, the Restructuring Documents to which the DGHL Scheme Creditors, or any of them, are named as a party and any other document referred to, contemplated by or ancillary to any of the foregoing;

(b)    agree on its behalf any amendments to any such document which are:

(i)    necessary or desirable to give effect to or reflect the terms of the Scheme;

(ii)    necessary to correct any manifest error; or

(iii)    minor or technical in nature; and

in each case would not (i) impose any additional obligation on, (ii) materially, adversely or disproportionately affect the rights of, any of the DGHL Scheme Creditors in any manner that is not otherwise contemplated by the Scheme or the Restructuring Documents, nor (iii) be materially inconsistent with the terms of the Scheme; and

(c)    take whatever action is necessary to ensure that the books and records of DTC are updated to reflect the terms of the Scheme, including without limitation to: (i) instruct DTC to debit the Beneficial Interests relating to the Existing Notes from the relevant DTC Participants; (ii) authorise the cancellation of the book entry interests in respect of the Existing Notes, and (iii) take or carry out any other step or procedure reasonably required to effect the settlement of the Scheme.

13.4    Without prejudice to the foregoing, on the Scheme Effective Date each DGHL Scheme Creditor hereby irrevocably authorises and instructs, and shall for all purposes be treated as having hereby irrevocably authorised and instructed, the Administrative Parties (as applicable) to enter into, execute and deliver (as a deed or otherwise) the

31

Restructuring Documents to which such Administrative Parties are party to (in any capacity) and to take all steps reasonably necessary to comply with their respective obligations under any other Restructuring Document to which the Administrative Parties are a party (in any capacity).

13.5     On and from the Scheme Effective Date, without prejudice to the Deed of Release, each DGHL Scheme Creditor for itself and its Scheme Creditor Parties in respect of the Existing Notes, the Existing Notes Indentures and all other related instruments, certificates, agreements and other documents, releases, discharges and exonerates each of the Existing Notes Trustee (including its officers, agents, Affiliates, Personnel, attorneys) and each of the Advisors from any Released Claims by the DGHL Scheme Creditors and their Scheme Creditor Parties:

(a)     by reason of any of them acting in accordance with the above authorisation and instruction;

(b)     for the manner of performance of all acts carried out on such instructions save to the extent of its own gross negligence, wilful default, wilful misconduct, fraud or dishonesty; and

(c)     in the case of a DGHL Scheme Creditor, under the Existing Notes Indenture and the Existing Notes with effect from the Scheme Effective Date (without prejudice to any rights of the Existing Notes Trustee under the Existing Notes Indenture, the Existing Notes or related documents),

in each case whether or not the Company obtains a suitable order from the US Bankruptcy Court under Chapter 15 of the US Bankruptcy Code or another applicable law, legal doctrine or Proceeding concerning cross-border recognition.

13.6     Each DGHL Scheme Creditor, including on behalf of its Scheme Creditor Parties, in respect of the Existing Notes, hereby acknowledges and agrees that any action taken by the Company in accordance with the Scheme and/or the Restructuring Documents will not constitute a breach of the Existing Notes, the Existing Notes Indentures (or any other agreement or document governing the terms of any Scheme Claim) or the Restructuring Documents and to the extent such agreement is ineffectual or unenforceable, hereby irrevocably waives any such breach.

13.7     The directions, instructions and authorisations granted under this Clause 13 shall be treated, for all purposes whatsoever and without limitation, as having been granted by deed and the Company shall be entitled to delegate the authority granted and conferred by this Clause 13 to any duly authorised officer or agent of the Company as necessary.

## 14     DGHL SCHEME CREDITOR UNDERTAKINGS AND RELEASES

14.1     Pursuant to the Scheme, each DGHL Scheme Creditor is deemed to provide the undertakings and releases contained in this Clause 14.

14.2     On and from the Scheme Effective Date, in exchange for the DGHL Scheme Consideration and notwithstanding any term of any other document, each DGHL Scheme Creditor hereby appoints the Company as its attorney and agent and irrevocably authorises, directs, instructs and empowers the Company (represented by

32

any authorised representative) to enter into, execute and deliver (whether as a deed or otherwise) for and on its behalf, each Restructuring Document to which the DGHL Scheme Creditors, or any of them, are named as a party.

14.3    Without prejudice to the Deed of Release and in consideration for its entitlement to the DGHL Scheme Consideration, on and from the Scheme Effective Date, each DGHL Scheme Creditor and its Scheme Creditor Parties irrevocably, unconditionally, fully and absolutely:

    (a)    confirms the Interim Distribution and all actions by the Company and/or any other Released Party in connection with the Interim Distribution;

    (b)    waives, discharges and releases all of its rights, title and interest in and to its Scheme Claims in consideration for its entitlement to receive the DGHL Scheme Consideration in accordance with the Scheme;

    (c)    except as otherwise expressly provided herein, waives, discharges and releases any Released Claim it may have under or in connection with the Existing Notes Indentures, and/or the Existing Notes against any Released Party in relation to any breaches or defaults under the Existing Notes Indentures, and/or the Existing Notes occurring on or before the Scheme Effective Date or which may occur as a result of implementation of the Scheme;

    (d)    ratifies and confirms everything which any Released Party may lawfully do or cause to be done in accordance with any authority conferred by the Scheme and agrees not to challenge any part of the Scheme including:

        (i)    the Interim Distribution;

        (ii)    the release of the Existing Notes and the issuance of the New Notes;

        (iii)    the Holding Period Trust and the transactions contemplated thereby (other than any breaches of the Holding Period Trust Deed by any of the parties thereto);

        (iv)    the validity of any act done or omitted to be done in good faith by any Released Party to implement the transactions and compromises contemplated hereby; or

        (v)    the exercise or omission to exercise of any power conferred in accordance with the provisions of the Scheme (including, without limitation, the exercise or omission of powers by the Holding Period Trustee to administer the DGHL Scheme Consideration, other than as a result of any breach of the Holding Period Trust Deed) in good faith by any Released Party;

    (e)    waives, releases and discharges each and every Released Claim which it ever had, may have or hereafter can, shall or may have against any Released Party;

    (f)    confirms, acknowledges and agrees that no Administrative Party shall have any liability to the Company, any DGHL Scheme Creditor, any of its or their

#97000160v26
Legal - 23383938.1

respective Affiliates of any of them for any action taken, document executed or any inaction or omission by it pursuant to the authorisation and instruction set out in this Scheme or in relying and acting on any instruction given to it in accordance with this Scheme, except as a result of its gross negligence, wilful default, wilful misconduct, fraud or dishonesty; and

(g)     undertakes to each of the Released Parties that it will not and shall procure that its Scheme Creditor Parties will not, directly or indirectly commence or continue, or instruct, direct or authorise any other person to commence or continue, any Proceedings in respect of or arising from any Released Claims.

14.4    Each DGHL Scheme Creditor acknowledges that it may later discover facts in addition to or different from those which it presently knows or believes to be true with respect to the subject matter of the Scheme, but it is its intention to fully, and finally forever settle and release any and all matters, disputes and differences, whether known or unknown, suspected or unsuspected, which presently exist, may later exist or may previously have existed between it and one or more of the Released Parties in respect of the Released Claims, and that in furtherance of this intention, the waivers, releases and discharges given in the Scheme shall be and shall remain in effect as full and complete general waivers, releases and discharges notwithstanding the discovery or existence of any such additional or different facts.

14.5    Nothing in this Clause 14 shall extinguish or otherwise affect the rights and/or remedies of any DGHL Scheme Creditor in respect of:

(a)     any Allowed Proceedings; and

(b)     any Excluded Claim.

#97000160v26
Legal - 23383938.1

**PART C**
**IDENTIFICATION OF SCHEME CLAIMS**

## 15    SALES, ASSIGNMENTS OR TRANSFERS

15.1    Neither the Company nor the Information Agent shall recognise any sale, assignment or transfer of any Scheme Claim after the Record Date for the purposes of determining entitlement to attend and vote at the Scheme Meetings.

15.2    All distributions of DGHL Scheme Consideration as of the Scheme Effective Date shall be made to DGHL Scheme Creditors in accordance with Clauses 7 or 9 (as the case may be) irrespective of any sale or assignment of any Scheme Claim after the New Notes Election Deadline. Notwithstanding the foregoing, the Company, the Holding Period Trustee and/or the Information Agent may, in their discretion, choose to recognise any assignment or transfer of any Scheme Claim after the New Notes Election Deadline (and shall be entitled to request any documentation to satisfy themselves of the same) for the purposes of distributing DGHL Scheme Consideration.

15.3    A transferee of an economic, beneficial or proprietary interest in the Existing Notes after the Record Date will, however, be bound by the terms of the Scheme in the event that it becomes effective, and any Existing Notes to which such transferee is entitled will be cancelled on the Scheme Effective Date in accordance with the terms of the Scheme.

15.4    If any Scheme Creditor (the "**Transferor**") assigns or transfers any economic, beneficial or proprietary interest in that Transferor's Scheme Claim after the New Notes Election Deadline such that the transferee or assignee entity becomes a Scheme Creditor (the "**Transferee**") in respect of the interests so transferred, then for the purposes of calculating any rights to Scheme Consideration, or any calculations, as at the New Notes Election Deadline, (A) the Transferor's Scheme Claim shall be reduced by the amount of the relevant Scheme Claims so transferred or assigned after the New Notes Election Deadline, and (B) the Transferee will be attributed with the Scheme Claims so transferred or assigned.

## 16    PROVISION OF INFORMATION

16.1    To the extent permitted by law (including any pre-existing obligations of confidentiality) DGHL Scheme Creditors (including any DTC Participants and Intermediaries) shall provide the Information Agent and the New Notes Paying Agent with all information reasonably requested by either of them in writing.

## 17    THE INFORMATION AGENT AND THE HOLDING PERIOD TRUSTEE

Neither the Information Agent nor Holding Period Trustee shall be liable for any Claim or Liability arising in respect of the performance of its duties as Information Agent or Holding Period Trustee respectively under the Scheme or Holding Period Trust Deed except where such Claim or Liability arises as a result of its own fraud, gross negligence, wilful default or wilful misconduct.

#97000160v26
Legal - 23383938.1

36

## PART D
## CONDITIONS TO THE SCHEME

**18    CONDITIONS TO THE EFFECTIVENESS OF THE SCHEME**

18.1    The Scheme shall only become effective following the satisfaction of all of the following conditions:

(a)    the approval of the Scheme (with or without modifications, subject to Clause 22) at the Scheme Meetings by a simple majority in number of each class of the DGHL Scheme Creditors entitled to vote at the Scheme Meetings either in person or by proxy representing at least three fourths in value of the Scheme Claims of the relevant class;

(b)    the sanction of the Scheme (with or without modifications, subject to Clause 22) by the Court;

(c)    entry into the Restructuring Documents and satisfaction of any conditions precedent thereunder;

(d)    the establishment by the Company of all bank accounts contemplated by the Restructuring Documents;

(e)    adoption of the Amended and Restated Bye-laws and appointment of each of the independent directors required thereunder, including the AHG Board Nominees;

(f)    entry of an order by the US Bankruptcy Court pursuant to Chapter 15 of the US Bankruptcy Code, recognising and enforcing the Scheme, with such order not having been reversed, stayed, modified or vacated on appeal;

(g)    payment in full, in cash of the Existing Notes Trustee's Fees and Expenses that have been invoiced to the Company no less than two (2) Business Days prior to the Scheme Effective Date;

(h)    payment of all outstanding or otherwise reasonable and documented Professional Fees in full;

(i)    payment of all Work Payments in full;

(j)    the delivery of an office copy of the Sanction Order to the Registrar of Companies for registration;

(k)    the approval by the members of the Ad Hoc Groups of the Post-Closing Budget;

(l)    execution of consents to act by the AHG Board Nominees;

(m)    the approval by the members of the Ad Hoc Groups of the Distributions Allocation Funds Flow; and

37

(n)     following completion of the final condition to occur of (a) to (m) above, written confirmation from the Company that the Restructuring Support Agreement has not been terminated by any of the parties thereto and it remains in full force and effect.

#97000160v26
Legal - 23383938.1

**PART E**
**GENERAL SCHEME PROVISIONS**

### 19    TERMINATION OF THE SCHEME

19.1    If the Scheme Effective Date does not occur on or before the Longstop Time, all of the compromises and arrangements provided by this Scheme and any releases granted pursuant to this Scheme shall be of no effect and shall be construed as if it had never become effective, and the rights and obligations of the DGHL Scheme Creditors (including under the Existing Notes and Existing Notes Indentures) shall not be affected and shall be reinstated and remain in full force and effect.

### 20    SECURITIES LAW CONSIDERATIONS

20.1    The New Notes will not be registered under the US Securities Act or any state or other securities laws of the United States of America or any other jurisdiction.

### 21    SCHEME COSTS

21.1    The Company shall pay all Scheme Costs and any other costs incurred by the Company including in connection with the negotiation, preparation and implementation of the Scheme as and when they arise.

### 22    MODIFICATIONS OF THE SCHEME

22.1    The Company may, subject to the terms of the Restructuring Support Agreement, at any hearing to sanction the Scheme, consent on behalf of all DGHL Scheme Creditors to any modification, addition, or waiver of the Scheme or any terms or conditions which the Court may think fit to approve or impose which is necessary or desirable for the implementation of the Scheme, provided that such modification, addition, waiver or term or condition does not directly or indirectly alter, modify or have an adverse effect on the economic treatment or any legal rights or obligations or interests of any DGHL Scheme Creditor and/or the Existing Notes Trustee under the Scheme or any Restructuring Document, or impose any direct or indirect additional obligation on a DGHL Scheme Creditor.

22.2    Before the Scheme Effective Date, the terms of the Scheme or any Restructuring Document may be amended or waived with the consent of the Company, the Majority DGHL Ad Hoc Group and the Majority PCG Ad Hoc Group, provided that such amendment or waiver is only of a technical or non-material nature or to correct a manifest error, and provided further any such proposed amendment does not directly or indirectly alter, modify or have an adverse effect on the economic treatment or any legal right or obligation or interests of any DGHL Scheme Creditor under the Scheme or any Restructuring Document (unless such DGHL Scheme Creditor consents) or impose any direct or indirect additional obligation on a DGHL Scheme Creditor.

22.3    The Company may not at any time designate any document a Restructuring Document without the consent of the Majority DGHL Ad Hoc Group and the Majority PCG Ad Hoc Group.

#97000160v26
Legal - 23383938.1

**23      LIMITATIONS OF LIABILITY**

23.1    Nothing in this Scheme constitutes any person a trustee, agent or fiduciary of any other person, other than the Holding Period Trustee.

23.2    None of the Administrative Parties shall be liable to any person for any action taken or not taken by it under or in connection with the Scheme, including any losses, damages, claims, liabilities, costs (including but not limited to legal costs and disbursements) and expenses of any kind, unless directly caused by its gross negligence, wilful default, wilful misconduct or fraud. The Administrative Parties may assume that and shall not be under any obligation to any person to verify or arrange, coordinate or facilitate the verification of) any representation, notice or document delivered to them is genuine, correct and appropriately authorized and any statement made by any director, authorised signatory or employee of any person regarding any matters which may reasonably be assumed to be within that person's knowledge or within that person's power to verify.

**24      FURTHER ASSURANCE**

24.1    On and from the Scheme Effective Date up to and including forty-five (45) Business Days after the Scheme Effective Date, each DGHL Scheme Creditor undertakes to the Company and its directors, officers and other duly appointed representatives to provide such further assurance (at the Company's sole expense) as may be reasonably required by the Company to implement this Scheme provided that:

(a)     such actions are consistent with the Scheme and the Restructuring Documents; and

(b)     the Company must notify the DGHL Scheme Creditor and (to the extent that the DGHL Scheme Creditor responds to the notice) consult in good faith with the relevant DGHL Scheme Creditor at least five (5) Business Days prior to the date on which any steps are required to be taken by the relevant DGHL Scheme Creditor in accordance with this Clause 24.

**25      NOTICES**

25.1    Any notice or other written communication to be given under or in relation to the Scheme shall be given in writing and shall be deemed to have been duly given if it is delivered by hand or sent by Post, and by air mail where it is addressed to a different country from that in which it is posted, with a copy sent by electronic mail to:

(a)     in the case of the Company

        Digicel Group Holdings Limited
        Clarendon House
        2 Church Street
        Hamilton, HM 11
        Bermuda
        Attn:   Jarleth Burke
        Email: Jarleth.Burke@digicelgroup.com

40

with a copy to (which shall not constitute notice):

Conyers Dill & Pearman Limited
Clarendon House
2 Church Street
Hamilton, HM 11
Bermuda
Attn:   Christian Luthi
        Rhys Williams
        Edward Rance
Email: christian.luthi@conyers.com
       rhys.williams@conyers.com
       edward.rance@conyers.com

-and-

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attn:   Timothy Graulich
        Darren Klein
Email: timothy.graulich@davispolk.com
       darren.klein@davispolk.com

(b)    in the case of a DGHL Scheme Creditor, its last known address known to the Company, provided that all deliveries of notices required to be made by the Scheme shall be effective by posting the same in pre-paid envelopes addressed to the DGHL Scheme Creditors or, if so directed by the DGHL Scheme Creditors, to the relevant DTC Participant for the persons respectively entitled thereto at the addresses appearing in the records of DTC or to such other addresses (if any) as such persons may respectively direct in writing, or

(c)    In the case of the Existing Notes Trustee:

Wilmington Trust, N.A.
Suite 1290
50 South Sixth Street
Minneapolis, MN 55402
Attn:   Peter Finkel, Vice President
Email: Pfinkel@wilmingtontrust.com

With a copy to: (which shall not constitute notice):

Foley & Lardner LLP
321 North Clark Street, Suite 3000
Attn:   Harold L. Kaplan, Mark F. Hebbeln
Email: hkaplan@foley.com, mhebbeln@foley.com

41

(d)    in the case of the New Notes Agent/Holding Period Trustee:

GLAS Trustees Limited
55 Ludgate Hill
Level 1, West
London, England, EC4M 7JW

Attention:    Manager DCM / Digicel Group

Email:    dcm@glas.agency

(e)    in the case of any other person, any address set forth for that person in any agreement entered into in connection with the Scheme.

25.2    In addition, any notice or other written communication under or in relation to the Scheme to be given to the DGHL Scheme Creditors shall be deemed to have been duly given if sent by electronic means through DTC.

25.3    Any notice or other written communication to be given under the Scheme shall be deemed to have been served:

(a)    if delivered by hand, on the first Business Day following delivery;

(b)    if sent by Post, on the second Business Day after posting if the recipient is in the country of dispatch, otherwise on the fifth Business Day after posting; and

(c)    if distributed electronically through DTC, on the fifth Business Day after such distribution.

25.4    In proving service, it shall be sufficient proof, in the case of a notice sent by Post, that the envelope was properly stamped, addressed and placed in the Post.

25.5    The accidental omission to send any notice, written communication or other document in accordance with this Clause 25 or the non-receipt of any such notice by any DGHL Scheme Creditor, shall not affect any of the provisions of the Scheme or the effectiveness thereof.

**26    CONFLICT AND INCONSISTENCY**

In the case of a conflict or inconsistency between the terms of the Scheme and the terms of the Explanatory Statement, the terms of the Scheme will prevail.

**27    SEVERABILITY**

If at any time, any provision of the Scheme is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of that provision under the law of any other jurisdiction, nor the legality, validity or enforceability of any other provision of the Scheme under the law of that jurisdiction will in any way be affected or impaired thereby.

42

**28      ANNOUNCEMENTS**

The Company shall not, and shall procure that no member of the Group will, make any public announcement regarding the Scheme which names any DGHL Scheme Creditor (or from which the identity of a DGHL Scheme Creditor can be discerned) unless the contents of that announcement have been agreed in writing by such DGHL Scheme Creditor prior to the publication of that announcement.

**29      GOVERNING LAW AND JURISDICTION**

Without prejudice to the choice of law provisions in the Existing Notes Indentures with respect to the rights and obligations of the Existing Notes Trustee thereunder, the Scheme shall be governed by, and construed in accordance with, the laws of Bermuda. The Company, the Existing Notes Trustee, the Information Agent and each of the DGHL Scheme Creditors agree that, to the fullest extent permitted by applicable law, any dispute between them shall be determined by the Court.

**30      TAX TREATMENT**

The Company and each of the DGHL Scheme Creditors agree that the Scheme is intended to be adopted as a "plan of liquidation" for U.S. federal income tax purposes.

43

**IN THE SUPREME COURT OF BERMUDA**

**COMMERCIAL COURT**

**2023: No. 282**

**IN THE MATTER OF DIGICEL GROUP HOLDINGS LIMITED**

**AND IN THE MATTER OF SECTION 99 OF THE COMPANIES ACT 1981**

---

**SANCTION ORDER**

---



**CONYERS DILL & PEARMAN LIMITED**
**Clarendon House**
**2 Church Street**
**Hamilton, Bermuda**
**Attorneys for the Company**

**CRL/gm/374622/23239507**

Legal - 23239507.1

**<u>Exhibit 2</u>**

**Scheme of Arrangement Chairman's Report**

**IN THE SUPREME COURT OF BERMUDA**
**COMMERCIAL COURT**
**2023: No. 282**

**IN THE MATTER OF DIGICEL GROUP HOLDINGS LIMITED**

**AND IN THE MATTER OF SECTION 99 OF THE COMPANIES ACT 1981**

_____

**SCHEME OF ARRANGEMENT**
**CHAIRMAN'S REPORT**

_____

**INTRODUCTION**

1.    I, John Bosacco, am a Managing Director at DC Advisory. I was appointed by the Court, pursuant to an order made in this matter on 25 August 2023 (the "**Convening Order**"), to act as Chairman of two Scheme Meetings of creditors of Digicel Group Holdings Limited ("**DGHL**" or the "**Company**").

2.    A capitalised term used but not defined in this Chairman's Report has the meaning given to that term in the Explanatory Statement which was distributed to all Scheme Creditors on 28 August 2023 (the "**Explanatory Statement**").

3.    All references to the time of day in this Chairman's Report are to Eastern Standard Time.

4.    The Scheme Meetings were each summoned by a notice circulated on 28 August 2023 in the form contained in the Explanatory Statement (the "**Notice**") and in accordance with paragraph 5 of the Convening Order.

5.    I have been informed by Conyers Dill & Pearman Ltd ("**Conyers**"), Bermuda attorneys for the Company, that the Scheme and Explanatory Statement provided with the Notice were substantially in the form of the versions approved by the Courts on 25 August 2023. The Scheme and the Explanatory Statement were subsequently subject to certain revisions. I have been informed by Conyers that any material amendments will be brought to the attention of the Court at the Sanction Hearing.

6.    In accordance with paragraphs 3 and 4 of the Convening Order, the Scheme

Meetings took place on 25 September 2023 at the offices of Davis Polk and Wardwell LLP, 450 Lexington Ave, New York, NY 10017, United States.

7.  I hereby report to the Court the proceedings and the results of the Scheme Meetings.

**PROCEDURE AT THE SCHEME MEETINGS**

8.  Upon registration, each attendee who was to act as a proxy or duly authorised representative for a Scheme Creditor at the Scheme Meetings was issued with a poll card for voting purposes at registration.

9.  In accordance with the terms of the Order, the meeting of the holders of the Existing Unsecured Notes (the "**First Meeting**") commenced first and was formally opened at 4:05 pm and closed at 4.13pm. The meeting of the holders of the Existing Subordinated Notes (the "**Second Meeting**") followed the First Meeting and commenced at 4.30pm and closed at 4.40pm.

10.  At each of the Scheme Meetings:

  (a)  I proposed that observers remain for the duration of the meeting. No objections were raised to this proposal.

  (b)  I informed those attending of the number of DGHL Scheme Creditors appointing me as their proxy, and noted that the Scheme Meetings were therefore quorate.

  (c)  I explained that the Notice was issued to the DGHL Scheme Creditors on 28 August 2023 and appeared at Appendix 3 of the Explanatory Statement, and that such Notice should be taken as read. I advised the DGHL Scheme Creditors that copies of the Notice were made available for them to read at the Scheme Meetings upon request. No such request was made.

  (d)  I explained that a summary of the Group, its principal business operations, a market overview and the financial position of the Group are described in the Explanatory Statement. I also explained that a summary of the terms of the Restructuring, the principal ways in which the Scheme facilitates the Restructuring and the consequences of the failure of the Scheme is all set out in the Explanatory Statement. Following this, I invited those attending to raise any questions.

(e)     I submitted the following resolutions (the "**Scheme Resolutions**") to approve each Scheme:

> "*THAT this Scheme Meeting approves (in the present form or with, or subject to, any modification, addition or condition approved or imposed by the Court) the scheme of arrangement under sections 99 and 100 of the Companies Act 1981 of Bermuda between Digicel Group Holdings Limited and the DGHL Scheme Creditors as set out in the Explanatory Statement, a copy of which has been submitted to the Scheme Meeting and signed by the chairman of the Scheme Meeting for the purpose of identification.*"

(f)     I noted the requirement that, in order to be approved, each Scheme Resolution would require the support of a majority in number representing over 75% in value of each class of DGHL Scheme Creditors present and voting in each class.

(g)     I informed those attending of the instructions I had received from those Scheme Creditors for whom I had been appointed proxy.

(h)     I stated that pursuant to a discretion granted to me under the Convening Order, I would accept any legible emailed or submitted Ballots/Proxy forms for the purpose of the Scheme Meetings and was also at liberty to accept otherwise incomplete or late Ballots/Proxy forms at my discretion, provided that any such Ballots/Proxy forms were received before the meeting was closed.

(i)     I explained to the DGHL Scheme Creditors that the value of their Scheme Claims would be assessed for voting purposes in accordance with paragraph 15.2 of the Explanatory Statement.

(j)     I directed those attending acting as proxy or duly authorised representative for a Scheme Creditor to submit their duly completed poll card to the scrutineer of the meeting.

11.     Having concluded the business of each Scheme Meeting, I declared the relevant meeting closed. I explained that the result of the voting at the Scheme Meetings would be announced as soon as possible by the Company on the website set up by the Information Agent relating to the Schemes. No objections were raised to this approach at the Scheme Meetings.

Legal - 23289441.1

**D        OUTCOME OF VOTING**

12.    Following the Scheme Meetings, I have received a report from the representative of the Informational Agent who acted as scrutineer of the Scheme Meetings setting out the results of the Scheme Meetings.

13.    The votes cast at the Scheme Meetings in respect of the Scheme Resolutions are summarised below:

_Existing Unsecured Notes_

|  | Present and Voting (either in person or by proxy) | | Voted **FOR** the Scheme of Arrangement | | Voted **AGAINST** the Scheme of Arrangement | |
|---|---|---|---|---|---|---|
|  | No. of Creditor(s) | Amount of Claim ($) | No. of Creditor(s) | Amount of Claim ($) | No. of Creditor(s) | Amount of Claim ($) |
| Total | 137 | 375,090,137 | 137 | 375,090,137 | 0 | 0 |
| (%) | 100 | 100 | 100 | 100 | 0 | 0 |

_Existing Subordinated Notes_

|  | Present and Voting (either in person or by proxy) | | Voted **FOR** the Scheme of Arrangement | | Voted **AGAINST** the Scheme of Arrangement | |
|---|---|---|---|---|---|---|
|  | No. of Creditors | Amount of Claim ($) | No. of Creditors | Amount of Claim ($) | No. of Creditors | Amount of Claim ($) |
| Total | 126 | 185,405,374 | 126 | 185,405,374 | 0 | 0 |
| (%) | 100 | 100 | 100 | 100 | 0 | 0 |

14.    Percentage for and against figures are calculated by reference to those Scheme Creditors present and voting at the relevant Scheme Meeting.

**FIRST MEETING**

15.    I was appointed as proxy for 132 DGHL Scheme Creditors entitled to vote at the First Meeting. Of the 137 votes cast, all were in favour of the Scheme Resolutions, amounting to 100% of support in terms of numerosity and 100% in terms of value.

No votes were cast against the Scheme.

16.    By way of further analysis of the results of the First Meeting, 100% of members of the DGHL Ad Hoc Group and PCG Ad Hoc Group by value who voted, being 137 by number, approved the Bermuda Scheme. The members of the PCG Ad Hoc Group and DGHL Ad Hoc Group who voted amount to 85.63% of the total value of all claims within that description for which a vote might have been cast.

**SECOND MEETING**

17.    I was appointed as proxy for 121 DGHL Scheme Creditors entitled to vote at the Second Meeting. Of the 126 votes cast, all were in favour of the Scheme Resolutions, amounting to 100% of support in terms of numerosity and 100% in terms of value. No votes were cast against the Scheme.

18.    By way of further analysis of the results of the Second Meeting 100% of members of the PCG Ad Hoc Group and DGHL Ad Hoc Group by value who voted, being 126 by number, approved the Bermuda Scheme. The members of the PCG Ad Hoc Group and DGHL Ad Hoc Group who voted amount to 83.09% of the total value of all claims within that description for which a vote might have been cast.

**CONCLUSION**

19.    On the basis of the figures summarised in the table at paragraph 13 above, the Scheme was approved by a majority in number representing over 75% in value of DGHL Scheme Creditors present and voting at each of the Scheme Meetings summoned pursuant to section 99 of the Companies Act 1981.

20.    At the close of each Scheme Meeting I explained that the applications to the Bermuda Court to sanction the Scheme is scheduled to be heard at midday on 5 October 2023 that DGHL Scheme Creditors were entitled to appear and make representations at such hearings, should they wish to do so.

Signed:…………………………………..

John Bosacco

Chairman of the Scheme Meetings

09/28/2023

Legal - 23289441.1

## <u>Exhibit 3</u>

**First Affidavit of Jane Sullivan**

**IN THE SUPREME COURT OF BERMUDA**

**COMMERCIAL COURT**

**2023: No.282**

**IN THE MATTER OF DIGICEL GROUP HOLDINGS
LIMITED**

**AND IN THE MATTER OF THE COMPANIES ACT 1981**

—————————————

**AFFIDAVIT OF SERVICE OF
JANE SULLIVAN**

—————————————

First Affidavit of
Jane Sullivan
On behalf of the Petitioner
Sworn on 7⅛ September 2023

**IN THE SUPREME COURT OF BERMUDA**

**COMMERCIAL COURT**

**2023: No.282**

**IN THE MATTER OF DIGICEL GROUP HOLDINGS LIMITED**

**AND IN THE MATTER OF THE COMPANIES ACT 1981**

---

**AFFIDAVIT OF SERVICE OF**
**JANE SULLIVAN**

---

I, Jane Sullivan, of Epiq Corporate Restructuring LLC, 777 Third Avenue, New York, NY, HEREBY MAKE OATH and SAY as follows:

1.  I am Executive Vice President of Epiq Corporate Restructuring, LLC ("**Epiq**"), which was designated by Digicel Group Holdings Limited ("**Company**") as information agent (which role includes collecting and tabulating proxy appointments) ("**Information Agent**") in connection with the convening of two meetings ("**Scheme Meetings**") of two classes of certain of the Company's creditors ("**DGHL Scheme Creditors**") pursuant to section 99 of the Companies Act 1981 in connection with a scheme of arrangement proposed by the Company.

2.  The matters to which I depose herein when within my own knowledge are true, and where based on information provided to me, I believe such information to be true.

3.  Unless otherwise specified, terms used herein shall have the definitions set out in the First Affidavit of Lawrence Hickey dated 24 August 2023 ("**Hickey Affidavit**") filed in these proceedings in support of the Company's application for an order convening the Scheme Meetings.

4.  I now produce marked with the letters "**JS-1**" a paginated true bundle of documents to which I refer in this affidavit.  References to Tabs and page numbers, unless expressly stated otherwise, are references to the Tabs and page numbers of my exhibit.

**Practice Statement Letter**

5.  On 24 July 2023, Epiq served the Practice Statement Letter (exhibited at Tab 3 of the Hickey Affidavit on (1) The Depository Trust Company ("**DTC**") as depository and registered holder of the Existing Notes and (2) arranged for transmission to beneficial owners of Existing Notes through the record holders holding Existing Notes on behalf of such beneficial owners.

**Scheme Documents**

6.  On 28 August 2023, Epiq served the Scheme Documents (defined below) by email on DTC and on record holders holding the Existing Notes on behalf of beneficial owners of the Existing Notes as of 28 August 2023, as required by this honourable Court's order dated 25 August 2023 (the "**Convening Order**").

7.  For these purposes the documents served were: (i) the Scheme (Exhibited at page 77 of Tab 6 of the Hickey Affidavit) (ii) the Explanatory Statement (Exhibited at Tab 6 of the Hickey Affidavit), (iii) the Notice of Scheme Meeting (Exhibited at page 153 of Tab 6 of the Hickey Affidavit), and (iv) the Proxy Form/Ballot (Exhibited at page 139 of Tab 6 of the Hickey Affidavit) (together, the "**Scheme Documents**"). I understand that in each case, these documents were subject to immaterial amendments from their exhibited form. The final versions of the Scheme Documents sent to the DGHL Scheme Creditors is exhibited at Tab 1 of JS-1.

**Notice of Scheme Sanction Hearing**

8.  On 1 September 2023, Epiq served by email on DTC and on the relevant record holders a Notice of Scheme Sanction Hearing (the "**Notice of Hearing**") on the holders of the Existing Notes. The Notice of Hearing is at Tab 2 of JS-1.

| | |
|---|---|
| SWORN by the said | ) |
| JANE SULLIVAN | ) |
| On the 1ˢᵗ day of September 2023 | ) |
| the city of Croton-on-Hudson, NY | ) |

BEFORE ME:

Notary Public

DIANE M. STREANY
Notary Public, State of New York
No. 01ST5003825
Qualified in Westchester County
Commission Expires November 2, 2026

**IN THE SUPREME COURT OF BERMUDA**

**COMMERCIAL COURT**

**2023: No.282**

**IN THE MATTER OF DIGICEL GROUP HOLDINGS LIMITED**

**AND IN THE MATTER OF THE COMPANIES ACT 1981**

---

**EXHIBIT "JS-1"**

---

This is the exhibit referred to in the First Affidavit of Jane Sullivan dated 7ᵗʰ September 2023.

Notary Public

DIANE M. STREANY
Notary Public, State of New York
No. 01ST5003825
Qualified in Westchester County
Commission Expires November 2, 2026

TAB 1
(Intentionally Omitted)

**EXHIBIT "JS-1"**

**<u>TAB 2</u>**

Date:    1 September 2023

From:    Digicel Group Holdings Limited

To:       The DGHL Scheme Creditors (as defined in the Practice Statement Letter dated 24 July 2023)


**Notice of Convening Hearing**

Please be aware that the Sanction Hearing (as defined in the Practice Statement Letter issued on 24 July 2023) will take place at 12pm on Thursday 5 October 2023 at the Supreme Court of Bermuda.

**Further Information**

If you require any further information, please contact Epiq Corporate Restructuring, the Information Agent, at +1 646-362-6336 or by email at tabulation@epiqglobal.com (with "Digicel Holdings Group Limited" in the subject line).

The Information Agent has set up a scheme website at https://dm.epiq11.com/digicelgroup (the "Scheme Website") to further disseminate information about the Scheme to DGHL Scheme Creditors and to facilitate the implementation of the Scheme. DGHL Scheme Creditors may obtain access to the Scheme Website by emailing tabulation@epiqglobal.com, with reference to "Digicel Group Holdings Limited" in the subject line. DGHL Scheme Creditors must provide proof of their holdings to receive access to the Scheme Website. Once access is obtained, DGHL Scheme Creditors may download documents relating to the Scheme from the Scheme Website.